lease the property to another tenant, sell the property, or open another business with new investors. At that time, the debt appeared to have possible potential value.

At the time of the bankruptcy settlement in 1994, the Taxpayer did not receive funds. However, a later sale of the property might have resulted in funds being obtained by the Taxpayer at settlement of the sale. Therefore, due to its mortgage on the property and resulting status as a secured creditor, in 1994 the debt still had potential value to the Taxpayer.

Over time, the Taxpayer became aware of the extent of the severe damage to this property. Toxic chemicals were spilled on the floors, walls were falling in, and so on. This damage worsened over the years, as chemicals leached into the ground and the building continued to deteriorate. The Taxpayer owns three properties bordering on this property. The mortgaged property is upgradient from the properties owned by the Taxpayer and therefore could negatively impact the properties the Taxpayer owns. This created a dilemma:

1. If the Taxpayer foreclosed and became the property owner, it would become liable to EPA and EPD for the balance of the remedial costs the agencies had incurred (about 2 million dollars), plus it would be legally liable to complete required additional clean-up actions.[4] This environmental liability would be far more than the amount owed on the mortgage (less than 1 million dollars). In addition, if the Taxpayer became the owner it would become liable for outstanding real property taxes totaling more than $165,000 at the end of the year 2000.[5]
2. If the Taxpayer abandoned the mortgage, it would have no ability to control what happened to the property. This could negatively impact the bordering properties owned by the Taxpayer. It would not be wise for the Taxpayer to walk away and release its lien, because a new owner could make the pollution worse. If the Taxpayer released the lien and then wanted to sell its paper, title would be with the owners, who could then do anything they wanted with the property.
3. If the Taxpayer continued to hold the mortgage, it still might receive little or no funds. (Under the laws in effect at that time, any new owner would have been liable on the liens, including the informal liens representing additional amounts spent by EPA and EPD.) On the other hand, by holding the mortgage the Taxpayer would have some leverage in what happened to the property, as the property could not be sold without the Taxpayer's agreement to release the mortgage.

The Taxpayer reasoned that if the current owners satisfied the judgments against them from the agencies, there was a possibility of at least partial recovery by the Taxpayer if the property was later sold. This favored the third option. In addition, the third option provided some protection to the adjacent properties the Taxpayer owned. Therefore, the Taxpayer determined that it was best to continue to hold the mortgage.

When the corporation ceased to exist in the mid-1990s, the Taxpayer was in the position of having no legitimate borrower to go to for payment on the mortgage because the mortgage was an *in rem* document (that is, non-recourse, with no personal liability by the individuals). Its only hope was to get at least partial payment at the closing of a sale arranged by the owners or by the Taxpayer on their behalf.

Accordingly, the Taxpayer elected to continue to hold the mortgage and try to get the property sold to someone who would agree to clean it up. In the late 1990s, the Taxpayer attempted to facilitate a deal where it would sell the three properties it owned along with its note on the mortgaged property. (The

---

[4] The government agencies have pressured the Taxpayer to assume clean-up obligations as a responsible party; however, because the Taxpayer did not foreclose and does not hold title, it has so far successfully argued that it is not liable to do so.

[5] The outstanding real property taxes exceeded $225,000 as of the end of the calendar year 2005.

mortgage would likely be sold for $1. The buyer would then foreclose on the mortgage and would own the property.) Because of a 1997 law[6] allowing a current tax deduction for environmental remediation costs ("brownfields") that would otherwise be required to be capitalized, this type of deal appeared to be possible. The Taxpayer located at least three interested parties in 1999, but none of the negotiations resulted in a completed sale. (Even with post-2000 passage of additional brownfield laws facilitating environmental clean-up and limiting purchaser liability if certain corrective actions are taken, to date a buyer has not been located despite repeated and ongoing attempts to do so.)

In September 1999, Nasaro and shareholder Robert Milgroom were notified by EPA that the property was to be sold at its true market value and that all net proceeds were to be turned over to EPA, finalizing an earlier proposed settlement. On January 2, 2000, under an agreement entered into by EPA and Sun Labs President Yoram Fishman, Fishman was to pay $50,000 to the EPA, thereby settling his obligations to the EPA. Both of these settlement agreements (consent decrees) were published, stating in the Nasaro agreement that the EPA was to retain proceeds of any sale, and in both agreements that the settling parties received "contribution protection," preventing later suits by any party against them to collect "response costs" at the site. As the result of these agreements, neither EPA nor EPD had further recourse against Nasaro or against Milgroom or Fishman personally, and both EPD and the Taxpayer are prevented from suing the owners for environmental remediation costs. (EPA reserved its right to sue until Fishman's performance by payment of the amount due January 2, 2000.)

Because of the publishing of the consent decree including the provision that EPA is to retain the net proceeds of any sale, EPA has an argument that is has a lien on the property. With respect to the EPD lien, EPD employees continue to state that they intend to record the lien for the additional $1,150,796.96. There is no statute of limitations that would prevent EPD from doing so. Even if the Taxpayer was able to establish that its liens are superior, the very fact of the existence of the liens has made finding a willing buyer very difficult. Even without formal liens, extensive efforts to sell have been futile.

Based on the documents available in the year 2000, both EPA and EPD had informal liens, which they could have converted into formal liens: EPA in the amount of $820,942.33, and EPD in the additional amount of $1,150,796.76. There did not appear to be any case law that addressed the priority of these liens, and the Taxpayer expected that both EPA and EPD would argue that their claims were superior to the Taxpayer's. Although the consent decrees did not result in a meaningful difference in the dollar amounts the EPA would receive because of the probability that there would not be any proceeds, they did support EPA's argument that EPA would have a superior claim to the Taxpayer's in the event that any funds might be available. Therefore, performance under the Fishman/EPA settlement agreement in the year 2000 extinguished any possibility that the Taxpayer could obtain any proceeds from a sale of the mortgaged property.

As of September 2004, for real property tax purposes the property had an assessed value of $362,200 and a current fair market value of $905,500, per the Tax Commissioner of Fulton County, Georgia, without consideration of any of the claims against the property. This results in the following[7]:

---

[6] Taxpayer Relief Act of 1997, P.L. 105-34.

[7] Although the fair market value used for the following illustration is from 2004, it is included here as an approximation of value in the year 2000. Any increase in value due to inflation from 2000 to 2004 would have been offset by the increasing deterioration of the building. This value is useful as an estimate but is not presented as an exact determination of the property's fair market value.

| | |
|---|---|
| Fair market value as determined by taxing authority | $905,500.00 |
| Liability to EPA | (820,942.33) |
| January 2, 2000, payment to EPA by Fishman (reducing total amount due to EPA) | 50,000.00 |
| EPD lien (not including additional expenditures of $1,150,796.76) | (137,463.20) |
| Net value after paying EDP/EPA if sold at Tax Commissioner's fair market value | ($2,905.53) |

This amount does not include the additional clean-up costs an owner would have to incur to use the property, the expense of making the building usable, the delinquent real property taxes of more than $165,000, or the additional informal EPD lien.

The Taxpayer determined that the debt was wholly worthless as of January 2, 2000. The adjusted basis, determined as follows, was deducted in the tax year 2000 in the amount of $914,068:

| | |
|---|---|
| Principal balance | $643,805.16 |
| Insurance | 6,991.00 |
| Title work | 500.00 |
| Environmental due diligence | 112,860.02 |
| Miscellaneous | 131.80 |
| Structural report | 1,200.00 |
| Legal expenses | 148,579.69 |
| Total | $914,067.67 |

As of October 2007, the note had not been sold. Under permission and direction from the EPA and EPD, the Taxpayer (through an LLC Principal created) hired a contractor to demolish the building, remove debris and overgrown landscaping, and haul away the empty tanks. The Taxpayer will not incur additional risk or liability for conducting this work on the site. When demolition is complete, the Taxpayer has some reporting requirements to the EPD, and then the Taxpayer will package the three adjacent properties along with the Sun Labs note, to market them all for sale. The Taxpayer does not expect to receive more than a token remuneration for the Sun Labs note; however, enhancing that property should help to sell the adjacent properties that the Taxpayer owns. The purchaser can then foreclose on the note and take action on the group of properties as a whole.

The district director of the Service disallowed the tax year 2000 deduction upon audit.

ANALYSIS

Internal Revenue Code (IRC) § 166(a)(1) provides for a deduction for a debt that becomes wholly worthless within the taxable year.[8] A business bad debt owed to a corporation may be taken in the amount of the adjusted basis[9] as an ordinary deduction (rather than as a capital loss[10]).

To support a deduction for a bad debt, the Taxpayer must show the existence of a bona fide business debt, the adjusted basis of the debt, and that the debt became worthless during the tax year of the deduction.

*Bona Fide Debt*
A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.[11] The debt in question arises from a mortgage loan. The bona fide nature of the debt is not in question.

[8] All references are to the Internal Revenue Code of 1986, as amended.
[9] IRC § 166(b).
[10] IRC § 166(d).

*Business Debt*
Debts of corporations are business debts. Non-business debt provisions apply only to taxpayers other than corporations.[12] The mortgage in question is held by Principal Life Insurance Company, a corporation doing business as an insurance company. Accordingly, the debt in question is a business debt.

*Adjusted Basis*
The basis for determining the amount of deduction under § 166 in respect of a bad debt is the same as the adjusted basis prescribed by Treasury Regulation § 1.1011-1 for determining the loss from the sale or other disposition of property.[13] As applicable in this instance, the original basis must be decreased by payments of principal received on the mortgage and must be increased by charges such as legal fees and other expenditures properly chargeable to the capital account.[14] The Taxpayer properly charged its due diligence and legal costs to the capital account, adding them to the adjusted basis of the mortgage. The district director did not argue that any part of the deduction is improperly included; therefore, the amount of the deduction, $914,068, is not in issue.

*Worthlessness During the Taxable Year*
The remaining requirement, worthlessness within the taxable year, is the only item disputed by the Service. For the protective claim for the year 2002, the Taxpayer must establish that the debt had value on January 1, 2002, and that by December 31, 2002, it no longer had any value.[15]

In determining whether a debt is worthless in whole or in part the district director must consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.[16] Legal action by the creditor against the debtor is not required; where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under IRC § 166.[17]

Whether a debt has become wholly worthless within a given taxable year is a question of fact. The Service cites *Hubble v. Commissioner*,[18] for the proposition that an identifiable event must take place to determine that the asset lacks value or has had a decline in value. However, *Hubble* actually states the following:

> Often, a showing that some identifiable event occurred during the course of the year will effectively demonstrate the absence of potential value, but such showing is not indispensable.[19]

In *Riss v. Commissioner*,[20] the Eighth Circuit Court of Appeals provides the following rules (citations omitted):

---

[11] Treas. Reg. § 1.166-1(c).
[12] IRC § 166(d).
[13] Treas. Reg. § 1.166-1(d).
[14] Treas. Reg. § 1.1016-2.
[15] The issue of partial worthlessness was not raised by the Service or by the Taxpayer. The Taxpayer did not charge off any portion of the debt on its books prior to the year 2000.
[16] Treas. Reg. §1.166-2(a).
[17] Treas. Reg. §1.166-2(b).
[18] T.C. Memo 1981-625.
[19] *Fox v. Commissioner*, 50 T.C. 813 (1968).
[20] 478 F.2d 1160, 1166 (8th Cir. 1973).

> The proper test to be used in determining the worthlessness of a debt is the exercise of sound business judgment, and there is no black rubric standard. If collection seems hopeless to a reasonable man knowledgeable in the field of business, a deduction is justified. .... In assessing the worthlessness or value of a debt, all of the pertinent evidence including the value of the collateral, if any, securing the debt and the financial condition of the debtor are to be considered.

In the context of § 166, "worthless" means lack of potential value as well as current liquid value. Events that form the basis of reasonable grounds for abandoning any hope of future recovery provide an objective standard for determining worthlessness.[21] In *Hubble*, the Tax Court stated that the "exercise of sound business judgment based upon as complete information as is reasonably obtainable" is to be used in considering whether a debt is worthless.

In *Crown v. Commissioner*,[22] the Tax Court held that the correct year for the deduction was the year in which the parties acknowledged that further efforts to recover would be futile. A change to an agreement was sufficient to warrant treating the debt as worthless in that year.

Taken together, these rules require that a taxpayer evaluate all relevant circumstances in determining whether a debt has become worthless.

Value as of January 1, 2002

Where a business has failed or a bankruptcy occurred, often a debt would be worthless.[23] In this case, the Taxpayer held a mortgage on real property that was not part of the bankruptcy estate, so it would have been inappropriate to consider the debt worthless while there was a meaningful possibility that the property could be sold and the Taxpayer could receive some payment on the mortgage. Under the test of the Eighth Circuit, the value of this collateral must be considered. Therefore, the 1991 business failure and the 1994 bankruptcy settlement were not sufficient to support a finding of worthlessness. The mortgage represented "potential value" of the debt.

During the year 1999, the agreements that Milgroom and Fishman entered into relieved them of further personal liability to the EPA. However, because the agreement with Fishman reserved the right of the EPA to sue him in the event that he did not make the agreed-upon payment on January 2, 2000, during 1999 there was still a possibility that Fishman might be required to assume more than the $50,000 called for in the agreement. Consequently, on December 31, 1999/January 1, 2000, the Taxpayer determined that the debt still had "potential value," and the debt was not written off for the tax year 1999.

During the year 2000 performance on the Fishman settlement agreement occurred, extinguishing any hope that Fishman would have any further liability or make any further contribution to the environmental remediation costs. The Taxpayer does not have a good argument for showing that the debt had any value by December 31, 2000. This protective claim for a deduction in the year 2002 is being filed in the event that the Service determines that the debt did have value at that time.

Worthlessness During the Year 2002

This debt did not mature until the year 2004. However, Treasury Regulation §1.166-1(c) provides that the fact that a bad debt is not due at the time of deduction shall not of itself prevent its allowance under

---

[21] *Hubble, supra.*

[22] 77 T.C. 582 (1981).

[23] Bankruptcy is generally an indication of the worthlessness of at least a part of an *unsecured* and unpreferred debt. Treas. Reg. § 1.166-2(c)(1).

IRC § 166. If the facts point to worthlessness before the due date, the Taxpayer need not wait until the debt becomes due.

The Taxpayer does not have a good argument for showing that the debt had any value on December 31, 2001/January 1, 2002, and that such value had disappeared by the end of 2002. This protective claim for a deduction in the year 2002 is being filed in the event that the Service determines that the debt had value at the beginning of 2002. The Taxpayer believes that it had no remaining actual or potential value either at the beginning or at the end of 2002.

*Statute of Limitations*
IRC § 6511(a) provides that in general a claim for refund (or credit) shall be filed within the later of 3 years from the time the return was filed or 2 years from the time the tax was paid. Under IRC § 6511(b)(2)(A), where the claim is filed within the 3-year period, the refund shall not exceed the tax paid within 3 years preceding the filing of the claim, plus the period of an extension of time for filing the return. Under IRC §6511(b)(s)(B), where the claim is not filed within the 3-year period, the refund is limited to the portion of the tax paid during the 2 years preceding the filing of the claim.

IRC § 6511(d)(1)(A) provides that, notwithstanding the above, if a claim for refund relates to an overpayment of tax on account of deductibility of a debt which became worthless, then in lieu of the general 3-year period of limitation for filing a claim, the period shall be 7 years from the date prescribed by law for filing the return for the year with respect to which the claim is made.[24] In such case, the amount of the refund may exceed the portion of the tax paid within the 3-year or 2-year period prescribed in subsection (b)(2), described above, to the extent of the amount of the overpayment attributable to the deductibility of the worthless debt.

The date prescribed by law for filing the Taxpayer's return for the year 2002 was March 15, 2003. A claim for refund that relates to an overpayment due to deductibility of a worthless debt must be filed by March 15, 2010. This claim for refund was filed by the Taxpayer on or about October 31, 2007. Accordingly, to the extent of the amount of the overpayment attributable to the worthless debt in the amount of $914,068, the Taxpayer's claim for refund for the tax year 2002 may be allowed and paid in addition to the total amount claimed by the Taxpayer within the periods described in the general rules.

CONCLUSION

The deduction should be allowed in the tax year 2000 in the amount of $914,068. In the alternative, the deduction should be allowed in the year 1999 or 2001. This protective claim for the year 2002 is being filed in the event the Service determines that the debt still had value at the end of the tax year 2001 and the beginning of the tax year 2002.

[24] For this purpose, the date prescribed by law for filing the return is determined without regard to any extension of time for filing the return. Reg. § 301.6511(d)-1(a)(1).

# TAB 8

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

CAPITAL LOSS ON TRANSFER OF SECURITIES TO WIND RIVER

2002 - $77,895,426

The Revenue Agent's Report disallowed Principal Life Insurance Company's ("Principal Life") claimed capital loss of $222,558,360 in 2002 upon transfer of certain distressed securities to a corporation called Wind River. However, because Wind River itself sold many of the same securities in 2003, a capital loss of $165,846,299 was allowed in that year. Therefore, this issue boils down to a net disallowance of $56,712,061 plus a timing difference of one year on $165,846,299.

## I. Additions/Corrections to Statement Of Facts.

The following represents additions and/or corrections to the statement of facts presented in the Revenue Agent's Report ("RAR"), which is incorporated herein by reference.

Principal Life is the ninth largest life insurance company in the United States. At the end of 2001 its assets exceeded $75 billion. Financial strength and liquidity are critical in order for Principal Life to maintain its competitive position and, accordingly, the company aggressively monitors the credit exposure of its fixed maturity portfolio.

During 2002, Principal Life, like many large financial services companies, recognized higher than normal investment losses as a result of difficult credit market conditions. During the year, the credit quality of the company's fixed maturity investment portfolio declined significantly. At December 31, 2002, only 91 percent of Principal Life's fixed maturity securities were investment grade, down from 93 percent a year earlier.

Through its continuous monitoring of its investments, Principal Life identified a portfolio of non-investment grade fixed maturities (the "Securities") with significant upside potential. Many of the Securities were private placements for which no active trading market existed. Principal Life was interested in improving the liquidity of the Securities while preserving the future upside potential of these assets. In a November 7, 2002 memorandum by Principal Life's investment managers seeking the approval of the company's Investment Committee, in which no tax considerations of any kind were mentioned, it was stated:

> Most of the impaired debt securities are not actively traded since they are in default and their value is difficult to determine. Since an active market does not exist this pool of assets has limited liquidity, PLIC [Principal Life] is interested in improving the liquidity of this

portfolio without sacrificing a material amount of any possible future recovery.

On December 19, 2002, Wind River Corporation ("Wind River") was formed upon the filing of a certificate of incorporation with the state of Delaware. The certificate authorized the issuance of 318,329 shares, consisting of 144,401 shares of common stock and 173,928 shares of preferred stock. The preferred stock consisted of two separate classes, 16,045 shares of Class A ("Class A preferred") and 157,883 shares of Class B ("Class B preferred"). Control of Wind River is shared between the holders of common stock and Class A preferred, each class voting separately in the election of one of the corporation's two directors. Except for certain protective rights, the Class B preferred is nonvoting.

Each share of preferred stock is entitled to a $1,000 liquidation preference. Dividends accrue at annual rates of 8.34 percent on Class A preferred and 8.75 percent on Class B preferred. The liquidation and dividend preferences granted to Class A preferred rank senior to the preferences of the Class B preferred. Shares of Class B preferred are not entitled to any additional dividend rights. Shares of Class A preferred, on the other hand, participate ratably on a share for share basis with shares of common stock as to the payment of dividends and distribution of assets in liquidation.

Also on December 19, 2002, subsequent to the filing of the certificate of incorporation, but prior to the issuance of any stock, Principal Life entered into a purchase and sale agreement to sell all of the Class A preferred to North Pine Finance, Inc., a Delaware corporation ("North Pine"). The purchase and sale agreement was binding on both parties but conditioned upon the transfer by Principal Life of the Securities to Wind River in exchange for the issuance of the Class A preferred stock.

Then, pursuant to an exchange agreement dated December 20, 2002, Principal Life transferred to Wind River cash in the amount of $2,000,000 and Securities having a cost basis of $362,897,222 and a fair market value of $140,338,874. In exchange, Principal Life received from Wind River all of its common stock, all of its Class A preferred, and 118,272 shares of Class B preferred. Immediately after the exchange, the relative values of the three classes of capital stock received by Principal were as follows:

| | | | |
|---|---|---|---|
| Class A Preferred | 16,045 shs | $16,044,584 | 11% |
| Class B Preferred | 118,282 shs | $118,271,988 | 83% |
| Common | 144,401 shs | $8,022,290 | 6% |
| Totals | | $142,338,862 | 100% |

Immediately upon receipt of the Class A preferred, pursuant to the terms of the purchase and sale agreement, Principal Life transferred all of the Class A preferred to North Pine in exchange for $16,044,584 in cash. At or about the same time, Principal Life also transferred the

remaining Wind River capital stock received in the exchange to its wholly owned subsidiary, Principal Holding Company ("PHC").

At the time of the exchange, the financial growth of Wind River was projected to exceed the required fixed dividend accruals on the Class A preferred and the Class B preferred by more than a nominal amount so as to generate profits that would be shared by the Class A preferred and the common stock through additional dividends or liquidation distributions.

Principal Life developed and implemented the plan involving Wind River and its distressed securities primarily for valid business reasons consistent with its investment operations, including the following:

- Improved Liquidity - The securitization of the distressed securities provided Principal Life with $16 million in cash from an otherwise illiquid pool of impaired high yield assets. The presentation of the proposal to the company's Investment Committee also noted that part or all of the Class B shares might be marketed to third parties for up to an additional $40 million.

- Future Appreciation - Principal Life desired to retain a participation in the expected future market appreciation based on the internal valuation of these assets. Its internal analysis had determined that the markets had overreacted during 2001 and 2002 leading to a severe decline in the market values of these assets.

- Cost of Capital - The cost of capital was determined to be less than the potential yield of the distressed asset portfolio (the potential yield was estimated at 24% versus 11.5 % cost of capital expected for the Class A preferred).

- Improved Financial Statements - By contributing its investment in Wind River downstream to its wholly-owned subsidiary, PHC, which already owned most of the other subsidiaries of Principal Life, Principal Life was able to remove the impaired securities from its GAAP financial statements and from its NAIC Annual Statement, thereby simplifying some of the required reporting to the Securities Valuation Office of the NAIC. At the same time, Principal Life was able to protect those financial statements from risks associated with continued retention of such securities, such as the risk of additional losses due to previously undetected securities fraud.

## II. Law and Analysis.

### A. The Conditions For Application Of Section 269 Are Not Present.

The RAR's first and primary basis for disallowance of the capital loss in 2002 (p. 207) is that the capital loss should be disallowed under Section 269 because the formation of Wind River represents an "acquisition made to evade or avoid income tax" with no real business purpose. This position appears abandoned in 2003, however, since the RAR allows a capital loss

of $165,846,299 in 2003 arising from Wind River's disposition in that year of many of the securities transferred to it by Principal Life.

Section 269 can only be applied in 2002, however, if all three conditions specified in the statute are present:

(1) an acquisition of control has occurred,
(2) as a result of such acquisition of control, the taxpayer has secured the benefit of a deduction, credit, or other allowance it would not otherwise have enjoyed, and
(3) the taxpayer's principal purpose for the acquisition was evasion or avoidance of federal tax.

While Principal Life concedes that, even after disregarding the Class A preferred stock that was immediately transferred to North Pine, Principal Life owned more than 50% in value of Wind River's capital stock, thus meeting the definition of "control" under Section 269, it is because neither the second nor the third condition is satisfied that this statutory provision has no application in this case.

**(1) Principal Did Not Obtain A "Deduction, Credit, Or Other Allowance" It Would Not Have Otherwise Enjoyed.**

The second condition is not met because Principal Life could have achieved its objective without the acquisition of control of Wind River. To the extent that there were other feasible alternatives that would have provided the same tax benefits, or the tax benefit did not arise as a consequence of the acquisition of control, section 269 is inapplicable.

In *Cromwell Corp. v. Comm.*, 43 TC 313 (1964), four individuals formed a corporation ("Cromwell") that purchased all the stock of another corporation ("Cornwell") that became its subsidiary. The purchase was partially financed by a loan obtained by Cromwell. After the purchase, Cornwell obtained a new loan and distributed the proceeds to Cromwell, which used the funds to repay its earlier acquisition loan. The corporations elected to file a consolidated return so that the distribution to Cromwell was eliminated in consolidation rather than being taxed as a dividend. The Service argued that the purpose of the transaction was to allow a tax-free dividend from Cornwell to Cromwell, and sought to disallow the filing of a consolidated return under the authority section 269. The court noted that there were several alternative methods the taxpayer could have used to obtain similar tax results. The court, therefore, held in favor of the taxpayer on the ground that the taxpayer had not obtained a tax benefit that it would not otherwise enjoy:

> Thus, the third element of section 269 requires an examination of the alternatives available to the taxpayers. Petitioners contend, and we agree that since the benefits received would have been enjoyed by means of the suggested alternatives, section 269 does not proscribe the use of a consolidated return. Viewed separately, petitioners' use of a consolidated return does not contravene

> any specific section of the code. When viewed together with the alternatives available to petitioners, it does not contravene section 269. *Id.* At 320.

In *Commodores Point Terminal Corp. v. Comm.*, 11 TC 411 (1948), an individual owned the majority of the stock of a corporation (Corp) that needed additional capital. The individual transferred to Corp a controlling (58 percent) interest in another corporation, Piggly Wiggly. Piggly Wiggly then paid a dividend to Corp that was subject to a dividends received credit. The Service argued that the dividends received credit was not allowed because the principal purpose of Corp's acquisition of control of Piggly Wiggly was to secure the benefit of the dividends received credit. The Tax Court disagreed. It held that although the principal purpose for the acquisition in this case was not federal income tax avoidance, section 269 was also not applicable because Corp's receipt of the credit was not dependent upon an acquisition of control of Piggly Wiggly:

> The dividends received credit claimed by petitioner in its 1944 return was in no sense dependent upon petitioner's acquisition of a controlling interest in the Piggly Wiggly corporation. Petitioner would have received dividends and would have been entitled to claim a dividends received credit proportionately as great from any number of shares less than an amount constituting a controlling interest. *Id.* At 417

The Tax Court also held that "[t]he word 'otherwise' [in Section 269(a)]can only be interpreted to mean that the deduction, credit, or other allowance, if it is to be disallowed, must stem from the acquired control."

*Cromwell* and *Commodores Point* together stand for the proposition that a determination of whether a taxpayer has secured a benefit that would not otherwise have been enjoyed necessarily requires two inquiries. First, an examination must be made of the alternatives available to the taxpayer to achieve his ends, and second, the facts of the case must be studied to determine whether the benefits derived "stem" from the acquisition of control of the corporation. If it is determined that other alternatives yield the same results, and/or the acquisition could have yielded the same results whether or not control of a corporation was acquired, section 269 does not apply. *See also, Zanesville Inv. Co. v. Comm.*, 335 F.2d 507 (6th Cir. 1964) (post-affiliation losses could not be denied under Section 269).

In this case, Principal Life enjoyed one tax benefit as a result of its acquisition of control of Wind River. That benefit is the ability of Principal Life to recognize losses relating to the Securities. However its ability to recognize those losses in the Securities was not dependent upon its acquisition of control of Wind River and could have been achieved by other means. In fact, Principal Life's acquisition of control of Wind River was irrelevant to recognition of the losses by Principal Life. If Principal Life were to have transferred the Securities to an unrelated entity for a less than controlling interest in that entity, or if Principal Life had co-transferors to Wind River who also sold the stock they received pursuant to a pre-existing obligation, as did

Principal Life, then in both instances Principal Life could have obtained the same benefit without the acquisition of control.

Finally, Principal Life could obviously have obtained the tax benefit incident to recognition of the losses if it had sold the Securities itself, rather than transferring them to Wind River in exchange for control of Wind River. It is true that in such a scenario, Principal Life would not have preserved for itself the upside potential it believed was inherent in the Securities, but preservation of that upside potential through the Wind River transaction was not a tax benefit, i.e., "a deduction, credit, or other allowance," it would not have otherwise enjoyed within the meaning of Section 269. *Alinco Life Ins. Co. v. U.S.*, 373 F.2d 336 (Ct.Cl. 1967) (Section 269 could not be used to deny taxpayer the status of a life insurance company); *Cromwell Corp. v. Comm., supra* (the privilege of filing consolidated returns was not a "deduction, credit, or other allowance" within the meaning of Section 269); *Nutt v. Comm.*, 39 T.C. 231 (1962), *acq.* 1964-2 C.B. 6 (corporation's existence, which IRS sought to disregard under Section 269, was not a "deduction, credit, or other allowance" within the meaning of that section); *Siegel v. Comm.*, 45 T.C. 566 (1966).

Thus, it was not necessary for Principal Life to acquire control of Wind River to obtain the benefit of transferring the Securities to Wind River in a taxable transaction. It is because the acquisition of control was not necessary for the federal tax benefits to be obtained that the second requirement for the application of section 269(a)(1) is not satisfied.

**(2) Proper Investment Management Was The Principal Purpose Of The Wind River Transaction.**

The facts show that Principal Life had a number of reasons for entering into the transactions with Wind River and North Pine. First, Principal Life improved its liquidity. It received more than $16 million in cash for the Wind River stock it sold to North Pine, and had the ability to sell additional stock if market conditions appeared favorable. Principal Life's rating had been reduced by Moody's Investor Services in 2002 and the rating agencies had expressed some concerns about the company's liquidity ratios. Thus the transactions with Wind River and North Pine provided ready cash and improved liquidity in exchange for impaired securities, the sale of which may have been difficult and disadvantageous (e.g., at fire sale prices).

Second, Principal Life concluded that the cost of capital of the stock sold to North Pine was less than the expected return of the underlying assets. In other words, Principal Life calculated the cost of acquiring the $16 million from North Pine and determined that the cost was less than the expected return on the assets held by Wind River.

Third, and also very important, the transactions with Wind River and North Pine permitted Principal Life to retain a large portion of the benefit of any favorable returns from the impaired assets, in contrast to a direct sale of the securities to an unrelated party. Principal Life possessed considerable experience with impaired assets. In 1989, 1990 and 1991, Principal Life purchased trust certificates involving impaired assets from Prudential and realized gains

exceeding $40 million. The Company recognized that impaired assets were difficult to value and that the market often undervalued such assets due to the lack of adequate public information regarding the financial position of the issuer as well as challenging and thinly traded market conditions

Fourth, the transactions with Wind River, North Pine and Principal Holding Company resulted in the removal of the impaired assets from the NAIC Annual Statements of Principal Life. In addition, although PHC, a subsidiary of Principal Life, retained a substantial portion of the economic risks and rewards of ownership of the impaired securities by holding the Wind River stock, Principal Life reduced the number of impaired assets reported on its GAAP financial statements, which it considered beneficial in light of the close scrutiny of life insurance companies as a result of the economic problems that followed the collapse of the tech boom and the attacks on the World Trade Center and the Pentagon in 2001.

In these circumstances, therefore, Section 269 is inapplicable. *Commodores Point Terminal Corp. v. Comm.*, 11 T.C. 411, 418 (1948) ("a tax avoidance purpose incidental to the transaction does not necessarily bring it within the condemnation of Section [269]"); *Alcorn Wholesale Co. v. Comm.*, 16 T.C. 75 (1951) (*held:* even where tax avoidance is admittedly present, Section 269 is not invoked unless it was the principal purpose); *Bijou Park Properties, Inc. v. Comm.*, 47 T.C. 207 (1966) (even though lawyer and CPA were consulted regarding favorable tax aspects, principal purpose of transaction was not tax avoidance); *Princeton Aviation Corp v. Comm.*, T.C. Memo 1983-735 (*held:* where principal purpose of transaction involved valid business reasons, awareness of the tax benefits arising from them does not disqualify one from using them); *D'Arcy-MacManus & Masius, Inc. v. Comm.*, 63 T.C. 440 (1975) (*held:* to constitute the principal purpose under Section 269, tax avoidance must outrank or exceed in importance any other single purpose); *VGS Corp. v. Comm.*, 68 T.C. 563, 596 (1977)("[c]omplicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or other tax benefits] to be nothing more than prudent business planning"); *U.S. Shelter Corp. v. U.S.*, 13 Cl.Ct. 606, 625 (1987) ("The principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences"); *American Processing and Sales Co. v. U.S.*, 371 F.2d 842 (Ct.Cl. 1967) (labor reasons, not tax reasons, were principal purpose of acquisition of corporation); *Bobsee Corp. v. U.S.*, 411 F.2d 231 (5th Cir. 1969) (*held:* in determining principal purpose, the nontax motives as a class are compared to the tax motives as a class).

This issue presents the classic case of proper tax planning versus improper tax avoidance. *Gregory v. Helvering*, 293 US 465 (1935), of course, stands for the proposition that every taxpayer has the right to plan his affairs in such a way as to minimize his taxes. *See also, U.S. v. Isham*, 84 U.S. 496 (1873); *U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Comm. v. Newman*, 159 F.2d 848, 850-851 (2nd Cir. 1947, Judge Learned Hand, dissenting). Other courts have held that taxpayers would be foolish to ignore the tax consequences of major transactions. *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 580 (1977).

Accordingly, contrary to the position the RAR appears to have adopted ("the parties were . . . well-prepared in tax avoidance." RAR, p. 210), not all tax minimization is nefarious. The individual investor who sells his appreciated security on the 366th day, so as to cause the capital gain to be taxed as long-term rather than short-term, has engaged in tax planning that is universally recognized as proper. The result should be the same when a sophisticated taxpayer such as Principal Life, with $75 billion in invested assets and highly educated and trained people managing them, structures a transaction undertaken for valid business purposes in such a way as to minimize its corporate taxes.[1] According to Judge Trask of the Ninth Circuit Court of Appeals, "[i]n the complexity of today's business and tax jungle, a corporate president who does not obtain tax advice before an acquisition, or merger or substantial dollar transaction ought to be fired." *Brumley-Donaldson Co. v. Comm.* 443 F.2d 501, 510 (9th Cir. 1971) (Trask, J. , dissenting).

**B. North Pine's Payment To Principal Life For Wind River's Class A Preferred Stock Was Not A Loan By North Pine To Wind River.**

The RAR's secondary position (p. 209) is that, under the substance over form doctrine, the purchase from Principal Life by an unrelated third party, North Pine Finance (a subsidiary of Deutsch Bank), of the Wind River Class A preferred stock that Principal Life had acquired in the capitalization of Wind River was not really a purchase by North Pine of Wind River's equity but was, instead, a loan by North Pine to Wind River. Therefore, according to the RAR, after reclassifying the Class A preferred stock as debt, Principal Life owned more than 50% of the equity of Wind River and in such circumstances Section 267(b)(3), which requires deferral of a loss on a transaction between two corporations that are members of the same controlled group, applies to require that the 2002 capital loss on Principal Life's transfer of the distressed securities to Wind River be deferred until such securities were transferred outside the controlled group (which in fact occurred in 2003).

Section 267(f) states that "controlled group" has the same meaning as under Section 1563(a), except that "more than 50 percent" is substituted for "at least 80 percent." But Section 1563(a) also defines what "stock" is to be taken into account for purposes of such determination. And under Section 1563(c)(1)(A), "nonvoting stock which is limited and preferred as to dividends" is not included. Since the Wind River Class B preferred is limited to a fixed annual dividend that is preferred over the participating dividend rights of the Class A preferred and the common stock, the Class B preferred is excluded in determining whether Principal Life owned more than 50% in voting power or value of Wind River.

But it remains unclear whether the revenue agent is asserting (1) that because the transaction with North Pine was an alleged loan, the Class A preferred stock should be treated as

---

[1] Nor should either Principal Life or the transaction at issue be tainted, as the revenue agent attempts to do, with "guilt by association" as a result of the subsequent well-publicized difficulties of KPMG.

a note or otherwise nonexistent so that Principal is deemed to own more than 50% (i.e., 100%) in voting power and value of Wind River by virtue of its ownership of the common stock, or (2) that because the transaction with North Pine was an alleged loan, Principal is deemed to never have parted with the Class A preferred stock and is considered to still own it for purposes of determining whether it owns more than 50% (again, 100%) in voting power and value of Wind River. This would be a distinction without a difference, however, since under both scenarios Principal Life would be deemed to own 100% of the voting power (either by virtue of its common stock being the only class of voting stock outstanding, or by virtue of its owning both the common stock and the voting Class A preferred stock), and 100% of the total value of all classes of stock. Consequently, the only real issue with respect to this secondary position is whether, under the substance over form doctrine, North Pine's purchase of the Class A preferred was in reality a loan rather than a purchase of stock, for if it was in reality a purchase of the Class A preferred Principal would not own "**more** than 50%" of the equity of Wind River, either in voting power or value.

The intent of the parties that the transaction be a sale and purchase, and not a loan, is evident from a variety of factors. The sale of the Class A preferred was not treated by either Principal Life or North Pine as a loan. Proper accounting treatment for the shares and dividend payments was followed and no accounting entries treated the Class A shares or their sale as a debt. The Class A preferred possessed 50% of the voting power of Wind River (the other 50% belonging to the common shares) and entitled those shares as a class to elect one of the two directors. The Class A preferred was subordinated to all of the creditors of Wind River. If dividends on the Class A shares were in arrears, Wind River was prohibited from paying dividends on any other class of shares. And if Wind River had insufficient earnings to pay the Class A dividend preference, the Class A holders had no legal right to force a dividend.

Further, the sale of the Class A shares took place pursuant to a private placement disclosure that clearly and thoroughly described the transaction as a sale. The $16 million was paid to Principal Life and not Wind River. Principal Life was not obligated in any way to North Pine to repay any funds paid to it by North Pine. North Pine could only look to Wind River and its assets for the payment of expected dividends and eventual liquidation proceeds.

By virtue of the right to elect one of the two directors, Wind River's Certificate of Incorporation accorded the holder of the Class A preferred stock rights of participation in governance of the corporation, and North Pine fully exercised such rights of participation. Regular Board meetings were held in which North Pine fully participated . At such meetings, dividend payments were approved, including dividends on the common stock, and various redemptions of the shares of the Class B preferred.

The actual sale of the Class A shares to North Pine resulted in an immediate cash payment to Principal Life of $16,044,584. This cash was then put to use by Principal Life in the normal course of its investment business and was not escrowed or otherwise set aside for any special purpose. The terms of the Class A shares required certain preferred dividends, which

were cumulative since the contributed Securities were not making all expected interest payments and the timing and amount of liquidation was uncertain.

Finally, if dividends were declared on Wind River's common stock, the Class A preferred shared in that dividend on a share-for-share basis. In addition, the Class A shares were preferred as to liquidation priority. In liquidation, after its initial preference, the Class A preferred shared the liquidation values with the common on a share-for-share basis. Thus, the Class A shares received more than just the quarterly fixed dividend. By sharing in the payments made to the common stock, the Class A shares also shared in the expected growth of the company.

These factors indicate not only that it was the intent of the parties that the Class A preferred represented equity rather than debt, but also that the actual features and characteristics of the Class A preferred were consistent with classification as equity. The RAR proceeds through a litany of eleven of the many factors various cases and commentators have listed to distinguish equity from debt (usually in the context of examining whether payments on the instrument were deductible interest or nondeductible dividends). But rather than addressing each of such eleven factors individually, Principal Life incorporates by reference its responses regarding such factors set forth in detail in the accompanying narrative regarding Principal Investors and the Osprey securities. While the facts regarding the Wind River Class A preferred and the transaction with North Pine are different in certain respects, nevertheless the reasoning and analysis that requires such factors to be decided in Principal Life's favor are equally applicable on this issue.

Additionally, with regard to the RAR's substance over form argument, the economics of each party's investment were changed by the transfer of the impaired securities by Principal Life to Wind River and the sale of the Class A preferred shares to North Pine, and these changed economics involving the potential for future rewards as well as risks were recognized by both parties. By selling the Class A preferred shares to North Pine, Principal Life changed its economic position by liquidating that portion of its investment - giving up the significant rights to the Wind River assets represented by the Class A shares in exchange for over $16 million in immediate cash. North Pine also changed its economic position by parting with over $16 million in hopes that its senior position in Wind River would bear fruit - in terms of projected dividend payments, some of which may have been eligible for the dividends-received deduction, and potential capital gains upon liquidation as it shared the liquidation proceeds with the common stock. But in the meantime, its investment in the Class A preferred was clearly illiquid and would remain so for the foreseeable future. As long as a transaction has business purpose and economic substance, it may not be disregarded even though it was structured to secure an advantageous tax consequence. *Cottage Savings Assoc. v. Comm.*, 409 U.S. 554 (1991); *Samson Tire & Rubber Corp v. Rogan*, 136 F.2d 345 (9th Cir. 1943), quoting *Comm. v. Laughton*, 113 F.2d 103 (9th Cir. 1940).

**CONCLUSION**

Whether the Principal Life – Wind River – North Pine transaction is analyzed under Section 269, Section 267, the substance over form doctrine, or the debt/equity dichotomy, it must be concluded that Section 269 does not apply, the Class A preferred was actually stock and not debt, the transaction with North Pine was a sale and not a loan, the substance and form of the transaction were the same and represented proper tax planning for a principal purpose that was business-motivated and not tax-motivated, and Principal's recognition of the capital loss need not be deferred into 2003 under Section 267. Principal recognizes that should it prevail on this issue in 2002, the Service's allowance of loss in 2003 would need to be reversed.

# TAB 9

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

CAPITAL LOSS ON SALE OF PREFERRED STOCK INVESTMENT IN PRINCIPAL INVESTORS CORPORATION

2002 - $21,634,009

The revenue agent's report[1] disallowed Principal Life Insurance Company's ("Principal Life") claimed capital loss of $61,811,454 in 2002 upon its sale to Deutsche Bank of the Class A preferred stock of Principal Investors, a corporation to which Principal and various affiliated companies had transferred certain distressed Enron-related securities in a Section 351 transaction.

The RAR asserts two grounds for disallowance of this 2002 capital loss. Initially invoking the doctrine of substance over form as it is applied in debt vs. equity cases, and citing various factors it claims to have identified, the RAR's primary position is that the capital loss should be disallowed on the ground that the $2.4 million sale by Principal Life to Deutsche Bank of the Principal Investors Class A preferred stock that Principal Life had acquired in the Section 351 transaction must be re-characterized as a loan by Deutsche Bank.

The RAR's secondary position is that the capital loss should be disallowed under Section 269 because Principal's acquisition of a controlling interest in Principal Investors was an acquisition made to evade or avoid income tax by securing a tax benefit that Principal would not have otherwise enjoyed.

## I. Additions and Corrections To Revenue Agent's Statement Of Facts.

The following represents additions and corrections to the statement of facts presented in the RAR, which is incorporated herein by reference.

Principal Financial Group, Inc. ("PFG") is a publicly held company. PFG, the common parent of the affiliated group (the "PFG Consolidated Group") that files a consolidated calendar-year tax return, is a leader in offering a wide range of financial products and services through its family of financial services companies. The PFG Consolidated Group and its foreign subsidiaries are collectively referred to as the "Group."

Principal Financial Services, Inc ("PFSI") is a wholly owned subsidiary of PFG. PFSI serves primarily as a holding company for the Group's operations. Principal Life Insurance Company ("Principal Life") and Principal International de Chile, S.A. ("PI Chile") are wholly owned subsidiaries of PFSI. Prior to the transactions described in this refund claim, all of the

[1] References in this narrative to "revenue agent's report" or "RAR" refer to the revenue agent's report, Form 4549-A and the accompanying 270 pages, dated 4-17-06 and signed by Christine H. Heth.

stock of Principal Investors Corporation ("PIC") was owned by various members of the Group, including Principal Life and PI Chile.

Principal Life is the ninth largest life insurance company in the United States. At the end of 2001, its assets exceeded $75 billion. PI Chile owns the fourth largest Chilean insurance company as well as joint venture interests in a Chilean mortgage loan servicing business and a Chilean mutual funds administrator.

Following the collapse of Enron Corp. ("Enron") in November 2001, the Group's Investment Committee reviewed Principal Life's $170 million exposure to Enron and Enron-related entities, which included structured financings involving special purpose entities ("SPEs"). Principal Life held direct debt obligations of Enron, as well as debt obligations of two Enron-related SPEs, Marlin and Osprey. Prior to the Enron collapse, these investments were assigned designations of NAIC 2. Following Enron's collapse, these investments were downgraded to NAIC 6. These designations were based on the grading classifications for fixed maturity securities established by the Securities Valuation Office of the National Association of Insurance Commissioners ("NAIC) for all insurance companies. Principal is required by law and regulation to adhere to the standards established by the NAIC.

Principal Life held two types of Osprey investments. The first consisted of secured debt obligations jointly issued by Osprey Trust and its wholly owned subsidiary, Osprey I, Inc. (the "Securities"). The second consisted of secured debt obligations issued by Osprey Associates, LLC (the "Certificates"). The Securities were secured by a partnership interest owned by Osprey Trust as well as credit enhancements provided by Enron. The Certificates were secured by a beneficial interest in Osprey Trust. Prior to Enron's collapse, Principal Life held Securities having an aggregate par value of $61,250,000 and Certificates having an aggregate par value of $16,000,000.

After Enron's collapse, careful study by the Group's investment analysts suggested that the market had significantly undervalued the Securities. At that time, the trading price of the Securities was approximately 25 percent of par. The Group's analysis, however, estimated a liquidation value of approximately 50 percent of par. Notwithstanding a relatively high degree of confidence in the ultimate recovery, the Group's analysts cautioned that continued holding of the in Securities remained a speculative proposition. Still, the analysts viewed the Marlin and direct Enron investments much less favorably than the investment in the Securities.

Upon completing its review of the analysts' recommendations, Principal Life decided to maintain, but not to increase, its aggregate Enron exposure. Principal Life modified its Enron positions by disposing of its direct Enron securities and repositioning its investments in the Enron SPEs. Principal Life disposed of its Marlin investment and reinvested the proceeds in additional Securities having an aggregate par value of $38,880,000.

On February 1, 2002, the Investment Committee for PFSI authorized the purchase of additional Securities. Due to regulatory sensitivities associated with the NAIC 6 designation and the potentially adverse effect on financial strength ratings, Principal Life was foreclosed from acquiring additional Securities itself. Consequently, the Group decided that the investment should be made through a non-regulated entity because expected appreciation in the Securities provided an effective means of funding future capital needs. By February 8, 2002, PFSI had purchased Securities having an aggregate par value of $29,070,000.

At the time the Group was analyzing the Osprey investments, PFSI determined that PI Chile had a need for future capital. PFSI decided to use the anticipated increase in value in the Securities to fund, among other things, PI Chile's future capital needs. On February 22, 2002, PFSI sold Securities having an aggregate par value of $5,814,000 to PI Chile in exchange for cash. Immediately prior to this transaction, PFSI contributed to PI Chile the cash necessary to effectuate the purchase. The two-step transfer was viewed as being more expeditious than a direct contribution of the Securities from PFSI to PI Chile because it avoided lengthy notice requirements under Chilean law.

On March 7, 2002, the Finance Committee of PFG met to consider a proposed restructuring method that would meet the differing investment objectives of Principal Life, PFSI, and PI Chile with respect to their Osprey positions. The proposed method called for the consolidation of the Osprey positions within PIC and a proposed capital structure for PIC that would allow Principal Life to convert its volatile Osprey investment into a high yield, senior equity position, thereby minimizing the regulated entity's risk of further loss on the Osprey positions. PFSI and PI Chile, on the other hand, were interested in long-term capital growth with which to fund future expansion and were willing, therefore, to accept the increased risk of loss in exchange for the possibility of the Securities' significant upside potential. The consolidation would also permit a more efficient management of claims in the Osprey liquidation and ultimately in the Enron bankruptcy. After due consideration, the Finance Committee of PFG approved the proposal.

On March 15, 2002, PIC amended and restated its certificate of incorporation in order to change its capital structure in accordance with the proposal approved by the PFG Finance Committee. Prior to the amendment, PIC had 2,000 shares of common stock ("common stock") issued and outstanding. The amendment increased the authorized common stock to 1,725,000 shares. The amendment also authorized the issuance of 275,000 shares of preferred stock ("preferred stock"). The preferred stock was divided into 25,000 shares of Class A preferred stock ("Class A preferred") and 250,000 shares of Class B preferred stock ("Class B preferred"). Except for certain protective rights, all preferred stock was nonvoting.

Each share of PIC preferred stock was entitled to a $100 liquidation preference. Dividends accrued at quarterly rates of $2.50 per share on Class A preferred and $3.75 per share on Class B preferred. The liquidation and dividend preferences granted to Class A preferred ranked senior to the preferences of the Class B preferred. Shares of Class B preferred were not entitled to any additional dividend rights. Shares of Class A preferred, however,

participated ratably on a share for share basis with shares of common stock as to the payment of dividends and distribution of assets in liquidation.

The Class A preferred was redeemable at the option of PIC after September 15, 2003, and at the option of the holder after March 1, 2004. In each case, the redemption price per share of Class A preferred consisted of one share of common stock and cash equal to the sum of $100 plus any unpaid dividends. The Class B preferred was subject to mandatory redemption by PIC on March 15, 2004. The redemption price of the Class B preferred was $100 per share plus any unpaid dividends.

Principal Life, PFSI, and PI Chile entered into an exchange agreement with PIC dated March 15, 2002. The following transfers occurred on March 20, 2002, pursuant to the exchange agreement, all of which were part of a Section 351 transaction:

1. Principal Life transferred Certificates with a par value of $16,000,000 and Securities with a par value of $100,130,000 to PIC in exchange for the issuance by PIC of 25,000 shares of Class A preferred and 225,375 shares of Class B preferred.

2. PFSI transferred Securities with a par value of $23,256,000 to PIC in exchange for the issuance by PIC of 1,162,800 shares of common stock.

3. PI Chile transferred Securities with a par value of $5,814,000 to PIC in exchange for the issuance by PIC of 290,700 shares of common stock.

It is important to note that the validity of the Section 351 transaction has not been challenged by the examining revenue agent.

In addition to the PIC stock issued in the Section 351 transaction, an additional 2,000 shares of PIC common stock were owned by three PFG affiliates, including 1,400 shares of common stock owned by Principal Holding Company, a wholly owned subsidiary of Principal Life, 500 shares of common stock owned by PI Chile and 100 shares of common stock owned by PFSI. PI Chile had acquired 500 shares of common stock from Principal Capital Management (Europe) Limited, a wholly owned foreign subsidiary corporation of PFSI, on February 25, 2002.

As stated in the RAR, pursuant to Sections 358 and 351(g) the Class A preferred was allocated approximately 75% of Principal Life's tax basis, or an allocated tax basis of $64,230,280. The fair market value of the Class A preferred at that time was estimated to be $2,500,000.

In May 2002, Principal Life began internal discussions to assess the benefits and risks of selling the Class A preferred. Those discussions concluded that sale of the Class A preferred would be desirable and, accordingly, a formal private placement memorandum was drafted and distributed to potential purchasers. As a result, Principal Life entered into an agreement with the

London branch of Deutsche Bank AG ("Deutsche Bank") to sell the 25,000 shares of Class A preferred. On July 19, 2002, Principal Life sold the Class A preferred to Deutsche Bank in exchange for cash of $2,418,827 (the "Sale"), resulting in the capital loss at issue. The sale of the Class A preferred to Deutsche Bank was neither planned nor intended at the time of the Section 351 transaction. At that time, two months before the eventual sale, Principal Life did not know who, if anyone, would purchase the Class A preferred stock of PIC.

On September 15, 2003, the Class A preferred held by Deutsche Bank, as well as the Class B preferred still held by Principal Life, were both redeemed by PIC for $100 per share plus dividends in arrears. As a result, Deutsche Bank was paid $2,875,000 upon redemption of the Class A preferred. Also, as required by PIC's Articles of Incorporation, Deutsche Bank received 25,000 shares of PIC's common stock in connection with the redemption. Such common stock was redeemed by PIC in 2005 for $160,000.

## II. Law and Analysis.

### A. Substance of the Transaction with Deutsche Bank.

It is Principal Life's position that Deutsche Bank's payment to Principal Life of the purchase price for the Class A preferred stock cannot properly be classified as a loan by Deutsche Bank to either Principal Life or PIC. The RAR, however, contends otherwise, stating that its primary position is that the sale of such shares by Principal Life to Deutsche Bank must be characterized as a loan or financing transaction, rather than a sale of stock that triggered loss recognition to Principal Life. It is unclear, however, whether the revenue agent is attacking the characteristics of the Class A preferred stock itself or the nature of the transaction with Deutsche Bank because the RAR's statements and conclusions seem to vacillate between the two. The agent's invocation of the substance over form doctrine with reference to the transaction (p. 176: "whether a transfer of funds to a corporation is, in substance, a loan or capital contribution") would seem to indicate that it is the transaction with Deutsche Bank, rather than the instrument, that is being scrutinized. The final paragraph of the RAR's statement of its primary position would suggest likewise (p. 184: "there was no sale of the Class A preferred shares").

If so, it is Principal Life's position that invocation of the substance over form doctrine for this purpose is unavailing because the substance and form of this transaction are the same. That the transaction with Deutsche Bank was intended as, and actually was, a sale of the Class A preferred stock is supported by the extensive private placement memorandum dated June 21, 2002. Principal Life carefully prepared and distributed the private placement memorandum not just to Deutsche Bank, but to numerous other potential purchasers. Consistent with the offering that precedes any sale, in the early samples of the proposed purchase agreement the name and address of the purchaser appear as blanks.

The private placement memorandum, as well as the purchase agreement itself, were obviously prepared to fulfill the requirements of the Securities Act of 1933, the Investment

Company Act of 1940, and the rules of the U.S. Securities and Exchange Commission thereunder. In the private placement memorandum, the proposed transaction is described as a "private secondary marketing of Class A preferred stock" and the characteristics and rights of such preferred stock are explained in detail under the heading "Description Of Capital Stock."

When Deutsche Bank entered the picture as a prospective purchaser, there were no negotiations over the terms of the Class A preferred stock being sold, as there usually are in deals involving loan agreements, inasmuch as the terms relating to the preferred stock had been determined and fixed prior to that time. Nor were there any demands that any of the terms of the Class A preferred be amended prior to any purchase and sale. However, as is usually the case in any sale, there were negotiations over the sale and purchase **price.** Deutsche Bank's only negotiation point was over the perceived value, risks and possible returns on the Class A preferred – as any prospective investor would do - as depicted in the possible outcome scenarios sent to Deutsche Bank. The result of these negotiations on price was that the highly prioritized Class A shares, with a par value of $2,580,822 ($80,822 representing accrued dividends prior to issuance) were sold to Deutsche Bank for $2,418,826.75.

Finally, the revenue agent's attempt to reclassify the transaction as a loan is belied by the fact that the "repayment" of the alleged loan was from a party (PIC) other than the party to whom the purported loan was made (Principal Life).

**B. Substance of the Preferred Stock.**

It is more likely, however, that the real thrust of the revenue agent's primary position is based on the contention that the Class A preferred stock itself was debt rather than equity, for the RAR cites the traditional debt vs. equity cases and the various factors considered in the debt vs. equity analysis before devoting several pages to a discussion of thirteen of such factors. Based on its analysis of such factors, it then concludes that "Deutsche Bank's investment in PIC's Class A preferred stock is, in substance, a loan from Deutsche Bank to Principal Life and not an equity investment in PIC." (RAR p.184)

Section 385(b) of the Code lists five factors that may, "among other factors," be taken into account in the debt-equity analysis and authorizes the Treasury by regulation to list others, which the Treasury never has. From the Senate Finance Committee report that accompanied enactment of this provision in 1969, it is clear that it was enacted to provide a tool to reclassify an instrument, where the interest paid on it was sought to be deducted by the payor, into equity where such payments would be treated as nondeductible dividends. S. Rept. 91-552, P.L. 91-172, __ Cong. ___ Sess., 1969-3 C.B. 511. In this case, the RAR attempts to use this tool to reach just the opposite result, that is, to reclassify an equity interest into a debt obligation. In *Segel v. Comm.*, 89 T.C. 816 (1987) and *Ragland Investment Co. v. Comm.*, 435 F.2d 188 (6th Cir. 1970), the Service's attempts to do so - to convert equity into debt - were unsuccessful.

The RAR correctly notes that certain cases have listed 11-13 factors to be taken into account in a debt versus equity analysis and one commentator has listed thirty-eight. Another

case listed sixteen. *Fin Hay Realty Co. v. U.S.*, 398 F.2d 694 (3rd Cir. 1968). As mentioned, the RAR here lists thirteen, although eight were sufficient for the Chief Counsel's Office in CCA 2001134004. But whatever the number of factors used, they are used to determine, in the language of Section 385(a), "whether **an interest in a corporation** is to be treated . . . as stock or indebtedness." (Emphasis supplied.)

In this case, this determination should be made at the time the "interest" was created, that is, upon the initial issuance of the "interest," for no change in the terms or provisions relating to the Class A preferred stock took place between the time such stock was issued on March 15, 2002 and the time it was sold to Deutsche Bank on July 18, 2002. The RAR makes no contention that any such change occurred. Then, looking at the initial issuance of such stock, the RAR's acknowledgement that the stock was acquired by Principal Life in a Section 351 transaction (RAR pp.171, 175-177) is significant because it represents a tacit admission that the Class A preferred was stock rather than debt at that time. If it had been debt at that time it would have defeated qualification of the transaction under Section 351(a), which requires that the transfer to the controlled corporation be solely in exchange for "stock."

<u>C. Analysis of Individual Factors.</u>

Whether five, eight, eleven, thirteen, sixteen, or thirty-eight factors are applied to test the Class A preferred in a debt vs. equity analysis, it is Principal Life's position that any application of the factors inevitably leads to the conclusion that the Class A preferred stock is indeed stock (equity) and not debt for federal income tax purposes. The following are the factors presented in the RAR and Principal Life's responses regarding those factors.

<u>1. Form of Transaction.</u>

While the "form of the transaction" is a legitimate inquiry, the RAR distorts application of this factor, stating that the form of the transaction here "does not carry much weight" because Principal Life was "thorough and well-prepared in tax avoidance." Of course, as the ninth largest life insurance company in the United States charged with the duty of investing its $75 billion in assets to maximize returns for the stockholders of its parent company (PFG), Principal Life has a sophisticated investment department that has kept pace with the past several decades of securities innovations, including special purpose entities. To suggest, as does the RAR, that the form of the transaction should be denigrated because it was dictated by tax avoidance motives coincides with the RAR's erroneous conclusion that the principal purpose of the transaction was tax avoidance. But, to the contrary, the facts show that the transaction was undertaken and consummated primarily due to investment considerations having to do with the distressed Enron-related securities and preserving the upside potential in the Securities. Because tax considerations were secondary, yet fully consistent with Principal Life's right to engage in a valid business transaction that also produced tax benefits, the form of the transaction deserves to be respected. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 580 (1977); *Comm. v. Newman*, 159 F.2d 848, 850-851 (2nd Cir. 1947) (Hand, J., dissenting).

## 2. Certainty of Repayment.

The RAR argues that repayment was certain and that "Deutsche Bank had very little economic risk because the Class A stock was, as a practical matter, well-secured." However, as seen in the press, Enron sued the Osprey trust (the Whitewing partnership that owned Osprey) in February, 2003, for a return of all cash and assets under the bankruptcy preference rule relating to transfers within 90 days of filing bankruptcy. If that litigation had been successful, the value of Osprey's assets could have been reduced to a mere unsecured claim against Enron as one of the many stockholders.

Thus, the benefit of the hindsight available through viewing a 2002 transaction in 2006, the RAR attributes to the Class A preferred stock much less risk than was actually the case. The uncertainty surrounding the Enron and Osprey securities is evident from their downgrade by the NAIC from a 2 to a 6. Since the Osprey securities were the only source of funds for any payments on or redemption of the Class A preferred stock, repayment was far from certain. This is also evident from the discount on the purchase price secured by Deutsche Bank when it purchased preferred stock having a par, liquidation, and redemption value of $2,500,000 for $2,418,827.

## 3. Fixed date for Repayment.

The RAR's contention that "the twenty month put option is a fixed date for payment of interest and repayment of principal." However, the RAR negates its own contention when it states that "the holders (or Deutsche Bank) **may** exercise their right to put their shares for redemption as of March 1, 2004 . . . ." (Emphasis added) That statement implicitly acknowledges, as it must, that Deutsche Bank **may not** have exercised its put option on that date. If PIC had not exercised its right to redeem the Class A preferred after September 15, 2003, Deutsche Bank may have chosen to continue to hold the stock because it preferred to continue to earn the 10.3% return on its $2.4 million investment (annual dividends of $10 per share on 25,000 shares). For this reason, the put right cannot be considered the equivalent of a debt security's fixed date for repayment.

## 4. Payment from Earnings and Profits.

The RAR notes that equity dividends normally come from earnings and profits while interest is paid from any available corporate assets. The RAR then cites the fact that on liquidation, the accrued but unpaid dividends were to be paid from any available corporate assets. The RAR thus ignores PIC's Certificate of Incorporation and established principles of corporate law that require that dividends be declared and paid only from legally available funds for that purpose (earnings and profits).

**5. Claim Subordination or Priority of Payment.**

The RAR contends that because the Class A shareholders have priority over the Class B shareholders and common shareholders, the Class A preferred stock has a priority of payment consistent with that of a debt instrument. That contention is in conflict with the many cases that hold that the seniority of certain classes of preferred over the common or other preferred is a common feature of preferred stock and despite its similarity to debt is not a significant factor in determining whether an instrument is debt or equity. See *Ragland Investment Co. v. Commissioner*, 435 F2d 118 (6th Cir. 1970). And in Chief Counsel Advice 200134004, relating to whether a perpetual note was equity, after noting that the document provided on it face that it was subordinate to any debts or notes, it was held that such was a factor in favor of equity treatment. In this case, the Class A shares are likewise subordinate to general creditors of PIC.

**6. Accrual and payment of interest.**

With regard to this factor, the RAR states that "'additional dividends' are earned as a percentage on the accumulated, unpaid 'dividends.' This is practically a definition of compound interest." However, this statement is clearly erroneous. There is, in fact, no such provision for additional dividends anywhere in the Articles of Incorporation, Bylaws, or other provisions relating to the preferred stock of PIC. In fact, both the Certificate of Incorporation and Private Placement Memorandum state that: "Accrued but unpaid dividends shall not bear interest." Moreover, the fact that accrued but unpaid dividends accumulate and must be paid eventually (upon liquidation or redemption, assuming funds are available for that purpose) is a "cumulative dividends" feature common to preferred stock and is no more indicative of debt than the priority of payment typically accorded to preferred stock. This is in stark contrast to the nonpayment of interest on a debt instrument, which usually constitutes an event of default causing acceleration of the entire principal balance.

**7. Actual repayment of principal.**

The RAR equates redemption of the Class A preferred upon exercise of Deutsche Bank's put option with repayment of principal on a debt instrument, which, except in the case of a demand debt instrument (which would be unusual in a transaction of this nature), usually occurs on a fixed maturity date. Even a demand debt instrument is distinguishable in that the holder is normally entitled to issue its demand for payment at any time, whereas Deutsche Bank's put option, consistent with such features in preferred stock issues, was exercisable only after expiration of a specified period of time.

Furthermore, upon redemption of the Class A preferred stock, in addition to its par value and accrued dividends, Deutsche Bank received 25,000 shares of common stock as required by PIC's Articles of Incorporation. This common stock was redeemed in 2005 for $160,000. The fact that Deutsche Bank received "repayment" in excess of the par value (the "principal") and

accrued dividends on the Class A preferred is also inconsistent with repayment of principal on a debt instrument.

**8. Security or Collateral.**

The RAR asserts that "PIC had initial assets valued at more than ten times that of Deutsche Bank's investment," and claims that that fact amounted to "security or collateral" for the Class A preferred stock. The Securities and Certificates transferred to PIC by Principal Life in the Section 351 transaction had an aggregate par value of $116,130,000, an aggregate tax basis of $85,767,780, and a fair market value of $25,037,500. This indicates a significant decline in the fair market value of such Securities and Certificates from the date of acquisition and there was no assurance that such decline would not continue. The lawsuit initiated by Enron against the Osprey trust (the Whitewing partnership that owned Osprey) in February, 2003, for a return of all cash and assets has already been mentioned. The trading value of the Osprey Securities ranged from 30 cents to 17 cents on the dollar during this period and their was no guaranty the value would not decrease to zero. In these circumstances, it is illusory to contend that the value of the assets owned by PIC amount to "security or collateral." Nor can the priority of the Class A preferred stock over the other classes of PIC stock be regarded as anything other than a priority normally given to such preferred stock.

**9. Business Purpose.**

The revenue agent's assertion that "it is clear that the entire PIC transaction was structured for no other reason than to recognize for tax purposes losses . . . ." is not only cavalier, but it is also wrong for several reasons.

First, it has previously been explained that the exigencies surrounding the collapse of Enron - the company whose related entities secured the payments due on the Securities and the Certificates - required Principal Life to take steps to minimize its exposure to losses, and, at the same time, maximize the chances for speedy recoupment of as much of its Osprey investments as possible. Downside protection for Principal Life was accomplished through shifting of risk to PFSI and PI Chile. The materials presented to the Finance Committee and Strategic Working Group are evidence of this valid business purpose.

Second, these same materials are evidence of the Group's internal investment analyst's view that in late 2001 and early 2002 the market had taken the price of the various Osprey investments too low. Their view was that the Osprey notes and interests should ultimately realize 50 cents on the dollar, including separate litigation that belonged to Principal Life (as initial purchaser) and could not be transferred. Their internal valuation put the Osprey value at around 40 cents (excluding litigation against banks, brokers & Enron) compared to the then going rate of between 17 cents and 22 cents on the dollar.

Third, it was internally recommended to the Corporate Finance Committee in February, 2002, that the Osprey securities could be a 'cheap' source of funding for the future operations of

PFSI and PI Chile because of the expected increase in value of the Osprey assets. Principal Financial and PI Chile each had five-year plans that showed targeted growth and expected capital requirements. Due to Principal Life's direct investment in Osprey, Principal Life had insider knowledge that some hard assets existed, as well as claims against Enron corporate stock. Senior management accepted the recommendation, which resulted in PFSI and PI Chile acquiring various Osprey notes in the marketplace. The subsequent transfer of these Osprey securities to PIC represented an effort by the Group to consolidate the Osprey assets into a single entity for more efficient management, yet in a manner that preserved the upside potential for the future capital requirements of Principal Financial and PI Chile. Moreover, PIC's capital structure had the effect of leveraging those entities' potential for future appreciation.

Fourth, the transfer by Principal Life of its Osprey assets to PIC enabled Principal Life to remove these impaired assets from its books and from its NAIC annual statements.

Fifth, although at the time there was no prospective purchaser and no discussions had been held with any party regarding the Class A shares, the Class A shares were designed to be marketable to provide Principal Life with immediate liquidity if that became desirable. This liquidity was realized when the Class A shares were sold in July, 2002.

**10. Voting rights.**

Contrary to the RAR's assertion, PIC's Class A preferred stock had voting rights typical of those usually accorded to preferred stock, namely, rights to vote with respect to any provision in the Articles of Incorporation or Bylaws that would affect the rights or preferences of that class of stock.

**11. Share in the Profits.**

According to the RAR, because no dividends were paid on the Class A preferred stock during the time it was outstanding, and because Deutsche received no "participation" in the appreciation of the Osprey securities or in PIC's earnings and profits at the time the preferred stock was redeemed, the Class A preferred fails to "share in the profits" in a manner consistent with an equity security. Aside from the fact that with the Osprey securities in default there was no income or "profits" from which dividends could be paid, the fact of the matter is that the Class A preferred stock was entitled to share in the profits in a manner entirely consistent with such preferred stock. Its fixed dividend rate entitled it to its share of the profits to that extent. While the dividends were not paid until the stock was redeemed, they continued to accrue and were in fact eventually paid (and because such dividends represented a distribution of profits, PIC neither sought nor received any deduction for their payment). Moreover, upon redemption of the Class A preferred, Deutsche Bank also received 25,000 shares of common stock for which it received $160,000 in January, 2005. This was clearly a share of PIC's profits.

**12. Credit worthiness.**

In determining credit worthiness, lenders look to the ability of the borrower to pay current interest. Because PIC had no expectation of cash flow from the Osprey securities for an indefinite period of time, there was little prospect for the payment of interest. The RAR also states that the Osprey securities were a very valuable, but distressed asset, on which it could "easily" obtain a bank loan. However, in view of Enron's widely-publicized difficulties and the lawsuit by Enron against Osprey previously mentioned, any prospective lender would undoubtedly have had at least two important concerns: (1) the prospect of further decline in the value of such assets, and, (2) the liquidity of PIC's assets. Under such circumstances, the credit worthiness of PIC would have been highly doubtful.

**13. Intent of the Parties.**

Principal Life agrees with the RAR's statement that the intent of the parties is best discerned by the objective, contemporaneous evidence. But for its objective evidence, the RAR refers to Deutsche Bank's "insistence on fully protecting its investment by guaranteeing that it would be repaid its original principal, plus a fixed rate of interest, on a fixed date, with repayment priorities and protections entirely in its favor . . . ." This is not objective evidence but rather subjective conclusions. There was no guaranty of repayment, nor any fixed date, and the repayment priorities and protections were entirely consistent with the terms of typical preferred stock. The various objective factors addressed above show unmistakable intent and assumption on the part of all parties that the Class A preferred stock would represent an equity interest in PIC. Consistent with that intent, and as another objective factor to be taken into account, Principal Life treated PIC's preferred and common stock as equity in its GAAP annual reports, its NAIC Annual Statements, and in its tax returns.

**III. Section 269 Does Not Apply.**

The RAR's secondary position is that the capital loss resulting from Principal Life's sale of the PIC Class A preferred stock to Deutsche Bank should be disallowed because Principal Life's acquisition of its interest in PIC was an acquisition made to evade or avoid income tax by securing a tax benefit that Principal Life would not otherwise enjoy, within the prohibition of Section 269.

**A. Sale of Stock is not an Acquisition.**

The only "acquisition" in this case that would permit invocation of Section 269 was the acquisition by Principal Life of a controlling (50%) interest in PIC. But it was not that acquisition that caused or enabled realization of the capital loss at issue. In fact, no tax benefits whatsoever resulted from that acquisition. It was only the subsequent sale of the Class A preferred stock by Principal Life to Deutsche Bank two months later that gave rise to the capital loss deducted for tax purposes. This was an event entirely separate and distinct from the "acquisition." No contention has been made that they should be collapsed or joined together under the "step transaction" or any other doctrine. Therefore, the revenue agent's invocation of

Section 269 to attack Principal Life's acquisition of control of PIC is unavailing because no deduction, credit, or allowance was taken or availed of as a result of that acquisition of control. Nor was any positive or negative tax attribute thereby brought "into conjunction with" (within the language of Regulation §1.269-3(b)(1) cited by the revenue agent) any opposite tax attribute.

Similarly, the RAR (p.198) cites Regulation §1.269-3(c)(1) "for *indications* of a purpose to evade or avoid tax." (Italics added.) That regulation refers to a "corporation [that] acquires property having in its hands an aggregate carryover basis which is materially greater than its aggregate fair market value at the time of such acquisition and utilizes the property to create tax-reducing losses or deductions." Without more, it might appear that this description applies in Principal Life's case. However, that regulation merely provides an example illustrating a situation within the ambit of Section 269(a)(2), which refers to a "corporation [that] acquires . . . property of another corporation **(not controlled, directly or indirectly, immediately before such acquisition by such acquiring corporation or its stockholders)** . . . ." (Emphasis supplied.) Since the "property" acquired by Principal Life from PIC, i.e., the Class A preferred stock, was acquired from a corporation (PIC) that was indeed controlled by Principal Life or its stockholders, neither the regulation cited nor the portion of the statute that it interprets have any applicability in this case.

**B. The Principal Purpose of the Transaction was Business, not Tax.**

Even if Principal Life's acquisition of control of PIC is collapsed into, or brought "into conjunction with" Principal Life's sale of the Class A preferred stock to Deutsche Bank, Section 269 is only applicable if tax evasion or avoidance was the **principal** purpose of Principal Life's acquisition of that control. *Commodores Point Terminal Corp. v. Comm.*, 11 T.C. 411, 418 (1948) ("a tax avoidance purpose incidental to the transaction does not necessarily bring it within the condemnation of Section [269]"); *Alcorn Wholesale Co. v. Comm.*, 16 T.C. 75 (1951) (*held*, even where tax avoidance is admittedly present, Section 269 is not invoked unless it was the principal purpose); *Bijou Park Properties, Inc. v. Comm.*, 47 T.C. 207 (1966) (even though lawyer and CPA were consulted regarding favorable tax aspects, principal purpose of transaction was not tax avoidance); *Princeton Aviation Corp v. Comm.*, T.C. Memo 1983-735 (*held*, where principal purpose of transaction involved valid business reasons, awareness of the tax benefits arising from them does not disqualify one from using them); *D'Arcy-MacManus & Masius, Inc. v. Comm.*, 63 T.C. 440 (1975) (*held*, to constitute the principal purpose under Section 269, tax avoidance must outrank or exceed in importance any other single purpose); *VGS Corp. v. Comm.*, 68 T.C. 563, 596 (1977)("[c]omplicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or other tax benefits] to be nothing more than prudent business planning"); *U.S. Shelter Corp. v. U.S.*, 13 Cl.Ct. 606, 625 (1987) ("The principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences"); *American Processing and Sales Co. v. U.S.*, 371 F.2d 842 (Ct.Cl. 1967) (labor reasons, not tax reasons, were principal purpose of acquisition of corporation); *Bobsee Corp. v. U.S.*, 411 F.2d 231 (5th Cir. 1969) (*held*: in determining principal purpose, the non-tax motives as a class are compared to the tax motives as a class).

Like the Tax Court many years ago in the *D'Arcy-MacManus* case, *supra,* Treasury Regulation §1.269-3(a) equates "principal purpose" with a "purpose to evade or avoid Federal income tax [that] exceeds in importance any other purpose." That is not the case here. Although Principal Life, as a sophisticated company, was not oblivious of the tax consequences that would ensue, tax considerations were clearly secondary to the numerous business purposes behind the transaction.

First, Principal Life and its affiliates, PFSI and PI de Chile each had interest in gaining back some of the losses experienced in the decline in value of the Osprey securities. Principal Life wanted downside protection and PFSI and PI de Chile were interested in higher upside potential in exchange for giving Principal Life that downside protection.

Second, Principal Life improved its liquidity. It received more than $2 million in cash for the stock sold to Deutsche Bank, and had the ability to sell additional stock if market conditions appeared favorable. Principal Life's rating had been reduced by Moody's Investor Services in 2002 and the rating agencies had expressed some concerns about the Company's liquidity ratios. Thus the transactions with PIC and Deutsche Bank provided access to cash in exchange for impaired securities, the sale of which may have been difficult and economically would have been at fire sale prices.

Third, Principal Life concluded that the cost of capital of the stock sold to Deutsche Bank was less than the expected return of the underlying assets. In other words, Principal Life calculated the cost of acquiring the $2 million from Deutsche Bank and determined that the cost was less than the expected return on the assets held by PIC.

Fourth, and also very important, the transactions with PIC and Deutsche Bank permitted Principal Life to retain a large portion of the benefit of any favorable returns from the impaired assets, in contrast to a direct sale of the securities to an unrelated party. Principal Life possessed considerable experience with impaired assets. In 1989, 1990 and 1991, Principal Life purchased trust certificates involving impaired assets from Prudential and realized gains exceeding $40 million. The Company recognized that Osprey held impaired assets and further, Osprey's claims against Enron were difficult to value and that the market often undervalued such assets due to the lack of adequate public information regarding the financial position of the issuer as well as challenging and thinly traded market conditions

Fifth, the transactions with PIC, Deutsche Bank, Principal Holding Company and P.I. de Chile resulted in the removal of the impaired assets from the annual statement of Principal Life. Although PFSI retained a substantial portion of the economic risks and rewards of ownership of the impaired securities by holding the PIC stock, Principal Life reduced the number of impaired assets reported on its financial statements, which it considered beneficial in light of the close scrutiny of life insurance companies as a result of the economic problems that followed the collapse of the tech boom in general and the attacks on the World Trade Center and the Pentagon in 2001, as well as the accounting scandals at Enron and other public companies in 2002.

Of the various alternatives reviewed, preserving upside potential, gaining liquidity, and attracting an investor to a troubled asset class with uncertain realization prospects were the primary objectives with respect to the distressed Osprey securities. This transaction best met those objectives. If those objectives could not be met, it is likely that the transaction would not have been done, despite the tax benefits otherwise available.

**C. No Tax Benefit Not Otherwise Obtainable.**

One of the requirements of section 269 is that "the taxpayer has secured the benefit of a deduction, credit, or other allowance it would not otherwise have enjoyed…" when the specified acquisition took place. As a result of the sale of PIC stock to Deutsche Bank, Principal Life enjoyed a tax benefit – that of recognizing the tax losses under IRC section 1001 due to the difference between the tax basis of the shares sold and the sales price. But section 269 only applies to disallow deductions, credits or other allowances which **are not otherwise available and which stem from the acquisition of control**. See *Cromwell Corp. v. Commissioner*, 43 T.C. 313 (1964), and *Commodores Point Terminal Corp. v. Commissioner*, 11 T.C. 411 (1948). To the extent that there are either feasible alternatives that provide the same tax benefits, or that the deduction, credit, etc. did not arise as a consequence of the acquisition of control, section 269 is not applicable.

In *Cromwell Corp. v. Comm.*, 43 TC 313 (1964), four individuals formed a corporation ("Cromwell") that purchased all the stock of another corporation ("Cornwell") that became its subsidiary. The purchase was partially financed by a loan obtained by Cromwell. After the purchase, Cornwell obtained a new loan and distributed the proceeds to Cromwell, which used the funds to repay its earlier acquisition loan. The corporations elected to file a consolidated return so that the distribution to Cromwell was eliminated in consolidation rather than being taxed as a dividend. The Service argued that the purpose of the transaction was to allow a tax-free dividend from Cornwell to Cromwell, and sought to disallow the filing of a consolidated return under the authority section 269. The court noted that there were several alternative methods the taxpayer could have used to obtain similar tax results. The court, therefore, held in favor of the taxpayer on the ground that the taxpayer had not obtained a tax benefit that it would not otherwise enjoy:

> Thus, the third element of section 269 requires an examination of the alternatives available to the taxpayers. Petitioners contend, and we agree that since the benefits received would have been enjoyed by means of the suggested alternatives, section 269 does not proscribe the use of a consolidated return. Viewed separately, petitioners' use of a consolidated return does not contravene any specific section of the code. When viewed together with the alternatives available to petitioners, it does not contravene section 269. *Id.* At 320.

In *Commodores Point Terminal Corp. v. Comm.*, 11 TC 411 (1948), an individual owned the majority of the stock of a corporation (Corp) that needed additional capital. The

individual transferred to Corp a controlling (58 percent) interest in another corporation, Piggly Wiggly. Piggly Wiggly then paid a dividend to Corp that was subject to a dividends received credit. The Service argued that the dividends received credit was not allowed because the principal purpose of Corp's acquisition of control of Piggly Wiggly was to secure the benefit of the dividends received credit. The Tax Court disagreed. It held that although the principal purpose for the acquisition in this case was not federal income tax avoidance, section 269 was also not applicable because Corp's receipt of the credit was not dependent upon an acquisition of control of Piggly Wiggly:

> The dividends received credit claimed by petitioner in its 1944 return was in no sense dependent upon petitioner's acquisition of a controlling interest in the Piggly Wiggly corporation. Petitioner would have received dividends and would have been entitled to claim a dividends received credit proportionately as great from any number of shares less than an amount constituting a controlling interest. *Id.* At 417

The Tax Court also held that "[t]he word 'otherwise' [in Section 269(a)]can only be interpreted to mean that the deduction, credit, or other allowance, if it is to be disallowed, must stem from the acquired control."

*Cromwell* and *Commodores Point* together stand for the proposition that a determination of whether a taxpayer has secured a benefit that would not otherwise have been enjoyed necessarily requires two inquiries. First, an examination must be made of the alternatives available to the taxpayer to achieve his ends, and second, the facts of the case must be studied to determine whether the benefits derived "stem" from the acquisition of control of the corporation. If it is determined that other alternatives yield the same results, and/or the acquisition could have yielded the same results whether or not control of a corporation was acquired, section 269 does not apply. *See also, Zanesville Inv. Co. v. Comm.*, 335 F.2d 507 (6th Cir. 1964) (post-affiliation losses could not be denied under Section 269).

Principal Life could easily have sold its distressed Osprey securities itself and achieved entitlement to the same capital loss here at issue. Doing so, however, would have deprived it of the upside potential it felt was inherent in those securities. Similarly, Principal Life could have transferred the Osprey securities to an unrelated entity for a less than controlling interest in that entity, or various parties could have contributed different assets and caused a taxable transfer under section 351(e), thereby enabling Principal Life to obtain the same benefit without acquisition of control.

It is true, of course, that in such scenarios Principal Life would not have preserved for itself the upside potential it believed was inherent in the Osprey Securities, but preservation of that upside potential through acquisition of control of PIC was not a **tax** benefit, i.e., "a deduction, credit, or other allowance," within the meaning of Section 269. *Alinco Life Ins. Co. v. U.S.*, 373 F.2d 336 (Ct.Cl. 1967) (Section 269 could not be used to deny taxpayer the status of a life insurance company); *Cromwell Corp. v. Comm., supra* (the privilege of filing consolidated

returns was not a "deduction, credit, or other allowance" within the meaning of Section 269); *Nutt v. Comm.*, 39 T.C. 231 (1962), *acq.* 1964-2 C.B. 6 (corporation's existence, which IRS sought to disregard under Section 269, was not a "deduction, credit, or other allowance" within the meaning of that section); *Siegel v. Comm.*, 45 T.C. 566 (1966).

## CONCLUSION

For the foregoing reasons, Principal Life's claim for refund based on the capital loss that resulted from its sale in 2002 of the Class A preferred stock of PIC to Deutsche Bank should be allowed in full.

# TAB 10

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2002
$556,877

**Penalty Abatement on Previously Taxed Income**

Taxpayer claims a refund based on removal of an accuracy-related penalty. On audit, the examining agent assessed an accuracy penalty on this transaction. For the reasons set forth below, the application of a penalty to this transaction is inappropriate, and the penalty should be abated.

**Facts**

Taxpayer and Charlton (Delaware), Inc. ("Charlton"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whistling Pines on September 7, 2001. Taxpayer contributed $370 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whistling Pines. Charlton contributed 100 percent of the stock of DB Warren Investments Limited ("Warren") and DB Rivington Investments Limited ("Rivington," and together with Warren, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whistling Pines. The total value of the stock of the Cayman Entities was $51,373,130.20. Taxpayer's investment in Whistling Pines was one of several investment transactions entered into by Taxpayer in 2001 in the ordinary course of its business.

As set forth in the Whistling Pines Operating Agreement (the "Operating Agreement"), the purpose of Whistling Pines was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whistling Pines was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whistling Pines invested $370 million in the class A common stock of Cedar Investment Co., a Delaware corporation ("Cedar"). Cedar in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that Charlton contributed the stock of the Cayman Entities to Whistling Pines, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI").

The Operating Agreement provided, in relevant part, that the profits of Whistling Pines would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 3.701 percent.

Whistling Pines received a distribution of $13,921,928 of PTI from the Cayman Entities during 2002. As such, Taxpayer reported the PTI on its tax return as previously taxed income.

**Law**

**A. Negligence or disregard of the rules or regulations**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Under section 6662(b)(1), if any portion of an underpayment is attributable to negligence or disregard of rules and regulations, the 20 percent penalty will be applied. Section 6662(c) defines negligence as any failure to make a reasonable attempt to comply with the provisions of the Title 26. Disregard includes careless, reckless, or intentional disregard. Pursuant to Treasury Regulation section 1.6662-(d), the penalty for negligence or disregard of the rules or regulations applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried, which portion is attributable to negligence or disregard of the rules or regulations in the year in which the carryback or carryover of the loss, deduction, or credit arises ("the loss or credit year").

The penalty for disregarding rules or regulations does not apply if the requirements to Treasury Regulation sections 1.6662-3(c)(1) and 1.6662-3(c)(2) are met.[1] Additionally, the penalty does not apply if the "reasonable cause and a good faith exception" as defined in section 1.6664-4. If the position is contrary to a revenue ruling or notice issued by the Internal Revenue Service, the penalty is not imposed if there is a realistic possibility of being sustained on its merits.

*1. Negligence*

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a return. Negligence also includes any failure by the taxpayer to keep adequate books and records to substantiate items. Negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion which would seem to a reasonable and prudent person "too good to be true" under the circumstances.[2]

*2. Disregard*

Disregard of the rules and regulations includes any careless, reckless or intentional disregard of the rules or regulations. Rules and regulations include the provisions of the Internal Revenue Code, temporary or final regulations, and revenue rulings and notices issued by the Internal Revenue Service. A disregard of the rules and regulations is

---

[1] Note that if negligence is asserted, a reasonable basis and disclosure do not preclude the imposition of the penalty.

[2] Treas. Reg. section 1.6662-(b)(1)(ii).

"careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[3]

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances that demonstrate a substantial deviation form the standard of conduct that a reasonable person would observe. A disregard is intentional if the taxpayer knows of the rule or regulation that is disregarded. A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice is the contrary position has a realistic probability of being sustained on its merits.[4]

**Analysis**

*1. Negligence*

In applying the accuracy penalty, the Service implied that the Taxpayer had been negligent because Taxpayer "should have known" that the deal was "too good to be true." Case law interpreting negligence concentrates, among other things, on whether the party in question the party sought legal and whether the taxpayer and/or the taxpayer's advisors had any experience in making similar investments. *Charfoos v. Commissioner of Internal Revenue,* T.C. Memo 1991-292; *Reali v. Commissioner,* T.C. Memo 1984-427; *Kozlowskiv. Commissioner,* T.C. Memo 1993-430.

In entering this transaction, the Taxpayer carefully and thoroughly considered all legal, economic, business and tax factors involved in this investment. The Taxpayer assembled a team of employees with considerable experience in investment transactions to review the business, legal and tax risks of the proposed transaction before engaging in it. The team provided its analysis to Taxpayer's Investment Committee before engaging in the transaction and the transaction was approved by the Investment Committee. Because the Taxpayer concluded the law was quite clear, it did not request a formal tax opinion from outside counsel.

The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003) for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of an accuracy related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, the Taxpayer's business purpose was to routinely make investments to support its insurance business. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position.

---

[3] Treas. Reg. section 1.6662-(b)(2).
[4] Treas. Reg. section 1.6662-4(b)(2).
[6] T.C. Memo 2004-179.

*a. Maintenance of records*

Additionally, the Taxpayer has maintained adequate books and records to substantiate items. In *Westby v. Commissioner*,[6] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, the Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively high standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[7] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[8] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[9] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[10]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, congressional intent, and guidance issued by the Service. The Taxpayer also relied upon an experienced team of employees. As a result of this thorough internal analysis, Taxpayer concluded that the law was quite clear. As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied. Here, the standard is met because the return position was based on a reasoned analysis of the law, which indicated that the return position was correct.

*3. Disclosure defense to disregard of the rules or regulations*

---

[7] Treas. Reg. section 1.6662-4(b)(3).
[8] Treas. Reg. section 1.6662-4(d)(3)(iii).
[9] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[10] Treas. Reg. section 1.6662-4(d)(3)(ii).

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[11]

Taxpayer concluded that the law was clear and did not file Form 8275. On its 2000 and 2001 returns, the Taxpayer prominently stated that it had received "Previously Taxed Income." This statement was a separate line item on Line 7 of Schedule M-1.[12] Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine. Because the Taxpayer did not attempt to bury the adjustment and because the Taxpayer complied with the Service's document request supporting this adjustment, it is unfair to assert a penalty merely because the Taxpayer did not attach a particular form to its return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[13]

---

[11] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.
[12] In 1999, this item was reported in another line item noted as Income from JVs.
[13] Treas. Reg. section 1.6664-2(c).

In this case, the Taxpayer relied on its team of experienced employees who reviewed the Code, regulations, case law, and Internal Revenue Service guidance. The internal review was not based upon unreasonable factual or legal assumptions or on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Because the Taxpayer thought the law regarding the transaction was quite clear, it did not seek a formal, written opinion. On its face, the regulation does not require a written opinion. After a careful and thorough analysis of all the business and tax factors, Taxpayer concluded that the transaction met not only its investment strategy but complied with the law. Accordingly, the Taxpayer had reasonable cause to and acted in good faith in entering the transaction.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies in accordance with Treasury Regulation section 1.6664-4(c). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or

2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[14]

Here, assuming arguendo that the transaction was a tax shelter, it was concluded that there is a greater than 50 percent the taxpayer will prevail. While it is true that the Taxpayer did not seek a written opinion, the regulation does not require a written opinion. To the contrary, the regulation provides that a corporation acts in good faith if the corporation relies on an advisor's opinion as long as the opinion is based on the pertinent facts and authorities and the advisor concludes that there is more than a 50 percent chance the position will be upheld. Here, Taxpayer's experienced team of

[14] Treas. Reg. section 1.6664-4(c)(2).

employees considered all of the factors carefully and as a result of this internal analysis concluded that there was a more than 50% chance of the position being upheld.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns. Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield that compared favorably with other short-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from the more complex, illiquid partnership structure. Taxpayer viewed its investment as being similar to an investment in an asset-backed security, which allows investors to maintain spreads while improving the credit quality of their investment. Likewise, the pool of taxable and tax-exempt assets held by the entity permitted Taxpayer to earn a yield comparable to BBB corporate securities while the structure raised the credit quality of the investment to the AA level. Taxpayer's purpose, therefore, was to realize the economic objective of earning an overall BBB yield over the two-year term of the partnership investment but with a higher overall credit quality estimated at AA-. The significance of the tax-exempt characteristic of the previously taxed income, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's yield on the investment. Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code, such as the previously taxed income benefit provided by section 959, in a manner consistent with the statute and Congressional purpose does not constitute a tax avoidance purpose.[15]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[16]

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[17] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of

---

[15] Treas. Reg. §1.6662-4(g)(2)(ii).
[16] Treas. Reg. section 1.6694-2(b)(1), (2).
[17] Treas. Reg. section 1.6662-4(d)(3)(iii).



084

appeal.[18] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[19]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

Here, the Taxpayer and the Service disagree on the treatment of the investment transaction, but that disagreement does not automatically nullify the efforts the Taxpayer undertook to analyze the transaction. Nor does it render the analysis unreasonable. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown reasonable cause and that it acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[20]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit year.[21] In the case of a tax shelter item, a tainted item is any item for which there is not

---

[18] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[19] Treas. Reg. section 1.6662-4(d)(3)(ii).
[20] IRC section 6662(2)(C).
[21] Treas. Reg. section 1.6662-4(c).

both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[22]

**Analysis**

*1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[23] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[24]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[25] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[26] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[27]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. Substantial authority for the transaction exists.

*2. Adequate disclosure and reasonable basis defense*

*a. Adequate disclosure*

Pursuant to Treasury Regulation sections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure. Revenue Procedure 2001-52[28] applies to tax returns filed on the 2001 tax form and addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and

---

[22] Treas. Reg. section 1.6662-4(c)(3).
[23] Treas. Reg. section 1.6662-4(d)(2).
[24] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[25] Treas. Reg. section 1.6662-4(d)(3)(iii).
[26] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[27] Treas. Reg. section 1.6662-4(d)(3)(ii).
[28] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[29]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. However, the Taxpayer did report a separate M-1 item.[30] The item was reported in tax years 2000 and 2001 as "Previously Taxed Income" on line 7 of Schedule M-1. This adjustment is not the result of netting.

The seminal case establishing the standard to measure whether an item was adequately disclosed is *Schirmer v. Commissioner*.[31] The *Schirmer* case is one of many hobby loss cases. In *Schirmer*, the taxpayer was a mechanical engineer who also owned a farm. The issue before the court was whether the farming activity was entered into for profit. The court held that the farm was a hobby activity. The taxpayer reported the farm's income and expenses on Schedule F and filed Form 4562 for depreciation and amortization deductions.

The court found that the inclusion of the schedules with the return did not constitute adequate disclosure. The information provided "was insufficient to enable respondent to identify the potential controversy involved here, that is whether petitioner engaged in the activity for profit."

None of the cases concluding that the disclosure was adequate directly address an M-1 adjustment. Instead, the cases deal with forms or statements attached to the return.[32]

---

[29] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46

[30] The Taxpayer reported the M-1 adjustment as a separate line item in years 2000 and 2001. In 1999, the Taxpayer had not received a distribution from the LLC. However, income had been accrued for statutory purposes, and a resulting M-1 adjustment was made. The adjustment was not separately itemized. However because the Taxpayer has substantial authority for its position, the substantial understatement penalty should not apply to tax year 1999.

[31] 89 T.C. 277 (1987).

[32] See *Elliot v. Commissioner*, 73 T.C.M. 3197 (1997) (adequate disclosure where taxpayer attached Form 8275 claiming deduction under section 1244 but abandons that position to deduct the losses as bad debts); *Henry v. Commissioner*, 73 T.C.M. 1769 (1997) (attaching a statement indicating options with a zero basis was adequate to apprise the Service of the issue of proper reporting as long term capital gain); *Dibsy v. Commissioner*, 70 T.C.M. 918 (1995) (reporting business income from a liquor store on Schedule C and a "transaction involving the same liquor store which produced zero capital gain as reported on Schedule D" was adequate to alert the Service to identify the controversy – whether the taxpayers engaged in a tax free exchange under section 1031); *Mayhew v. Commissioner*, 63 T.C.M. 1984 (1992) (adequate disclosure was found where the taxpayer reported a capital gain resulting from the sale of a partnership interest even though the court held the income to be ordinary); *Rebecca K. Crown Income Charitable Fund v. Commissioner*, 98 T.C. 327 (1992) (filing Forms 5227, 1041-A, and 1041 adequately disclosed that the trust was structured as a charitable lead trust, that an annual annuity of $975,000 was required to be paid, and that the trust claimed charitable deductions in excess of the annual annuity amount, putting the Service

Here, however, the M-1 adjustment was clearly set out as a separate line item, including which company in the affiliated group earned the income. The adjustment was clearly identified as "Previously Taxed Income." This should be considered more than enough to "to identify the potential controversy involved," i.e. whether the income was previously taxed income and therefore excludable from taxable income.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[33] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[34] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[35] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[36]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement

---

on notice that the claimed deductions might exceed the amounts paid to charitable beneficiaries under the terms of the trust agreement for purposes of section 642(c)); *Zermeno v. Commissioner*, 62 T.C.M. 1155 (1991) (statement explaining interest income was not effectively connected income was adequate); *Pinson v. Commissioner*, 59 T.C.M. 554 (1990) (adequate disclosure where statement disclosing underlying facts and other documents outlining their legal position and pursuit of civil recourse was sufficient for a theft loss deduction).

[33] Treas. Reg. section 1.6662-4(b)(3).

[34] Treas. Reg. section 1.6662-4(d)(3)(iii).

[35] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).

[36] Treas. Reg. section 1.6662-4(d)(3)(ii).

for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.

# DISCLOSURE STATEMENT FOR REPORTABLE TRANSACTION

Principal Life Insurance Company
711 High Street
Des Moines, Iowa 50392-0350

EIN: 42-0127290

1. Identification of transaction: Taxable transfer to Wind River Corporation

2. Registration status under section 6111: Not registered

3. Description of transaction: On December 20, 2002, Principal Life Insurance Company, an indirect subsidiary of Principal Financial Group, Inc. (EIN: 42-1520346), transferred investment securities to Wind River Corporation in exchange for stock.

4. Principal tax benefits: Capital loss recognized on the transfer.

5. Estimates of expected reduction of Federal income tax liability for affected taxable years: $73 million 2002, carried back to 1999. $5 million in 2003.

6. Entities providing advice: KPMG, LLP, 303 E. Wacker Drive, Chicago, IL 60601. Telephone number 312-665-1000.

# TAB 11

Principal Financial Group

Principal Life Insurance Company

February 12, 2008

Internal Revenue Service Center
Ogden, UT 84201-0012

Re: Claim for Refund
Principal Financial Group, Inc. EIN: 42-1520346

Enclosed is the 2003 amended consolidated federal income tax return for Principal Financial Group, Inc., being herein sometimes referred to as "Principal," "Principal Life Insurance Company," or "Taxpayer."

The following items are included:

1. Form 1120 Claim for Refund
2. Income Tax Return for 2003 Form 1120 for Consolidated Taxable Income
3. Schedule D (Form 1120) Capital Gains and Losses
4. Copy of Original Return Form 851, Affiliations Schedule and attachment.
5. Form 1118, Computation of Foreign Tax Credit – Financial Services Regular Taxable Income; Alternative Minimum Taxable Income.
6. Form 1118, Computation of Foreign Tax Credit – Dividends from Each Noncontrolled Section 902 Corporation Regular Taxable Income; Alternative Minimum Taxable Income.
5. Form 1118, Computation of Foreign Tax Credit – High Withholding Regular Taxable Income; Alternative Minimum Taxable Income.
6. Form 4626 - Alternative Minimum Tax Corporations.
7. Form 4797 - Supplemental Schedule of Gains and Losses.
8. Form 8827 – Credit for Prior Year Minimum Tax - Corporations
9. Form 1120 Supporting Statements
10. Statement of Facts and Grounds for Refund
11. Copies of reportable transactions

In addition to deficiency interest and statutory interest noted in the claim calculation, the Taxpayer claims refund for interest calculated under Section 6621(d) of the Internal Revenue Code. Should the Service deny any of the items claimed, the Taxpayer requests such denial be made in a Notice of Proposed Disallowance. In addition to the items identified, the Taxpayer claims refund arising from any change in one of the items that results in a decrease in federal income tax in a prior year, the current year, or a subsequent year.

If you have any questions, please call Lillian Chen at (515) 247-5545.

Sincerely,

Lillian Chen

Lillian Chen
Vice President – Tax
Principal Financial Group, Inc.

Enclosures
S:\H035\Audits\99-00\cover letter.doc

PRINCIPAL FINANCIAL GROUP, INC.
711 High Street
Des Moines, IA 50392-0350

EIN 42-1520346

CLAIM FOR REFUND

AMENDED RETURN - CLAIM FOR REFUND
Taxable Year 2003

As shown on Amended Return and supporting schedules attached, Taxpayer hereby makes claim for refund in connection with federal income taxes paid, plus deficiency interest paid with respect to the portion of such overpayment paid pursuant to revenue agent's adjustment and subsequent assessment, plus statutory interest. thereon as allowable by law.

The claim which is made as aforesaid, computed as follows:

| | | |
|---|---|---|
| Tax paid with or before filing of original return | $116,743,411 | $116,743,411 |
| Less: | | |
| 2003 Tax paid with Return | $8,669,331 | |
| Tax refund received 2003 Form 1139 - filed 3/23/2004 | ($17,962,792) | |
| Tax paid with 2003 tax audit - per RAR | $51,935,407 | |
| Less application of amount paid with tax return | ($8,669,331) | |
| Plus refund show on return file March 04 included in audit | ($62,666) | |
| Tax refund requested on 1120-X filed 8/16/07 | ($9,120,865) | |
| Tax paid with 2003 tax audit - per 2nd RAR | $3,790,836 | |
| Net Tax Paid | $28,579,920 | $28,579,920 |
| | | $145,323,331 |
| Tax per line 31, Consolidated 1120 - Claim for Refund | $133,380,085 | |
| Request abatement of IRC. Sec 6662 penalty * | | |
| Correct amount of tax and penalty, as computed by taxpayer | | $133,380,085 |
| TAX REFUND CLAIM | | ($11,943,246) |

S:\H035\Audits\02-03\Claim\PFG Claim RAR\[Tax refund summary.xls]2003

Principal Life Insurance Company
FEIN 42-0127290
Carryback Claim
Form 1120-X
Year Ended December 31, 2003

CLAIM FOR REFUND

| | | |
|---|---|---|
| Taxable income as previously reported<br>(Source: 2002/2003 RAR report) | 562,244,181 | |
| Adjustments | | |
| Adjustments reported in Claim | (60,765,419) | |
| Taxable Income Reported on 1120-X | 501,478,762 | |
| Tax computed on revised taxable income | 175,517,567 | |
| Tax reported on Previously filed return - before credits | 196,785,463 | |
| Decrease in Tax Liability | | (21,267,896) |
| Change in FTC from RAR | | |
| Foreign tax credit per RAR plus prior claim for FTC | (37,175,609) | |
| Foreign tax credit per Claim | (37,051,378) | |
| Foreign tax credit carryforward from 2002 in audit. This amount is carried back to 2000 in taxpayer calculation | | 124,231 |
| Change in AMT tax | | |
| AMT credit carryforward reported on previous return | (13,848,463) | |
| AMT credit carryforward reported on amended return | (4,400,797) | |
| Additional AMT credit carryforward | | 9,447,666 |
| Net Decrease in Tax | | $ (11,695,999) |
| Request abatement of IRC. Sec 6662 penalty * | | $ (247,247) |
| Total Refund requested | | $ (11,943,246) |

S:\H035\Audits\02-03\Claim\PFG Claim RAR\[2002-2003 Claim All Year Summary.xls]2003