# TAB 19

**PRINCIPAL LIFE INSURANCE COMPANY**
**TAX YEAR 2003**
**$2,100,000**

**OTHER DEDUCTIONS – ORDINARY LOSS ON COMMERCIAL MORTGAGE LOAN 751486**

## ISSUE

Taxpayer claims a refund for a deduction in the amount of $6,000,000 for the partial worthlessness of a commercial mortgage loan may be allowed for the tax year 2003.

## FACTS

On June 10, 1997, Principal Life Insurance Company (formerly known as Principal Mutual Life Insurance Company), a corporation doing business as an insurance company ("Principal Life"), issued a substantially non-recourse mortgage loan (Principal Life's loan number 751486) to Connecticut General Life Insurance Company ("CIGNA"). The mortgage loan had an original principal balance of $9,175,000, a note rate of 7.23%, and a maturity date of June 1, 2002. Under the terms of the deed of trust note, CIGNA waived presentment, protest and demand, notice of protest, notice of default, and other notices. The loan was secured by Saratoga Springs Apartments, a 264-unit multi-building Class A apartment complex built in 1994 at 17671 Addison Road, Dallas, Texas. CIGNA's liability to Principal Life was limited to its interest in the property and the rents, issues, proceeds and profits from the property (except that CIGNA was personally liable in certain circumstances such as for waste it committed or allowed to the property, situations where CIGNA was required to indemnify Principal Life for certain environmental issues, or CIGNA's failure to operate and maintain the complex in accordance with standards for a Class A apartment complex). Principal Life was accordingly limited to foreclosure for relief, except in the specified instances.

In 1999, approximately 155 of the apartment units were found to contain Stachybotrys (toxic black mold) and other biohazardous substances of various levels and types. At that time, the occupancy rate was 56%. By mid-2000 the property was completely vacant, remaining empty throughout 2003. CIGNA made its last interest-only payment on the mortgage on June 1, 2001—CIGNA made no further debt service payments, as there were no tenants and CIGNA was receiving no income from the apartment complex. The loan was still in default as of December 31, 2003.

A group of tenants instituted a class action lawsuit against the landlord. CIGNA was not able to settle the personal injury claims, and because the units involved in litigation could not be fixed because the conditions had to be documented for the trial, CIGNA was not able to move forward with reconstruction of the property. After making the attempt in a couple of the units not involved in the lawsuit, CIGNA determined that remediation and repair was not possible, and that the complex would have to be knocked down and rebuilt. Contracting services for remediation and repair were terminated in June 2003.

In September 2001, Principal Life contributed the note and deed of trust to 17671 Addison Road, LLC, a limited liability company disregarded for federal income tax purposes, of which Principal Life was the sole and managing member. This was done to insulate Principal Life from liability pertaining to current and potential third party lawsuits.

Principal Life (through the holder of the note, 17671 Addison Road, LLC) also pursued litigation against CIGNA, under the theory that CIGNA had committed one of the acts specified above that would result in

its personal liability. The complaint was filed in October 2001, and in April 2004 the court ruled against the LLC (i.e., against Principal Life).

In 2003, Principal Life's local counsel ordered an appraisal of the property securing the loan. In June 2003, based on early indications from the appraiser (Paul Hornsby & Company, an independent and unaffiliated Texas real estate appraisal business), Principal Life recorded a permanent impairment of $6 million, reducing the book value of the mortgage loan principal from $9,175,000 to $3,175,000. This write-down was approved by Principal Life's internal Portfolio Asset Management Committee, which included officers of Principal Life experienced in valuing and managing problem assets. The completed appraisal, dated August 4, 2003, contained a final value estimate of $3,500,000.

Principal Life recorded the permanent impairment by debiting a realized loss account (3525724) and crediting a contra-asset account (0886049). The contra-asset account is not a reserve account. It did not contain any entries other than the entry for mortgage loan number 751486. For reporting purposes, the balance in account 0886049 was netted against the principal balance of the mortgage loan. Only the net amount ($3,557,844) was reported on the Principal Life Annual Statement, Schedule BA – Part 1 (showing other long-term invested assets owned December 31, 2003) as the mortgage loan/LLC's book/adjusted carrying value. The loan was permanently reduced on Principal Life's GAAP and statutory balance sheets. On its tax return for the year 2003, Principal Life claimed a deduction for partial worthlessness of this loan, in the amount of $6 million, as an "Other Deduction."

The procedure described above was followed because Principal Life determined that this impairment was permanent, and accordingly reported it under procedures for permanently unrecoverable amounts. No reserve accounts are used for permanent impairments. If the impairment had been considered temporary, different procedures would have been followed. Principal Life follows one of two procedures for temporary impairments:

- Mandatory reserves:
  Under statutory accounting rules, mandatory reserves are required for loans in default, foreclosure, etc. Principal Life accounts for this type of temporary impairment in commercial loans by debiting an unrealized gain/loss account and crediting a reserve account in accordance with the statutory accounting rules. Principal Life records these mandatory reserves in trial balance account 9030088, with the corresponding unrealized losses in account 9031058.
- Discretionary reserves:
  In addition to the mandatory reserves, Principal Life maintains an additional reserve for loans that show signs of distress but do not meet the requirements for the mandatory reserve. These discretionary reserves are recorded in trial balance account 9030096, with the corresponding unrealized losses in account 9031057.

These unrealized losses recorded for temporary impairments are subject to revision or recovery, and the reserve accounts fluctuate as unrealized losses are increased or recovered. These reserves for temporary impairments are not offset against specific mortgage loans, but are netted against the total book value of the commercial mortgage loans reported on Schedule B. (This net amount is reported on the asset page.) No tax deduction is claimed by Principal Life for these increases to temporary reserves.

Principal Life did not foreclose on the mortgage or forgive any portion of the principal balance owed by CIGNA. Therefore, no notice was sent to CIGNA that the asset valuation of the mortgage was reduced. Principal Life was not interested in taking ownership of the property because of the mold situation and the costs to rebuild. Instead, Principal Life wanted to recoup as much of the outstanding debt as possible and move on.

The Internal Revenue Service disallowed the deduction upon audit, for the stated reasons that the loan was not partially or totally worthless, written off, foreclosed, or forgiven; no notice was given to the debtor that the asset balance was reduced; and the deduction was due to the establishment of a bad debt reserve, open only to small banks.

In late 2004 Principal Life was approached by a third party, unrelated to Principal Life or to CIGNA, interested in purchasing the note. This offer was accepted, and on December 29, 2004, Principal Life received $5,975,000 from Maverick-Southwest Holdings LP for mortgage loan number 751486. Litigation with CIGNA, on appeal at that time, was terminated. After consideration of the 2003 permanent impairment, additional costs such as legal fees, and cash received, a taxable recovery of $2,085,817.73 resulted. Principal Life reported this amount as taxable ordinary gain in tax year 2004.

| | |
|---|---|
| Principal Balance | $(9,175,000.00) |
| Appraisal Fees | (4,306.25) |
| Legal Fees | (92,094.16) |
| Title Fees | (270.63) |
| Tax Advancements | (617,511.23) |
| Mortgage Basis | (9,889,182.27) |
| Permanent Impairment, 2003 | 6,000,000.00 |
| Funds from sale of note | 5,975,000.00 |
| Recovery | $2,085,817.73 |

## ANALYSIS

Internal Revenue Code (IRC) § 166(a)(2)[1] provides that, when satisfied that a bona fide business debt is recoverable only in part, the Secretary may allow a deduction for such debt in an amount not in excess of the part charged off within the taxable year. A deduction for a partially worthless business debt may be claimed either in the year in which that part of the debt becomes worthless or in any subsequent year prior to the time the debt becomes wholly worthless.[2]

The taxpayer must demonstrate to the Internal Revenue Service to what extent the debt was worthless and the amount charged off.[3] If, from all the surrounding and attending circumstances the Internal Revenue Service is satisfied that a debt is partially worthless, the amount which has become worthless shall be allowed as a deduction, but only to the extent charged off during the taxable year.[4] If a taxpayer charges off and deducts a portion of a debt, but the deduction is disallowed for that year, the charge-off carries over to subsequent years.[5]

***Amount of Partial Worthlessness During the Taxable Year***

In determining whether a debt is worthless in whole or in part, the Internal Revenue Service must consider all pertinent evidence, including the value of the collateral[6] (if any) securing the debt and the financial condition of the debtor.[7] Legal action by the creditor against the debtor is not required; where the surrounding circumstances indicate that all or part of a debt is worthless and uncollectible, and that

---

[1] All IRC references are to the Internal Revenue Code of 1986, as amended.
[2] *Findley v. Commissioner*, 25 TC 311 (1955), *affd. per curiam* 236 F.2d 959 (3rd Cir. 1956).
[3] Treas. Reg. §1.166-3(a)(2)(iii).
[4] Treas. Reg. §1.166-3(a)(2)(i).
[5] Treas. Reg. §1.166-3(a)(2)(ii).
[6] Underlined terms are discussed in more detail below.
[7] Treas. Reg. §1.166-2(a).

legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under IRC § 166.[8]

In the case of a deduction for partial worthlessness, although the deduction is not limited to the year in which the debt becomes worthless, in other aspects the same criteria used to determine whether a debt is wholly worthless apply in determining partial worthlessness. Whether a debt has become worthless is a question of fact. The Eighth Circuit Court of Appeals provides the following rules (citations omitted):

> The proper test to be used in determining the worthlessness of a debt is the exercise of sound business judgment, and there is no black rubric standard. If collection seems hopeless to a reasonable man knowledgeable in the field of business, a deduction is justified.[9]

For partial worthlessness, the taxpayer may face a heavier burden of proof because of the provision that the Internal Revenue Service "may" allow the deduction,[10] and the determination of the Internal Revenue Service generally will not be reversed unless it is arbitrary and unreasonable and constitutes an abuse of discretion.[11] However, the discretion of the Internal Revenue Service is not absolute and must be based upon reason, and the Internal Revenue Service must respect the taxpayer's sound business judgment if the taxpayer can show that a reasonable person would conclude that the debt is only recoverable in part.[12] If the business judgment of the taxpayer is coupled with facts which establish the reasonableness of such judgment, disallowance by the Internal Revenue Service is not a reasonable exercise of discretion, and the deduction must be allowed.[13] Events in subsequent years may be considered in evaluating the reasonableness of the taxpayer's business judgment.[14]

Value of Collateral

Principal Life hired an unrelated third party real estate appraisal firm, Paul Hornsby & Company, to value the apartment building. The appraiser indicated in June 2003 that the reduction in value would be approximately $6 million less than the outstanding principal loan balance. Accordingly, Principal Life recorded a permanent impairment in that amount so as not to overstate its assets in its second quarter financial statements. The completed appraisal, dated August 4, 2003, contained a final valuation of $3,500,000, which was $5,675,000 less than the outstanding principal balance, somewhat more than originally estimated but about 95% of the original impairment indicated. Although one might wish to quibble about the 5% difference ($325,000 less than $6,000,000), it is clear that the property was worth substantially less than the principal loan balance of $9,175,000.

Financial Condition of Debtor, Legal Action, and Surrounding Circumstances

A non-recourse debt is a secured loan that is secured by a pledge of collateral (in this case real property) for which the borrower is not personally liable. If the borrower defaults, the lender/issuer can seize the collateral, but the lender's recovery is limited to the collateral. If the property is insufficient to cover the outstanding loan balance, as when the value of a parcel of real property declines, the lender is simply out the difference.

---

[8] Treas. Reg. §1.166-2(b).
[9] *Riss v. Commissioner*, 478 F.2d 1160, 1166 (8th Cir. 1973).
[10] IRC § 166(a)(2).
[11] *Findley, supra.*
[12] *Portland Manufacturing Company, et al v. Commissioner*, 56 TC 58 (1971); *The Austin Co., Inc., v. Commissioner*, 71 TC 955 (1979).
[13] *Portland Manufacturing Company, supra.*
[14] *Portland Manufacturing Company, supra.*

Because the mortgage loan in question was a non-recourse loan, the financial condition of the debtor, CIGNA, is irrelevant. Legal action against CIGNA to enforce payment failed, as CIGNA had no legal obligation beyond relinquishing the real property. It would not have been in the best interests of CIGNA to make payment on a loan that was in excess of the value of the property securing the loan. The recovery of the lender, Principal Life, was limited to the value of the collateral (the apartment building that was contaminated with black mold) or to whatever amount it could sell the note for.

Legal action to foreclose would have left Principal Life with a property worth considerably less than the principal balance owing. This would not have made Principal Life whole, and it would have had to contend with cleaning up a toxic apartment complex.

As noted above, legal action to enforce payment is not required where the surrounding circumstances indicate that such action would likely not result in satisfactory relief.[15] Accordingly, Principal Life was not required to take legal action to foreclose on the mortgage. Principal Life litigated in an attempt to collect under three theories, but was unable to establish any liability of CIGNA beyond the collateral Under the circumstances of this loan, the financial condition of the debtor does not constitute evidence that the loan was not partially worthless.

Sound Business Judgment

As indicated previously, the Internal Revenue Service must respect the taxpayer's sound business judgment if the taxpayer can show that a reasonable person would conclude that the debt is only recoverable in part.

CIGNA would have been acting against its business interests to have made payment on a non-recourse loan for an amount considerably in excess of the value of the collateral. Principal Life hired an unrelated party to evaluate that value; it was finally determined that the property was worth $5,675,000 less than the outstanding principal balance, which is close to the amount Principal Life wrote off.

Principal Life exercised sound business judgment in determining that to foreclose on the mortgage, ending up with buildings that had to be torn down and rebuilt, was not in accordance with the business aims of Principal Life. Holding a mortgage loan is not the same business activity as building a commercial apartment complex. In this case, rather than holding a sellable building, Principal Life would have had to engage in demolition and construction before it would have a building to sell. Therefore, Principal Life did not wish to acquire ownership of the property.

The loan was non-recourse. At the time of the charge-off, the debtor was in default, had been so for two years, and had no business reason to resume making payments on the debt. The property was vacant and had been so for years. This constitutes ample evidence of impairment.

Principal Life has established that the debt was partially worthless, but not totally worthless, in 2003. Therefore, 2003 is an acceptable year for the deduction for partial worthlessness. Principal Life has also established that a considerable portion of the debt was worthless. Although the amount of impairment could not be known with exact certainty, the findings of the appraiser made clear that the diminution in value was at least several million dollars. The soundness of this determination is illustrated by the sale in 2004 for millions less than the unpaid principal balance.

Because the soundly exercised business judgment of Principal Life is supported by facts which establish that its judgment was reasonable, disallowance by the Internal Revenue Service is not a reasonable exercise of discretion, and the deduction must be allowed to the extent of the partial worthlessness.

[15] Treas. Reg. §1.166-2(b).

***Amount Charged Off***

The purpose of the charge-off requirement is to establish that the taxpayer has abandoned any hope of collecting the portion of the debt that is claimed as worthless.[16] This requirement also ensures that the treatment of the debt for tax purposes is consistent with the taxpayer's treatment for financial accounting purposes; it prevents a taxpayer from taking advantage of the loss for tax purposes while continuing to carry the item on the books as an asset for other purposes.[17] A charge-off may be necessary to determine the extent to which income is realized upon a later recovery on the debt, or to determine the basis of a debt which is later sold.[18]

Neither the statute nor the regulations prescribe a particular method for making a charge-off of a partially worthless debt from books of account. To satisfy the charge-off requirement, the taxpayer must take some action (normally a bookkeeping entry) which clearly establishes that a specific portion of the debt has become worthless and will no longer be included in book assets of the taxpayer. There is no fixed mode of charge-off; anything which manifests the intent to eliminate an item from assets is sufficient.[19] Courts have accepted numerous methods, including for example:

- eliminating the worthless portion from notes or accounts receivable and making a corresponding entry to a bad debt account,[20]
- adjusting journal entries and crediting a special account,[21] and
- charging an item to profit and loss account and removing from the balance sheet while retaining in a suspended receivables account.[22]

Principal Life effectively eliminated the worthless portion of the mortgage loan debt from its statutory accounting records. SSAP No. 37 governs the statutory accounting for mortgage loans. SSAP No. 37 distinguishes between temporary impairments and permanent impairments. In the case of temporary impairments, the difference between the net value of the collateral and the recorded amount of the mortgage loan is recorded as an unrealized loss and is reflected as a valuation allowance. However, if the impairment is permanent, SSAP No. 37 requires a direct write-down of the loan, recognition of a realized loss, and establishment of a new cost basis, which cannot be changed for subsequent recoveries in value. (Accordingly, Principal Life did not increase the basis when the final valuation came in slightly higher than the appraiser had indicated in June 2003.) Principal Life recorded a permanent impairment and a realized loss in accordance with SSAP No. 37, reporting the reduced asset value on Schedule BA.

Principal Life recorded the permanent impairment by debiting a realized loss account and crediting a contra-asset account. For reporting purposes, the balance in the contra account was netted against the principal balance of the mortgage loan. The net amount was reported on Schedule BA (Assets) as the mortgage loan's book value, statement value, and market value. The loan was permanently reduced on Principal Life's GAAP and statutory balance sheets. Principal Life eliminated the worthless portion from notes receivable and made a corresponding entry to a bad debt account. As noted above, case law has found this to be an acceptable method for eliminating the item from assets. The amount was properly charged off.

---

[16] *Findley v. Commissioner*, 25 TC 311 (1955).
[17] *Commissioner v. MacDonald Engineering Co.*, 102 F.2d 942 (7th Cir. 1939).
[18] *International Proprietaries, Inc., v. Commissioner*, 18 TC 133 (1952).
[19] *Commissioner v. MacDonald Engineering Co., supra.*
[20] *American Cigarette & Cigar Co. v. Bowers*, 92 F.2d 596 (2nd Cir. 1937).
[21] *Brandtjen & Kluge, Inc., v. Commissioner*, 34 TC 416 (1960).
[22] *Fairbanks, Morse & Co. v. Harrison*, 63 F. Supp. 495 (N.D. Ill. 1945).

***Loan not Foreclosed or Forgiven***

One of the stated reasons for disallowance by the Internal Revenue Service is that the loan was not foreclosed or forgiven. The taxpayer is not required to release or cancel the worthless amount.[23] This argument is without merit.

***Notice to the Debtor***

One of the stated reasons for disallowance by the Internal Revenue Service is that no notice was given to the debtor that the asset value was reduced. Charge-off for partial worthlessness of a debt does not require debtor notification.[24] The Internal Revenue Service has acquiesced to this rule. The argument is without merit.

***Bad Debt Reserve***

One of the stated reasons for disallowance by the Internal Revenue Service is that the deduction was due to the establishment of a bad debt reserve, open only to small banks.[25] The taxpayer concedes that the reserve method, formerly allowed under IRS §166(c), was repealed in 1986 for taxpayers other than small banks. However, the taxpayer did not use the reserve method, also known as the "bank experience method." This method calculates an ending reserve balance by multiplying the outstanding combined loan amounts at the end of the taxable year by an average percentage of uncollectible loans present during the current and preceding five taxable years. The method is based on a reasonably accurate prediction as to the percentage of receivables which will go uncollected. It does not reference specific loans. It is a forecast, not relying on specific circumstances that have already occurred. Principal Life does not maintain a reserve for bad debts. The deduction in question was based on a specific loan, and on identifiable events which occurred to render the loan partially worthless prior to the end of the year 2003. A specific write-down was credited to a contra-asset account that related only to the specific mortgage loan in question. The argument of the Internal Revenue Service that the reserve method was used is without merit.

***Recent Case Law Supports Principal Life's Position***

A Tax Court Memorandum decision is generally issued when the rules of law affecting the outcome of a case are well settled. A recent such decision[26] determined that a company was entitled to claim a $10 million bad debt deduction for partial worthlessness equal to the difference between the outstanding loan balance and the fair market value of the real property securing the loan. The decision upholds many considerations that apply to this determination:

- The Internal Revenue Service must reasonably exercise its discretion.
- The Internal Revenue Service cannot ignore the sound business judgment of a corporation's officers.
  - Officers of Principal Life exercised their business judgment in determining that it was not appropriate to hold the full value of the debt as an asset on its books, and that given the surrounding circumstances, foreclosure would not serve the business interests of Principal Life.
- Legal action to enforce payment is not required where the surrounding circumstances indicate that a debt is worthless and legal action would likely not result in satisfactory relief.

---

[23] *Henry v. U.S.*, 180 F. Supp. 597 (Ct. Cl. 1960).

[24] *Hammerschmidt & Franzen Co. v. Commissioner*, 12 BTA 811 (1928), *acq.*, VII-1 CB 19.

[25] The Internal Revenue Service does not reference the conclusive presumption of worthlessness available to banks and other regulated businesses such as insurance companies. Treas. Reg. §1.166-2(d)(1). This presumption requires the involvement of the regulating authority, either in ordering the charge-off or confirming in writing that it would have been ordered. The taxpayer does not argue that this presumption applies here.

[26] *ABC Beverage Corp., F.K.A. Beverage America, Inc., v. Commissioner*, TC Memo 2006-196.

  - Because the debt was substantially non-recourse, there was no purpose in pursuing legal action to enforce general personal liability against the debtor. Such relief would not have been granted.
- A decline in the value of property securing a debt, with an appraisal revealing a reduced valuation, is an objective identifiable event indicating whole or partial worthlessness.
  - Principal Life obtained an appraisal from an independent third party appraisal firm, affirming a substantial diminution in value caused by toxic black mold and other biohazardous substances.
- The debtor's default or refusal to pay for valid business reasons is an objective identifiable event indicating whole or partial worthlessness.
  - CIGNA defaulted, refusing to pay on the non-recourse loan, presumably for the valid business reason that the property was worth substantially less than the amount CIGNA owed on the loan.

The legal principles governing the outcome of a partial bad debt deduction with the facts existing in this case are well settled. The Internal Revenue Service abused its discretion

***Alternative Position***

If the deduction is completely or partly denied for the tax year 2003, then the income reported in 2004 must be reduced by an equal amount.[27] As noted previously, if a taxpayer charges off and deducts a portion of a debt, but the deduction is disallowed for that year, the charge-off carries over to subsequent years.[28] The subsequent year, 2004, is the year in which the note was sold. Principal Life reported a gain on the disposition. If the 2003 deduction is fully or partially disallowed, the 2004 gain must be adjusted accordingly to allow for a higher basis.

**<u>CONCLUSION</u>**

The taxpayer has shown that by the end of 2003 a bona fide business debt had become partially worthless and that such partial worthlessness was properly charged off. The deduction should be allowed in the tax year 2003 in the amount of $6,000,000. In the alternative, the gain on recovery reported in the year 2004 must be reduced by whatever amount is not allowed in the year 2003, resulting in a decrease to 2004 income in the same amount.

---

[27] From *Levine v. Commissioner*, 31 TC 1121 (1959) (citations omitted):

> The precedents are replete with instances of subsequent recoveries on obligations previously treated as totally or partially worthless... If there is a total or partial recovery, this will constitute income, at least to the extent of any prior tax benefit. If it is sold, whether or not as a capital asset, the result is an income adjustment, with the item given a basis of zero or more, depending on the previous treatment.

[28] Treas. Reg. §1.166-3(a)(2)(ii).

# TAB 20

**PRINCIPAL LIFE INSURANCE COMPANY**
**TAX YEAR 2003**
**$2,450,000**

**OTHER DEDUCTIONS – ORDINARY LOSS ON COMMERCIAL MORTGAGE LOAN 201710**

## ISSUE

Taxpayer claims a refund for a deduction in the amount of $7,000,000 for the partial worthlessness of a commercial mortgage loan may be allowed for the tax year 2003.

## FACTS

On December 2, 1981, Principal Life Insurance Company (formerly known as Bankers Life Company), a corporation doing business as an insurance company ("Principal Life"), originated loan number 201710. The principal balance was $30,476,600 and the maturity date was December 1, 2006. The non-recourse loan was made to Pittbalt, Inc. ("Pittbalt), secured by an office building located at 500 N. Water Street, Corpus Christi, Texas. Three lenders were involved with the issuance of the original loan: Principal Life Insurance Company, 71.43% ($21,769,435.38); CIGNA, 14.285%; and Pacific Mutual, 14.285%. MBank Corpus Christi (Bank of America) was the lessee under a master lease for the entire office building. MCorp, a bank holding company, guaranteed the lessee's obligations under the master lease. Principal's share of the property was valued at $29,200,000 as of the loan date, December 2, 1981.

In 1990, MCorp filed for Chapter 11 bankruptcy. To avoid problems in dealing with the FDIC, the lenders allowed the senior management of the bank occupying the building to assume the master lease from MBank Corpus Christi. The lenders then agreed to restructure the loan, reducing the pay rate in order to enable the borrowers to more easily make debt service payments. At that time, Principal Life's share of the loan balance was $21,560,11.75. The master lease was extended to August 30, 2015. The lease specified the amount of rent through October 1, 1995. After that date, rent was to be adjusted every three years to market levels, but not below the current rent amount. Because the loan was non-recourse to the borrower and there was no longer a guarantor, the rental amounts under the master lease determined the borrower's ability to service the debt.

In 2001, Terrance F. Wood & Company, an independent third party appraisal firm, conducted the required limited scope appraisal to estimate the fair market rental under the master lease. The calculated monthly installment was less than the current rent; therefore, the terms of the lease did not change. (The 2004 appraisal done by the same firm showed a further decline in market rents). The decrease in rental value was due to the fact that Corpus Christi was oil-industry based. At that time the industry in the area was in decline; there were few new jobs, with decreasing demand for office space, resulting in a roughly 30% vacancy rate in the area because of overbuilding prior to the slump.

The requirement in the lease that rent could not go below the current rent as of 1990 put this property at a competitive disadvantage in the area. Rents in Corpus Christi were decreasing, but the owners of this property could not reduce the amounts they charged. Therefore, there was some vacancy and total rent collected was not adequate for sufficient profit. The loan was in arrears in 2003. However, the loan did not go into default status. Bank of America received the rents as trustee and paid taxes, utilities, etc., from the rents, passing the remainder on to the lenders, including Principal Life. The principal amount due was increasing as payments were less than accrued interest, but some payment continued to be received by Principal Life.

The Annual Statement of Principal Life Insurance Company for the year 2002 reported a book value of $23,474,483for Principal's share of this investment. The 2002 statement continued to reflect the original value of the collateral, $29,200,000. Amid concerns that the borrower would default on the loan at maturity and that the value of the property would not support the principal balance of the loan, Dick Bruce, Director of Appraisal Services for Principal Real Estate Investors and an officer of Principal Life, traveled to Corpus Christi in 2003, inspected the property, and discussed the situation with the appraiser Terrance Wood of Terrance F. Wood & Company. Mr. Bruce then updated his earlier discounted cash flow analysis and estimated that the collateral would be worth only $23,100,000 as of July 3, 2003. Principal Life's 71.43% share of this amount was approximately $16.5 million. Because Principal Life's loan balance was approximately $23.5 million, a permanent impairment of $7 million was recorded. This impairment was approved by officers of Principal Life, including Mr. Bruce. Accordingly, the book value/recorded investment for this loan was reduced from $23,474,483 to $16,474,483. (The value of the collateral was reduced from $29,200,000 to $16,475,000, a reduction of $12,725,000, reflecting that the loan value was now equal to the value of the collateral.)

Principal Life recorded this permanent impairment by debiting a realized loss account (3422000) and crediting a contra-asset account (0746100). The contra-asset account is not a reserve account. For reporting purposes, the balance in account 0746100 was netted against the principal balance of the specific mortgage loan in question. Only the net amount of the loan after the write-down ($16,474,483) was reported on the Annual Statement for the year 2003, Schedule B – Part 1, as the book value/recorded investment of this specific mortgage loan. (Schedule B – Part 1 lists all mortgage loans owned as of December 31 of the current year.) The loan valuation was also permanently reduced on Principal Life's GAAP and statutory balance sheets. As a result, Principal Life's financial statements reflected a lower total asset value than would have been the case without the impairment. On its tax return for the year 2003, Principal Life claimed a deduction for partial worthlessness of this loan, in the amount of $7 million, as an "Other Deduction."

The procedure described above was followed because Principal Life determined that this impairment was permanent, and accordingly reported it under procedures for permanently unrecoverable amounts. No reserve accounts are used for permanent impairments. If the impairment had been considered temporary, different procedures would have been followed. Principal Life follows one of two procedures for temporary impairments:

- Mandatory reserves:
  Under statutory accounting rules, mandatory reserves are required for loans in default, foreclosure, etc. Principal Life accounts for this type of temporary impairment in commercial loans by debiting an unrealized gain/loss account and crediting a reserve account in accordance with the statutory accounting rules. Principal Life records these mandatory reserves in trial balance account 9030088, with the corresponding unrealized losses in account 9031058.
- Discretionary reserves:
  In addition to the mandatory reserves, Principal Life maintains an additional reserve for loans that show signs of distress but do not meet the requirements for the mandatory reserve. These discretionary reserves are recorded in trial balance account 9030096, with the corresponding unrealized losses in account 9031057.

These unrealized losses recorded for temporary impairments are subject to revision or recovery, and the reserve accounts fluctuate as unrealized losses are increased or recovered. These reserves for temporary impairments are not offset against specific mortgage loans, but are netted against the total book value of the commercial mortgage loans reported on Schedule B. (This net amount is reported on the asset page.) No tax deduction is claimed by Principal Life for these increases to temporary reserves.

The Internal Revenue Service (the Service) disallowed the deduction upon audit, for the stated reasons that the loan was not in default, foreclosure or demand proceedings had not been initiated, no action was taken to reduce the interest rate, the debtor was not notified that any of the lenders would forgive or cancel any of the debt, the claimed loss was based solely on the decrease in the fair market value of the collateral, and the impairment was an unallowable reserve for a potential loss. (The adjustment is characterized by the Service as an adjustment to capital losses; however, the deduction was taken as an expense, and it was disallowed by the Service in the ordinary income calculation.)

In November 2005 Principal Life sold the loan documents (prior to maturity) and received a discounted payoff. After consideration of the 2003 permanent impairment, additional costs (trustee fees, legal fees, etc.), and cash received, a taxable recovery of $92,812.64 resulted. Principal Life included this amount in taxable income for the tax year 2005.

| | |
|---|---|
| Principal Balance | $(23,474,059.53) |
| Recoverable Protective Advance – Legal | (423.65) |
| Recoverable Protective Advance – Miscellaneous | (2,500.04) |
| Recoverable Protective Advance – MAI Appraisal | (1,964.32) |
| Accrued Interest | (100,263.52) |
| Permanent Impairment, 2003 | 7,000,000.00 |
| Funds in Suspense from Sale of Note | 16,672,023.70 |
| Recovery | $ 92,812.64 |

## ANALYSIS

Internal Revenue Code (IRC) § 166(a)(2) [1] provides that, when satisfied that a bona fide business debt is recoverable only in part, the Secretary may allow a deduction for such debt in an amount not in excess of the part charged off within the taxable year. A deduction for a partially worthless business debt may be claimed either in the year in which that part of the debt becomes worthless or in any subsequent year prior to the time the debt becomes wholly worthless.[2]

The taxpayer must demonstrate to the Internal Revenue Service to what extent the debt was worthless and the amount charged off.[3] If, from all the surrounding and attending circumstances the Service is satisfied that a debt is partially worthless, the amount which has become worthless shall be allowed as a deduction, but only to the extent charged off during the taxable year.[4] If a taxpayer charges off and deducts a portion of a debt, but the deduction is disallowed for that year, the charge-off carries over to subsequent years.[5]

***Amount of Partial Worthlessness During the Taxable Year***

In determining whether a debt is worthless in whole or in part, the Service must consider all pertinent evidence, including the value of the collateral (if any) securing the debt and the financial condition of the debtor.[6] Legal action by the creditor against the debtor is not required; where the surrounding circumstances indicate that all or part of a debt is worthless and uncollectible, and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a

---

[1] All IRC references are to the Internal Revenue Code of 1986, as amended.

[2] *Findley v. Commissioner*, 25 TC 311 (1955), *affd. per curiam* 236 F.2d 959 (3rd Cir. 1956).

[3] Treas. Reg. §1.166-3(a)(2)(iii).

[4] Treas. Reg. §1.166-3(a)(2)(i).

[5] Treas. Reg. §1.166-3(a)(2)(ii).

[6] Treas. Reg. §1.166-2(a).

showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under IRC § 166.[7]

In the case of a deduction for partial worthlessness, although the deduction is not limited to the year in which the debt becomes worthless, in other aspects the same criteria used to determine whether a debt is wholly worthless apply in determining partial worthlessness. Whether a debt has become worthless is a question of fact. The Eighth Circuit Court of Appeals provides the following rules (citations omitted):

> The proper test to be used in determining the worthlessness of a debt is the exercise of sound business judgment, and there is no black rubric standard. If collection seems hopeless to a reasonable man knowledgeable in the field of business, a deduction is justified.[8]

For partial worthlessness, the taxpayer may face a heavier burden of proof because of the provision that the Internal Revenue Service "may" allow the deduction,[9] and the determination of the Service generally will not be reversed unless it is arbitrary and unreasonable and constitutes an abuse of discretion.[10] However, the discretion of the Service is not absolute and must be based upon reason, and the Service must respect the taxpayer's sound business judgment if the taxpayer can show that a reasonable person would conclude that the debt is only recoverable in part.[11] If the business judgment of the taxpayer is coupled with facts which establish the reasonableness of such judgment, disallowance by the Service is not a reasonable exercise of discretion, and the deduction must be allowed.[12] Events in subsequent years may be considered in evaluating the reasonableness of the taxpayer's business judgment.[13]

Value of Collateral

Principal Life hired an unrelated third party real estate appraisal firm, Terrance F. Wood & Company, to value the property. The appraiser indicated that the reduction in value would be approximately $7 million less than the outstanding principal loan balance. An officer of Principal Life personally inspected the property and agreed with the findings of the appraisal firm. Accordingly, Principal Life recorded a permanent impairment in that amount so as not to overstate its assets in its financial statements.

Financial Condition of Debtor, Legal Action, and Surrounding Circumstances

A non-recourse debt is a secured loan that is secured by a pledge of collateral (in this case real property) for which the borrower is not personally liable. If the borrower defaults, the lender/issuer can seize the collateral, but the lender's recovery is limited to the collateral. If the property is insufficient to cover the outstanding loan balance, as when the value of a parcel of real property declines, the lender is simply out the difference.

Because the mortgage loan in question was a non-recourse loan, the financial condition of the debtor, Pittbalt, is irrelevant. Legal action against the debtor to enforce payment would certainly have failed, as Pittbalt had no legal obligation beyond relinquishing the real property. It would not have been in the best interests of Pittbalt to make the final payment on a loan that was in excess of the value of the property securing the loan. The recovery of the lender, Principal Life, was limited to the value of the office

---

[7] Treas. Reg. §1.166-2(b).
[8] *Riss v. Commissioner,* 478 F.2d 1160, 1166 (8th Cir. 1973).
[9] IRC § 166(a)(2).
[10] *Findley, supra.*
[11] *Portland Manufacturing Company, et al v. Commissioner*, 56 TC 58 (1971); *The Austin Co., Inc., v. Commissioner*, 71 TC 955 (1979).
[12] *Portland Manufacturing Company, supra.*
[13] *Portland Manufacturing Company, supra.*

building. Furthermore, Pittbalt was able to make current payments from the rents received; it was the final payment that would pay off the principal balance that was in jeopardy.

As noted above, legal action to enforce payment is not required where the surrounding circumstances indicate that such action would likely not result in satisfactory relief.[14] Therefore, under the circumstances of this loan, the financial condition of the debtor and the fact that legal action was not taken do not constitute evidence that the loan was not partially worthless.

Sound Business Judgment

As indicated previously, the Internal Revenue Service must respect the taxpayer's sound business judgment if the taxpayer can show that a reasonable person would conclude that the debt is only recoverable in part.

Pittbalt would have been acting against its business interests to have paid off a non-recourse loan for an amount considerably in excess of the value of the collateral. Principal Life hired an unrelated party to evaluate that value; it was finally determined that the property was worth $7,000,000 less than the outstanding principal balance, which is the amount Principal Life wrote off.

The loan was non-recourse. At the time of the charge-off, the rental income was not sufficient to support servicing the debt. This constitutes evidence of impairment.

Principal Life has established that the debt was partially worthless, but not totally worthless, in 2003. Therefore, 2003 is an acceptable year for the deduction for partial worthlessness. Principal Life has also established that a considerable portion of the debt was worthless. The soundness of this determination is illustrated by the sale in 2005 for very close to the amount of the 2003 appraisal.

Because the soundly exercised business judgment of Principal Life is supported by facts which establish that its judgment was reasonable, disallowance by the Service is not a reasonable exercise of discretion, and the deduction must be allowed to the extent of the partial worthlessness.

***Amount Charged Off***

The purpose of the charge-off requirement is to establish that the taxpayer has abandoned any hope of collecting the portion of the debt that is claimed as worthless.[15] This requirement also ensures that the treatment of the debt for tax purposes is consistent with the taxpayer's treatment for financial accounting purposes; it prevents a taxpayer from taking advantage of the loss for tax purposes while continuing to carry the item on the books as an asset for other purposes.[16] A charge-off may be necessary to determine the extent to which income is realized upon a later recovery on the debt, or to determine the basis of a debt which is later sold.[17]

Neither the statute nor the regulations prescribe a particular method for making a charge-off of a partially worthless debt from books of account. To satisfy the charge-off requirement, the taxpayer must take some action (normally a bookkeeping entry) which clearly establishes that a specific portion of the debt has become worthless and will no longer be included in book assets of the taxpayer. There is no fixed mode of charge-off; anything which manifests the intent to eliminate an item from assets is sufficient.[18] Courts have accepted various methods such as:

---

[14] Treas. Reg. §1.166-2(b).
[15] *Findley v. Commissioner*, 25 TC 311 (1955).
[16] *Commissioner v. MacDonald Engineering Co.*, 102 F.2d 942 (7th Cir. 1939).
[17] *International Proprietaries, Inc., v. Commissioner*, 18 TC 133 (1952).
[18] *Commissioner v. MacDonald Engineering Co., supra.*

- eliminating the worthless portion from notes or accounts receivable and making a corresponding entry to a bad debt account,[19]
- adjusting journal entries and crediting a special account,[20] and
- charging an item to profit and loss account and removing from the balance sheet while retaining in a suspended receivables account.[21]

Principal Life effectively eliminated the worthless portion of the mortgage loan debt from its statutory accounting records. SSAP No. 37 governs the statutory accounting for mortgage loans. SSAP No. 37 distinguishes between temporary impairments and permanent impairments. In the case of temporary impairments, the difference between the net value of the collateral and the recorded amount of the mortgage loan is recorded as an unrealized loss and is reflected as a valuation allowance. However, if the impairment is permanent, SSAP No. 37 requires a direct write-down of the loan, recognition of a realized loss, and establishment of a new cost basis, which cannot be changed for subsequent recoveries in value. Principal Life recorded a permanent impairment and a realized loss in accordance with SSAP No. 37, reporting the reduced asset value on Schedule B.

Principal Life recorded the permanent impairment by debiting a realized loss account and crediting a contra-asset account. For reporting purposes, the balance in the contra account was netted against the principal balance of the mortgage loan. The net amount was reported on Schedule B (Mortgage Loans Owned) as the mortgage loan's book value and the property's market value. The loan was permanently reduced on Principal Life's GAAP and statutory balance sheets. Principal Life eliminated the worthless portion from notes receivable and made a corresponding entry to a bad debt account. As noted above, case law has found this to be an acceptable method for eliminating the item from assets. The amount was properly charged off.

***Loan not Foreclosed, Demand Proceedings not Initiated***

One of the stated reasons for disallowance by the Service is that the loan was not foreclosed and demand proceedings were not initiated. In this case, these factors are irrelevant, because the default was not expected to occur until the end of the loan and lease period, even though the decrease in the value of the collateral was apparent in 2003.

***Interest Rate Not Reduced***

One of the stated reasons for disallowance by the Service is that none of the lenders took action to reduce the interest rate on the mortgage. The lenders did restructure the note; however, they reduced the pay rate rather than the interest rate. Either action would have had the effect of enabling the borrower to more easily make debt service payments on the loan. Even so, in determining whether a debt is partially worthless, there is no requirement that a lender renegotiate the loan to reduce the interest rate or for any other reason. This argument is without merit.

***Notice to the Debtor***

One of the stated reasons for disallowance by the Service is that no notice was given to the debtor that the asset value was reduced. Charge-off for partial worthlessness of a debt does not require debtor notification.[22] The Service has acquiesced to this rule. The argument is without merit.

---

[19] *American Cigarette & Cigar Co. v. Bowers*, 92 F.2d 596 (2nd Cir. 1937).
[20] *Brandtjen & Kluge, Inc., v. Commissioner*, 34 TC 416 (1960).
[21] *Fairbanks, Morse & Co. v. Harrison*, 63 F. Supp. 495 (N.D. Ill. 1945).
[22] *Hammerschmidt & Franzen Co. v. Commissioner*, 12 BTA 811 (1928), *acq.*, VII-1 CB 19.

***Bad Debt Reserve***

One of the stated reasons for disallowance by the Service is that the deduction was due to the establishment of a bad debt reserve.[23] The taxpayer concedes that the reserve method, formerly allowed under IRS §166(c), was repealed in 1986 for taxpayers other than small banks. However, the taxpayer did not use the reserve method, also known as the "bank experience method." This method calculates an ending reserve balance by multiplying the outstanding combined loan amounts at the end of the taxable year by an average percentage of uncollectible loans present during the current and preceding five taxable years. This method is based on a reasonably accurate prediction as to the percentage of receivables which will go uncollected. It does not reference specific loans. It is a forecast, not relying on specific circumstances that have already occurred. Although Principal Life has reserves for temporary impairments, it does not maintain a reserve for permanent impairments. The deduction in question was based on permanent impairment to a specific loan, and on identifiable events which occurred to render the loan partially worthless prior to the end of the year 2003. A specific write-down was credited to a contra-asset account that related only to the specific mortgage loan in question. The argument of the Service that the reserve method was used is without merit.

***Recent Case Law Supports Principal Life's Position***

A Tax Court Memorandum decision is generally issued when the rules of law affecting the outcome of a case are well settled. A recent such decision,[24] wherein the collateral securing the debt was worth less than the debt, determined that a company was entitled to claim a $10 million bad debt deduction for partial worthlessness equal to the difference between the outstanding loan balance and the fair market value of the real property securing the loan. The decision upholds many considerations that apply to this determination:

- The Internal Revenue Service must reasonably exercise its discretion.
- Whet her a bad debt deduction is proper must be analyzed according to reasonableness, commonsense and economic reality.
    - The economic reality was that it would not make sense for Pittbalt to pay off the principal balance of the non-recourse loan in exchange for property worth considerably less than the amount Pittbalt would have to pay. Doing so would not be reasonable.
- The Internal Revenue Service cannot ignore the sound business judgment of a corporation's officers.
    - Officers of Principal Life exercised their business judgment in determining that it was not appropriate to hold the full value of the debt as an asset on its books, and that given the surrounding circumstances, foreclosure would not serve the business interests of Principal Life.
- Legal action to enforce payment is not required where the surrounding circumstances indicate that a debt is worthless and legal action would likely not result in satisfactory relief.
    - Because the debt was non-recourse, there was no purpose in pursuing legal action to enforce personal liability against the debtor. Such relief would not have been granted.
- A decline in the value of property securing a debt, with an appraisal revealing a reduced valuation, is an objective identifiable event indicating whole or partial worthlessness.

---

[23] The Service does not reference the conclusive presumption of worthlessness available to banks and other regulated businesses such as insurance companies. Treas. Reg. §1.166-2(d)(1). This presumption requires the involvement of the regulating authority, either in ordering the charge-off or confirming in writing that it would have been ordered. The taxpayer does not argue that this presumption applies here.

[24] *ABC Beverage Corp., F.K.A. Beverage America, Inc., v. Commissioner*, TC Memo 2006-196.

  - Principal Life obtained an appraisal from an independent third party appraisal firm, confirming a substantial diminution in value caused by a slump in the oil industry, which was the primary industry of the Corpus Christi economy.
- The debtor's default *or refusal to pay* for valid business reasons is an objective identifiable event indicating whole or partial worthlessness.
  - Pittbalt had not yet defaulted, but its payments were in arrears, and it was clear that it would be an exercise of sound business judgment for Pittbalt to decline to pay off the principal at the end of the loan period, given that the amount owed was several million dollars more than the value of the property. There was a valid business reason to refuse to pay off the loan.

The legal principles governing the outcome of a partial bad debt deduction with the facts existing in this case are well settled. The Internal Revenue Service abused its discretion

***Alternative Position***
If the deduction is completely or partly denied for the tax year 2003, then the income reported in 2005 must be reduced by an equal amount.[25] As noted previously, if a taxpayer charges off and deducts a portion of a debt, but the deduction is disallowed for that year, the charge-off carries over to subsequent years.[26] The note was sold in 2005. Principal Life reported a gain on the disposition. If the 2003 deduction is fully or partially disallowed, the 2005 gain must be adjusted accordingly to allow for a higher basis.

## CONCLUSION

The taxpayer has shown that by the end of 2003 a bona fide business debt had become partially worthless and that such partial worthlessness was properly charged off. The deduction should be allowed in the tax year 2003 in the amount of $7,000,000. In the alternative, the gain on recovery reported in the year 2005 must be reduced by whatever amount is not allowed in the year 2003, resulting in a decrease to 2005 income in the same amount.

---

[25] From *Levine v. Commissioner*, 31 TC 1121 (1959) (citations omitted):

> The precedents are replete with instances of subsequent recoveries on obligations previously treated as totally or partially worthless... If there is a total or partial recovery, this will constitute income, at least to the extent of any prior tax benefit. If it is sold, whether or not as a capital asset, the result is an income adjustment, with the item given a basis of zero or more, depending on the previous treatment.

[26] Treas. Reg. §1.166-3(a)(2)(ii).

# TAB 21

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

CAPITAL LOSS ON SALE OF PREFERRED STOCK INVESTMENT IN PRINCIPAL INVESTORS CORPORATION

2002 - $21,634,009

The revenue agent's report[1] disallowed Principal Life Insurance Company's ("Principal Life") claimed capital loss of $61,811,454 in 2002 upon its sale to Deutsche Bank of the Class A preferred stock of Principal Investors, a corporation to which Principal and various affiliated companies had transferred certain distressed Enron-related securities in a Section 351 transaction.

The RAR asserts two grounds for disallowance of this 2002 capital loss. Initially invoking the doctrine of substance over form as it is applied in debt vs. equity cases, and citing various factors it claims to have identified, the RAR's primary position is that the capital loss should be disallowed on the ground that the $2.4 million sale by Principal Life to Deutsche Bank of the Principal Investors Class A preferred stock that Principal Life had acquired in the Section 351 transaction must be re-characterized as a loan by Deutsche Bank.

The RAR's secondary position is that the capital loss should be disallowed under Section 269 because Principal's acquisition of a controlling interest in Principal Investors was an acquisition made to evade or avoid income tax by securing a tax benefit that Principal would not have otherwise enjoyed.

## I. Additions and Corrections To Revenue Agent's Statement Of Facts.

The following represents additions and corrections to the statement of facts presented in the RAR, which is incorporated herein by reference.

Principal Financial Group, Inc. ("PFG") is a publicly held company. PFG, the common parent of the affiliated group (the "PFG Consolidated Group") that files a consolidated calendar-year tax return, is a leader in offering a wide range of financial products and services through its family of financial services companies. The PFG Consolidated Group and its foreign subsidiaries are collectively referred to as the "Group."

Principal Financial Services, Inc ("PFSI") is a wholly owned subsidiary of PFG. PFSI serves primarily as a holding company for the Group's operations. Principal Life Insurance Company ("Principal Life") and Principal International de Chile, S.A. ("PI Chile") are wholly owned subsidiaries of PFSI. Prior to the transactions described in this refund claim, all of the

[1] References in this narrative to "revenue agent's report" or "RAR" refer to the revenue agent's report, Form 4549-A and the accompanying 270 pages, dated 4-17-06 and signed by Christine H. Heth.

stock of Principal Investors Corporation ("PIC") was owned by various members of the Group, including Principal Life and PI Chile.

Principal Life is the ninth largest life insurance company in the United States. At the end of 2001, its assets exceeded $75 billion. PI Chile owns the fourth largest Chilean insurance company as well as joint venture interests in a Chilean mortgage loan servicing business and a Chilean mutual funds administrator.

Following the collapse of Enron Corp. ("Enron") in November 2001, the Group's Investment Committee reviewed Principal Life's $170 million exposure to Enron and Enron-related entities, which included structured financings involving special purpose entities ("SPEs"). Principal Life held direct debt obligations of Enron, as well as debt obligations of two Enron-related SPEs, Marlin and Osprey. Prior to the Enron collapse, these investments were assigned designations of NAIC 2. Following Enron's collapse, these investments were downgraded to NAIC 6. These designations were based on the grading classifications for fixed maturity securities established by the Securities Valuation Office of the National Association of Insurance Commissioners ("NAIC) for all insurance companies. Principal is required by law and regulation to adhere to the standards established by the NAIC.

Principal Life held two types of Osprey investments. The first consisted of secured debt obligations jointly issued by Osprey Trust and its wholly owned subsidiary, Osprey I, Inc. (the "Securities"). The second consisted of secured debt obligations issued by Osprey Associates, LLC (the "Certificates"). The Securities were secured by a partnership interest owned by Osprey Trust as well as credit enhancements provided by Enron. The Certificates were secured by a beneficial interest in Osprey Trust. Prior to Enron's collapse, Principal Life held Securities having an aggregate par value of $61,250,000 and Certificates having an aggregate par value of $16,000,000.

After Enron's collapse, careful study by the Group's investment analysts suggested that the market had significantly undervalued the Securities. At that time, the trading price of the Securities was approximately 25 percent of par. The Group's analysis, however, estimated a liquidation value of approximately 50 percent of par. Notwithstanding a relatively high degree of confidence in the ultimate recovery, the Group's analysts cautioned that continued holding of the in Securities remained a speculative proposition. Still, the analysts viewed the Marlin and direct Enron investments much less favorably than the investment in the Securities.

Upon completing its review of the analysts' recommendations, Principal Life decided to maintain, but not to increase, its aggregate Enron exposure. Principal Life modified its Enron positions by disposing of its direct Enron securities and repositioning its investments in the Enron SPEs. Principal Life disposed of its Marlin investment and reinvested the proceeds in additional Securities having an aggregate par value of $38,880,000.

On February 1, 2002, the Investment Committee for PFSI authorized the purchase of additional Securities. Due to regulatory sensitivities associated with the NAIC 6 designation and the potentially adverse effect on financial strength ratings, Principal Life was foreclosed from acquiring additional Securities itself. Consequently, the Group decided that the investment should be made through a non-regulated entity because expected appreciation in the Securities provided an effective means of funding future capital needs. By February 8, 2002, PFSI had purchased Securities having an aggregate par value of $29,070,000.

At the time the Group was analyzing the Osprey investments, PFSI determined that PI Chile had a need for future capital. PFSI decided to use the anticipated increase in value in the Securities to fund, among other things, PI Chile's future capital needs. On February 22, 2002, PFSI sold Securities having an aggregate par value of $5,814,000 to PI Chile in exchange for cash. Immediately prior to this transaction, PFSI contributed to PI Chile the cash necessary to effectuate the purchase. The two-step transfer was viewed as being more expeditious than a direct contribution of the Securities from PFSI to PI Chile because it avoided lengthy notice requirements under Chilean law.

On March 7, 2002, the Finance Committee of PFG met to consider a proposed restructuring method that would meet the differing investment objectives of Principal Life, PFSI, and PI Chile with respect to their Osprey positions. The proposed method called for the consolidation of the Osprey positions within PIC and a proposed capital structure for PIC that would allow Principal Life to convert its volatile Osprey investment into a high yield, senior equity position, thereby minimizing the regulated entity's risk of further loss on the Osprey positions. PFSI and PI Chile, on the other hand, were interested in long-term capital growth with which to fund future expansion and were willing, therefore, to accept the increased risk of loss in exchange for the possibility of the Securities' significant upside potential. The consolidation would also permit a more efficient management of claims in the Osprey liquidation and ultimately in the Enron bankruptcy. After due consideration, the Finance Committee of PFG approved the proposal.

On March 15, 2002, PIC amended and restated its certificate of incorporation in order to change its capital structure in accordance with the proposal approved by the PFG Finance Committee. Prior to the amendment, PIC had 2,000 shares of common stock ("common stock") issued and outstanding. The amendment increased the authorized common stock to 1,725,000 shares. The amendment also authorized the issuance of 275,000 shares of preferred stock ("preferred stock"). The preferred stock was divided into 25,000 shares of Class A preferred stock ("Class A preferred") and 250,000 shares of Class B preferred stock ("Class B preferred"). Except for certain protective rights, all preferred stock was nonvoting.

Each share of PIC preferred stock was entitled to a $100 liquidation preference. Dividends accrued at quarterly rates of $2.50 per share on Class A preferred and $3.75 per share on Class B preferred. The liquidation and dividend preferences granted to Class A preferred ranked senior to the preferences of the Class B preferred. Shares of Class B preferred were not entitled to any additional dividend rights. Shares of Class A preferred, however,

participated ratably on a share for share basis with shares of common stock as to the payment of dividends and distribution of assets in liquidation.

The Class A preferred was redeemable at the option of PIC after September 15, 2003, and at the option of the holder after March 1, 2004. In each case, the redemption price per share of Class A preferred consisted of one share of common stock and cash equal to the sum of $100 plus any unpaid dividends. The Class B preferred was subject to mandatory redemption by PIC on March 15, 2004. The redemption price of the Class B preferred was $100 per share plus any unpaid dividends.

Principal Life, PFSI, and PI Chile entered into an exchange agreement with PIC dated March 15, 2002. The following transfers occurred on March 20, 2002, pursuant to the exchange agreement, all of which were part of a Section 351 transaction:

1. Principal Life transferred Certificates with a par value of $16,000,000 and Securities with a par value of $100,130,000 to PIC in exchange for the issuance by PIC of 25,000 shares of Class A preferred and 225,375 shares of Class B preferred.

2. PFSI transferred Securities with a par value of $23,256,000 to PIC in exchange for the issuance by PIC of 1,162,800 shares of common stock.

3. PI Chile transferred Securities with a par value of $5,814,000 to PIC in exchange for the issuance by PIC of 290,700 shares of common stock.

It is important to note that the validity of the Section 351 transaction has not been challenged by the examining revenue agent.

In addition to the PIC stock issued in the Section 351 transaction, an additional 2,000 shares of PIC common stock were owned by three PFG affiliates, including 1,400 shares of common stock owned by Principal Holding Company, a wholly owned subsidiary of Principal Life, 500 shares of common stock owned by PI Chile and 100 shares of common stock owned by PFSI. PI Chile had acquired 500 shares of common stock from Principal Capital Management (Europe) Limited, a wholly owned foreign subsidiary corporation of PFSI, on February 25, 2002.

As stated in the RAR, pursuant to Sections 358 and 351(g) the Class A preferred was allocated approximately 75% of Principal Life's tax basis, or an allocated tax basis of $64,230,280. The fair market value of the Class A preferred at that time was estimated to be $2,500,000.

In May 2002, Principal Life began internal discussions to assess the benefits and risks of selling the Class A preferred. Those discussions concluded that sale of the Class A preferred would be desirable and, accordingly, a formal private placement memorandum was drafted and distributed to potential purchasers. As a result, Principal Life entered into an agreement with the

London branch of Deutsche Bank AG ("Deutsche Bank") to sell the 25,000 shares of Class A preferred. On July 19, 2002, Principal Life sold the Class A preferred to Deutsche Bank in exchange for cash of $2,418,827 (the "Sale"), resulting in the capital loss at issue. The sale of the Class A preferred to Deutsche Bank was neither planned nor intended at the time of the Section 351 transaction. At that time, two months before the eventual sale, Principal Life did not know who, if anyone, would purchase the Class A preferred stock of PIC.

On September 15, 2003, the Class A preferred held by Deutsche Bank, as well as the Class B preferred still held by Principal Life, were both redeemed by PIC for $100 per share plus dividends in arrears. As a result, Deutsche Bank was paid $2,875,000 upon redemption of the Class A preferred. Also, as required by PIC's Articles of Incorporation, Deutsche Bank received 25,000 shares of PIC's common stock in connection with the redemption. Such common stock was redeemed by PIC in 2005 for $160,000.

## II. Law and Analysis.

### A. Substance of the Transaction with Deutsche Bank.

It is Principal Life's position that Deutsche Bank's payment to Principal Life of the purchase price for the Class A preferred stock cannot properly be classified as a loan by Deutsche Bank to either Principal Life or PIC. The RAR, however, contends otherwise, stating that its primary position is that the sale of such shares by Principal Life to Deutsche Bank must be characterized as a loan or financing transaction, rather than a sale of stock that triggered loss recognition to Principal Life. It is unclear, however, whether the revenue agent is attacking the characteristics of the Class A preferred stock itself or the nature of the transaction with Deutsche Bank because the RAR's statements and conclusions seem to vacillate between the two. The agent's invocation of the substance over form doctrine with reference to the transaction (p. 176: "whether a transfer of funds to a corporation is, in substance, a loan or capital contribution") would seem to indicate that it is the transaction with Deutsche Bank, rather than the instrument, that is being scrutinized. The final paragraph of the RAR's statement of its primary position would suggest likewise (p. 184: "there was no sale of the Class A preferred shares").

If so, it is Principal Life's position that invocation of the substance over form doctrine for this purpose is unavailing because the substance and form of this transaction are the same. That the transaction with Deutsche Bank was intended as, and actually was, a sale of the Class A preferred stock is supported by the extensive private placement memorandum dated June 21, 2002. Principal Life carefully prepared and distributed the private placement memorandum not just to Deutsche Bank, but to numerous other potential purchasers. Consistent with the offering that precedes any sale, in the early samples of the proposed purchase agreement the name and address of the purchaser appear as blanks.

The private placement memorandum, as well as the purchase agreement itself, were obviously prepared to fulfill the requirements of the Securities Act of 1933, the Investment

Company Act of 1940, and the rules of the U.S. Securities and Exchange Commission thereunder. In the private placement memorandum, the proposed transaction is described as a "private secondary marketing of Class A preferred stock" and the characteristics and rights of such preferred stock are explained in detail under the heading "Description Of Capital Stock."

When Deutsche Bank entered the picture as a prospective purchaser, there were no negotiations over the terms of the Class A preferred stock being sold, as there usually are in deals involving loan agreements, inasmuch as the terms relating to the preferred stock had been determined and fixed prior to that time. Nor were there any demands that any of the terms of the Class A preferred be amended prior to any purchase and sale. However, as is usually the case in any sale, there were negotiations over the sale and purchase **price.** Deutsche Bank's only negotiation point was over the perceived value, risks and possible returns on the Class A preferred – as any prospective investor would do - as depicted in the possible outcome scenarios sent to Deutsche Bank. The result of these negotiations on price was that the highly prioritized Class A shares, with a par value of $2,580,822 ($80,822 representing accrued dividends prior to issuance) were sold to Deutsche Bank for $2,418,826.75.

Finally, the revenue agent's attempt to reclassify the transaction as a loan is belied by the fact that the "repayment" of the alleged loan was from a party (PIC) other than the party to whom the purported loan was made (Principal Life).

**B. Substance of the Preferred Stock.**

It is more likely, however, that the real thrust of the revenue agent's primary position is based on the contention that the Class A preferred stock itself was debt rather than equity, for the RAR cites the traditional debt vs. equity cases and the various factors considered in the debt vs. equity analysis before devoting several pages to a discussion of thirteen of such factors. Based on its analysis of such factors, it then concludes that "Deutsche Bank's investment in PIC's Class A preferred stock is, in substance, a loan from Deutsche Bank to Principal Life and not an equity investment in PIC." (RAR p.184)

Section 385(b) of the Code lists five factors that may, "among other factors," be taken into account in the debt-equity analysis and authorizes the Treasury by regulation to list others, which the Treasury never has. From the Senate Finance Committee report that accompanied enactment of this provision in 1969, it is clear that it was enacted to provide a tool to reclassify an instrument, where the interest paid on it was sought to be deducted by the payor, into equity where such payments would be treated as nondeductible dividends. S. Rept. 91-552, P.L. 91-172, ___ Cong. ___ Sess., 1969-3 C.B. 511. In this case, the RAR attempts to use this tool to reach just the opposite result, that is, to reclassify an equity interest into a debt obligation. In *Segel v. Comm.*, 89 T.C. 816 (1987) and *Ragland Investment Co. v. Comm.*, 435 F.2d 188 (6th Cir. 1970), the Service's attempts to do so - to convert equity into debt - were unsuccessful.

The RAR correctly notes that certain cases have listed 11-13 factors to be taken into account in a debt versus equity analysis and one commentator has listed thirty-eight. Another

case listed sixteen. *Fin Hay Realty Co. v. U.S.*, 398 F.2d 694 (3rd Cir. 1968). As mentioned, the RAR here lists thirteen, although eight were sufficient for the Chief Counsel's Office in CCA 200113 4004. But whatever the number of factors used, they are used to determine, in the language of Section 385(a), "whether **an interest in a corporation** is to be treated . . . as stock or indebtedness." (Emphasis supplied.)

In this case, this determination should be made at the time the "interest" was created, that is, upon the initial issuance of the "interest," for no change in the terms or provisions relating to the Class A preferred stock took place between the time such stock was issued on March 15, 2002 and the time it was sold to Deutsche Bank on July 18, 2002. The RAR makes no contention that any such change occurred. Then, looking at the initial issuance of such stock, the RAR's acknowledgement that the stock was acquired by Principal Life in a Section 351 transaction (RAR pp.171, 175-177) is significant because it represents a tacit admission that the Class A preferred was stock rather than debt at that time. If it had been debt at that time it would have defeated qualification of the transaction under Section 351(a), which requires that the transfer to the controlled corporation be solely in exchange for "stock."

## C. Analysis of Individual Factors.

Whether five, eight, eleven, thirteen, sixteen, or thirty-eight factors are applied to test the Class A preferred in a debt vs. equity analysis, it is Principal Life's position that any application of the factors inevitably leads to the conclusion that the Class A preferred stock is indeed stock (equity) and not debt for federal income tax purposes. The following are the factors presented in the RAR and Principal Life's responses regarding those factors.

### 1. Form of Transaction.

While the "form of the transaction" is a legitimate inquiry, the RAR distorts application of this factor, stating that the form of the transaction here "does not carry much weight" because Principal Life was "thorough and well-prepared in tax avoidance." Of course, as the ninth largest life insurance company in the United States charged with the duty of investing its $75 billion in assets to maximize returns for the stockholders of its parent company (PFG), Principal Life has a sophisticated investment department that has kept pace with the past several decades of securities innovations, including special purpose entities. To suggest, as does the RAR, that the form of the transaction should be denigrated because it was dictated by tax avoidance motives coincides with the RAR's erroneous conclusion that the principal purpose of the transaction was tax avoidance. But, to the contrary, the facts show that the transaction was undertaken and consummated primarily due to investment considerations having to do with the distressed Enron-related securities and preserving the upside potential in the Securities. Because tax considerations were secondary, yet fully consistent with Principal Life's right to engage in a valid business transaction that also produced tax benefits, the form of the transaction deserves to be respected. *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *U.S. v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 580 (1977); *Comm. v. Newman*, 159 F.2d 848, 850-851 (2nd Cir. 1947) (Hand, J., dissenting).

**2. Certainty of Repayment.**

The RAR argues that repayment was certain and that "Deutsche Bank had very little economic risk because the Class A stock was, as a practical matter, well-secured." However, as seen in the press, Enron sued the Osprey trust (the Whitewing partnership that owned Osprey) in February, 2003, for a return of all cash and assets under the bankruptcy preference rule relating to transfers within 90 days of filing bankruptcy. If that litigation had been successful, the value of Osprey's assets could have been reduced to a mere unsecured claim against Enron as one of the many stockholders.

Thus, the benefit of the hindsight available through viewing a 2002 transaction in 2006, the RAR attributes to the Class A preferred stock much less risk than was actually the case. The uncertainty surrounding the Enron and Osprey securities is evident from their downgrade by the NAIC from a 2 to a 6. Since the Osprey securities were the only source of funds for any payments on or redemption of the Class A preferred stock, repayment was far from certain. This is also evident from the discount on the purchase price secured by Deutsche Bank when it purchased preferred stock having a par, liquidation, and redemption value of $2,500,000 for $2,418,827.

**3. Fixed date for Repayment.**

The RAR's contention that "the twenty month put option is a fixed date for payment of interest and repayment of principal." However, the RAR negates its own contention when it states that "the holders (or Deutsche Bank) **may** exercise their right to put their shares for redemption as of March 1, 2004 . . . ." (Emphasis added) That statement implicitly acknowledges, as it must, that Deutsche Bank **may not** have exercised its put option on that date. If PIC had not exercised its right to redeem the Class A preferred after September 15, 2003, Deutsche Bank may have chosen to continue to hold the stock because it preferred to continue to earn the 10.3% return on its $2.4 million investment (annual dividends of $10 per share on 25,000 shares). For this reason, the put right cannot be considered the equivalent of a debt security's fixed date for repayment.

**4. Payment from Earnings and Profits.**

The RAR notes that equity dividends normally come from earnings and profits while interest is paid from any available corporate assets. The RAR then cites the fact that on liquidation, the accrued but unpaid dividends were to be paid from any available corporate assets. The RAR thus ignores PIC's Certificate of Incorporation and established principles of corporate law that require that dividends be declared and paid only from legally available funds for that purpose (earnings and profits).

**5. Claim Subordination or Priority of Payment.**

The RAR contends that because the Class A shareholders have priority over the Class B shareholders and common shareholders, the Class A preferred stock has a priority of payment consistent with that of a debt instrument. That contention is in conflict with the many cases that hold that the seniority of certain classes of preferred over the common or other preferred is a common feature of preferred stock and despite its similarity to debt is not a significant factor in determining whether an instrument is debt or equity. See *Ragland Investment Co. v. Commissioner*, 435 F2d 118 (6th Cir. 1970). And in Chief Counsel Advice 200134004, relating to whether a perpetual note was equity, after noting that the document provided on it face that it was subordinate to any debts or notes, it was held that such was a factor in favor of equity treatment. In this case, the Class A shares are likewise subordinate to general creditors of PIC.

**6. Accrual and payment of interest.**

With regard to this factor, the RAR states that "'additional dividends' are earned as a percentage on the accumulated, unpaid 'dividends.' This is practically a definition of compound interest." However, this statement is clearly erroneous. There is, in fact, no such provision for additional dividends anywhere in the Articles of Incorporation, Bylaws, or other provisions relating to the preferred stock of PIC. In fact, both the Certificate of Incorporation and Private Placement Memorandum state that: "Accrued but unpaid dividends shall not bear interest." Moreover, the fact that accrued but unpaid dividends accumulate and must be paid eventually (upon liquidation or redemption, assuming funds are available for that purpose) is a "cumulative dividends" feature common to preferred stock and is no more indicative of debt than the priority of payment typically accorded to preferred stock. This is in stark contrast to the nonpayment of interest on a debt instrument, which usually constitutes an event of default causing acceleration of the entire principal balance.

**7. Actual repayment of principal.**

The RAR equates redemption of the Class A preferred upon exercise of Deutsche Bank's put option with repayment of principal on a debt instrument, which, except in the case of a demand debt instrument (which would be unusual in a transaction of this nature), usually occurs on a fixed maturity date. Even a demand debt instrument is distinguishable in that the holder is normally entitled to issue its demand for payment at any time, whereas Deutsche Bank's put option, consistent with such features in preferred stock issues, was exercisable only after expiration of a specified period of time.

Furthermore, upon redemption of the Class A preferred stock, in addition to its par value and accrued dividends, Deutsche Bank received 25,000 shares of common stock as required by PIC's Articles of Incorporation. This common stock was redeemed in 2005 for $160,000. The fact that Deutsche Bank received "repayment" in excess of the par value (the "principal") and

accrued dividends on the Class A preferred is also inconsistent with repayment of principal on a debt instrument.

**8. Security or Collateral.**

The RAR asserts that "PIC had initial assets valued at more than ten times that of Deutsche Bank's investment," and claims that that fact amounted to "security or collateral" for the Class A preferred stock. The Securities and Certificates transferred to PIC by Principal Life in the Section 351 transaction had an aggregate par value of $116,130,000, an aggregate tax basis of $85,767,780, and a fair market value of $25,037,500. This indicates a significant decline in the fair market value of such Securities and Certificates from the date of acquisition and there was no assurance that such decline would not continue. The lawsuit initiated by Enron against the Osprey trust (the Whitewing partnership that owned Osprey) in February, 2003, for a return of all cash and assets has already been mentioned. The trading value of the Osprey Securities ranged from 30 cents to 17 cents on the dollar during this period and their was no guaranty the value would not decrease to zero. In these circumstances, it is illusory to contend that the value of the assets owned by PIC amount to "security or collateral." Nor can the priority of the Class A preferred stock over the other classes of PIC stock be regarded as anything other than a priority normally given to such preferred stock.

**9. Business Purpose.**

The revenue agent's assertion that "it is clear that the entire PIC transaction was structured for no other reason than to recognize for tax purposes losses . . . ." is not only cavalier, but it is also wrong for several reasons.

First, it has previously been explained that the exigencies surrounding the collapse of Enron - the company whose related entities secured the payments due on the Securities and the Certificates - required Principal Life to take steps to minimize its exposure to losses, and, at the same time, maximize the chances for speedy recoupment of as much of its Osprey investments as possible. Downside protection for Principal Life was accomplished through shifting of risk to PFSI and PI Chile. The materials presented to the Finance Committee and Strategic Working Group are evidence of this valid business purpose.

Second, these same materials are evidence of the Group's internal investment analyst's view that in late 2001 and early 2002 the market had taken the price of the various Osprey investments too low. Their view was that the Osprey notes and interests should ultimately realize 50 cents on the dollar, including separate litigation that belonged to Principal Life (as initial purchaser) and could not be transferred. Their internal valuation put the Osprey value at around 40 cents (excluding litigation against banks, brokers & Enron) compared to the then going rate of between 17 cents and 22 cents on the dollar.

Third, it was internally recommended to the Corporate Finance Committee in February, 2002, that the Osprey securities could be a 'cheap' source of funding for the future operations of

PFSI and PI Chile because of the expected increase in value of the Osprey assets. Principal Financial and PI Chile each had five-year plans that showed targeted growth and expected capital requirements. Due to Principal Life's direct investment in Osprey, Principal Life had insider knowledge that some hard assets existed, as well as claims against Enron corporate stock. Senior management accepted the recommendation, which resulted in PFSI and PI Chile acquiring various Osprey notes in the marketplace. The subsequent transfer of these Osprey securities to PIC represented an effort by the Group to consolidate the Osprey assets into a single entity for more efficient management, yet in a manner that preserved the upside potential for the future capital requirements of Principal Financial and PI Chile. Moreover, PIC's capital structure had the effect of leveraging those entities' potential for future appreciation.

Fourth, the transfer by Principal Life of its Osprey assets to PIC enabled Principal Life to remove these impaired assets from its books and from its NAIC annual statements.

Fifth, although at the time there was no prospective purchaser and no discussions had been held with any party regarding the Class A shares, the Class A shares were designed to be marketable to provide Principal Life with immediate liquidity if that became desirable. This liquidity was realized when the Class A shares were sold in July, 2002.

**10. Voting rights.**

Contrary to the RAR's assertion, PIC's Class A preferred stock had voting rights typical of those usually accorded to preferred stock, namely, rights to vote with respect to any provision in the Articles of Incorporation or Bylaws that would affect the rights or preferences of that class of stock.

**11. Share in the Profits.**

According to the RAR, because no dividends were paid on the Class A preferred stock during the time it was outstanding, and because Deutsche received no "participation" in the appreciation of the Osprey securities or in PIC's earnings and profits at the time the preferred stock was redeemed, the Class A preferred fails to "share in the profits" in a manner consistent with an equity security. Aside from the fact that with the Osprey securities in default there was no income or "profits" from which dividends could be paid, the fact of the matter is that the Class A preferred stock was entitled to share in the profits in a manner entirely consistent with such preferred stock. Its fixed dividend rate entitled it to its share of the profits to that extent. While the dividends were not paid until the stock was redeemed, they continued to accrue and were in fact eventually paid (and because such dividends represented a distribution of profits, PIC neither sought nor received any deduction for their payment). Moreover, upon redemption of the Class A preferred, Deutsche Bank also received 25,000 shares of common stock for which it received $160,000 in January, 2005. This was clearly a share of PIC's profits.

**12. Credit worthiness.**

In determining credit worthiness, lenders look to the ability of the borrower to pay current interest. Because PIC had no expectation of cash flow from the Osprey securities for an indefinite period of time, there was little prospect for the payment of interest. The RAR also states that the Osprey securities were a very valuable, but distressed asset, on which it could "easily" obtain a bank loan. However, in view of Enron's widely-publicized difficulties and the lawsuit by Enron against Osprey previously mentioned, any prospective lender would undoubtedly have had at least two important concerns: (1) the prospect of further decline in the value of such assets, and, (2) the liquidity of PIC's assets. Under such circumstances, the credit worthiness of PIC would have been highly doubtful.

**13. Intent of the Parties.**

Principal Life agrees with the RAR's statement that the intent of the parties is best discerned by the objective, contemporaneous evidence. But for its objective evidence, the RAR refers to Deutsche Bank's "insistence on fully protecting its investment by guaranteeing that it would be repaid its original principal, plus a fixed rate of interest, on a fixed date, with repayment priorities and protections entirely in its favor . . . ." This is not objective evidence but rather subjective conclusions. There was no guaranty of repayment, nor any fixed date, and the repayment priorities and protections were entirely consistent with the terms of typical preferred stock. The various objective factors addressed above show unmistakable intent and assumption on the part of all parties that the Class A preferred stock would represent an equity interest in PIC. Consistent with that intent, and as another objective factor to be taken into account, Principal Life treated PIC's preferred and common stock as equity in its GAAP annual reports, its NAIC Annual Statements, and in its tax returns.

**III. Section 269 Does Not Apply.**

The RAR's secondary position is that the capital loss resulting from Principal Life's sale of the PIC Class A preferred stock to Deutsche Bank should be disallowed because Principal Life's acquisition of its interest in PIC was an acquisition made to evade or avoid income tax by securing a tax benefit that Principal Life would not otherwise enjoy, within the prohibition of Section 269.

**A. Sale of Stock is not an Acquisition.**

The only "acquisition" in this case that would permit invocation of Section 269 was the acquisition by Principal Life of a controlling (50%) interest in PIC. But it was not that acquisition that caused or enabled realization of the capital loss at issue. In fact, no tax benefits whatsoever resulted from that acquisition. It was only the subsequent sale of the Class A preferred stock by Principal Life to Deutsche Bank two months later that gave rise to the capital loss deducted for tax purposes. This was an event entirely separate and distinct from the "acquisition." No contention has been made that they should be collapsed or joined together under the "step transaction" or any other doctrine. Therefore, the revenue agent's invocation of

Section 269 to attack Principal Life's acquisition of control of PIC is unavailing because no deduction, credit, or allowance was taken or availed of as a result of that acquisition of control. Nor was any positive or negative tax attribute thereby brought "into conjunction with" (within the language of Regulation §1.269-3(b)(1) cited by the revenue agent) any opposite tax attribute.

Similarly, the RAR (p.198) cites Regulation §1.269-3(c)(1) "for *indications* of a purpose to evade or avoid tax." (Italics added.) That regulation refers to a "corporation [that] acquires property having in its hands an aggregate carryover basis which is materially greater than its aggregate fair market value at the time of such acquisition and utilizes the property to create tax-reducing losses or deductions." Without more, it might appear that this description applies in Principal Life's case. However, that regulation merely provides an example illustrating a situation within the ambit of Section 269(a)(2), which refers to a "corporation [that] acquires . . . property of another corporation **(not controlled, directly or indirectly, immediately before such acquisition by such acquiring corporation or its stockholders)** . . . ." (Emphasis supplied.) Since the "property" acquired by Principal Life from PIC, i.e., the Class A preferred stock, was acquired from a corporation (PIC) that was indeed controlled by Principal Life or its stockholders, neither the regulation cited nor the portion of the statute that it interprets have any applicability in this case.

**B. The Principal Purpose of the Transaction was Business, not Tax.**

Even if Principal Life's acquisition of control of PIC is collapsed into, or brought "into conjunction with" Principal Life's sale of the Class A preferred stock to Deutsche Bank, Section 269 is only applicable if tax evasion or avoidance was the **principal** purpose of Principal Life's acquisition of that control. *Commodores Point Terminal Corp. v. Comm.*, 11 T.C. 411, 418 (1948) ("a tax avoidance purpose incidental to the transaction does not necessarily bring it within the condemnation of Section [269]"); *Alcorn Wholesale Co. v. Comm.*, 16 T.C. 75 (1951) (*held,* even where tax avoidance is admittedly present, Section 269 is not invoked unless it was the principal purpose); *Bijou Park Properties, Inc. v. Comm.*, 47 T.C. 207 (1966) (even though lawyer and CPA were consulted regarding favorable tax aspects, principal purpose of transaction was not tax avoidance); *Princeton Aviation Corp v. Comm.*, T.C. Memo 1983-735 (*held,* where principal purpose of transaction involved valid business reasons, awareness of the tax benefits arising from them does not disqualify one from using them); *D'Arcy-MacManus & Masius, Inc. v. Comm.*, 63 T.C. 440 (1975) (*held,* to constitute the principal purpose under Section 269, tax avoidance must outrank or exceed in importance any other single purpose); *VGS Corp. v. Comm.*, 68 T.C. 563, 596 (1977)("[c]omplicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or other tax benefits] to be nothing more than prudent business planning"); *U.S. Shelter Corp. v. U.S.*, 13 Cl.Ct. 606, 625 (1987) ("The principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences"); *American Processing and Sales Co. v. U.S.*, 371 F.2d 842 (Ct.Cl. 1967) (labor reasons, not tax reasons, were principal purpose of acquisition of corporation); *Bobsee Corp. v. U.S.*, 411 F.2d 231 (5th Cir. 1969) (*held:* in determining principal purpose, the non-tax motives as a class are compared to the tax motives as a class).

Like the Tax Court many years ago in the *D'Arcy-MacManus* case, *supra,* Treasury Regulation §1.269-3(a) equates "principal purpose" with a "purpose to evade or avoid Federal income tax [that] exceeds in importance any other purpose." That is not the case here. Although Principal Life, as a sophisticated company, was not oblivious of the tax consequences that would ensue, tax considerations were clearly secondary to the numerous business purposes behind the transaction.

First, Principal Life and its affiliates, PFSI and PI de Chile each had interest in gaining back some of the losses experienced in the decline in value of the Osprey securities. Principal Life wanted downside protection and PFSI and PI de Chile were interested in higher upside potential in exchange for giving Principal Life that downside protection.

Second, Principal Life improved its liquidity. It received more than $2 million in cash for the stock sold to Deutsche Bank, and had the ability to sell additional stock if market conditions appeared favorable. Principal Life's rating had been reduced by Moody's Investor Services in 2002 and the rating agencies had expressed some concerns about the Company's liquidity ratios. Thus the transactions with PIC and Deutsche Bank provided access to cash in exchange for impaired securities, the sale of which may have been difficult and economically would have been at fire sale prices.

Third, Principal Life concluded that the cost of capital of the stock sold to Deutsche Bank was less than the expected return of the underlying assets. In other words, Principal Life calculated the cost of acquiring the $2 million from Deutsche Bank and determined that the cost was less than the expected return on the assets held by PIC.

Fourth, and also very important, the transactions with PIC and Deutsche Bank permitted Principal Life to retain a large portion of the benefit of any favorable returns from the impaired assets, in contrast to a direct sale of the securities to an unrelated party. Principal Life possessed considerable experience with impaired assets. In 1989, 1990 and 1991, Principal Life purchased trust certificates involving impaired assets from Prudential and realized gains exceeding $40 million. The Company recognized that Osprey held impaired assets and further, Osprey's claims against Enron were difficult to value and that the market often undervalued such assets due to the lack of adequate public information regarding the financial position of the issuer as well as challenging and thinly traded market conditions

Fifth, the transactions with PIC, Deutsche Bank, Principal Holding Company and P.I. de Chile resulted in the removal of the impaired assets from the annual statement of Principal Life. Although PFSI retained a substantial portion of the economic risks and rewards of ownership of the impaired securities by holding the PIC stock, Principal Life reduced the number of impaired assets reported on its financial statements, which it considered beneficial in light of the close scrutiny of life insurance companies as a result of the economic problems that followed the collapse of the tech boom in general and the attacks on the World Trade Center and the Pentagon in 2001, as well as the accounting scandals at Enron and other public companies in 2002.

Of the various alternatives reviewed, preserving upside potential, gaining liquidity, and attracting an investor to a troubled asset class with uncertain realization prospects were the primary objectives with respect to the distressed Osprey securities. This transaction best met those objectives. If those objectives could not be met, it is likely that the transaction would not have been done, despite the tax benefits otherwise available.

**C. No Tax Benefit Not Otherwise Obtainable.**

One of the requirements of section 269 is that "the taxpayer has secured the benefit of a deduction, credit, or other allowance it would not otherwise have enjoyed…" when the specified acquisition took place. As a result of the sale of PIC stock to Deutsche Bank, Principal Life enjoyed a tax benefit – that of recognizing the tax losses under IRC section 1001 due to the difference between the tax basis of the shares sold and the sales price. But section 269 only applies to disallow deductions, credits or other allowances which **are not otherwise available and which stem from the acquisition of control**. See *Cromwell Corp. v. Commissioner*, 43 T.C. 313 (1964), and *Commodores Point Terminal Corp. v. Commissioner*, 11 T.C. 411 (1948). To the extent that there are either feasible alternatives that provide the same tax benefits, or that the deduction, credit, etc. did not arise as a consequence of the acquisition of control, section 269 is not applicable.

In *Cromwell Corp. v. Comm.*, 43 TC 313 (1964), four individuals formed a corporation ("Cromwell") that purchased all the stock of another corporation ("Cornwell") that became its subsidiary. The purchase was partially financed by a loan obtained by Cromwell. After the purchase, Cornwell obtained a new loan and distributed the proceeds to Cromwell, which used the funds to repay its earlier acquisition loan. The corporations elected to file a consolidated return so that the distribution to Cromwell was eliminated in consolidation rather than being taxed as a dividend. The Service argued that the purpose of the transaction was to allow a tax-free dividend from Cornwell to Cromwell, and sought to disallow the filing of a consolidated return under the authority section 269. The court noted that there were several alternative methods the taxpayer could have used to obtain similar tax results. The court, therefore, held in favor of the taxpayer on the ground that the taxpayer had not obtained a tax benefit that it would not otherwise enjoy:

> Thus, the third element of section 269 requires an examination of the alternatives available to the taxpayers. Petitioners contend, and we agree that since the benefits received would have been enjoyed by means of the suggested alternatives, section 269 does not proscribe the use of a consolidated return. Viewed separately, petitioners' use of a consolidated return does not contravene any specific section of the code. When viewed together with the alternatives available to petitioners, it does not contravene section 269. *Id.* At 320.

In *Commodores Point Terminal Corp. v. Comm.*, 11 TC 411 (1948), an individual owned the majority of the stock of a corporation (Corp) that needed additional capital. The

individual transferred to Corp a controlling (58 percent) interest in another corporation, Piggly Wiggly. Piggly Wiggly then paid a dividend to Corp that was subject to a dividends received credit. The Service argued that the dividends received credit was not allowed because the principal purpose of Corp's acquisition of control of Piggly Wiggly was to secure the benefit of the dividends received credit. The Tax Court disagreed. It held that although the principal purpose for the acquisition in this case was not federal income tax avoidance, section 269 was also not applicable because Corp's receipt of the credit was not dependent upon an acquisition of control of Piggly Wiggly:

> The dividends received credit claimed by petitioner in its 1944 return was in no sense dependent upon petitioner's acquisition of a controlling interest in the Piggly Wiggly corporation. Petitioner would have received dividends and would have been entitled to claim a dividends received credit proportionately as great from any number of shares less than an amount constituting a controlling interest. *Id.* At 417

The Tax Court also held that "[t]he word 'otherwise' [in Section 269(a)]can only be interpreted to mean that the deduction, credit, or other allowance, if it is to be disallowed, must stem from the acquired control."

*Cromwell* and *Commodores Point* together stand for the proposition that a determination of whether a taxpayer has secured a benefit that would not otherwise have been enjoyed necessarily requires two inquiries. First, an examination must be made of the alternatives available to the taxpayer to achieve his ends, and second, the facts of the case must be studied to determine whether the benefits derived "stem" from the acquisition of control of the corporation. If it is determined that other alternatives yield the same results, and/or the acquisition could have yielded the same results whether or not control of a corporation was acquired, section 269 does not apply. *See also, Zanesville Inv. Co. v. Comm.*, 335 F.2d 507 (6th Cir. 1964) (post-affiliation losses could not be denied under Section 269).

Principal Life could easily have sold its distressed Osprey securities itself and achieved entitlement to the same capital loss here at issue. Doing so, however, would have deprived it of the upside potential it felt was inherent in those securities. Similarly, Principal Life could have transferred the Osprey securities to an unrelated entity for a less than controlling interest in that entity, or various parties could have contributed different assets and caused a taxable transfer under section 351(e), thereby enabling Principal Life to obtain the same benefit without acquisition of control.

It is true, of course, that in such scenarios Principal Life would not have preserved for itself the upside potential it believed was inherent in the Osprey Securities, but preservation of that upside potential through acquisition of control of PIC was not a **tax** benefit, i.e., "a deduction, credit, or other allowance," within the meaning of Section 269. *Alinco Life Ins. Co. v. U.S.*, 373 F.2d 336 (Ct.Cl. 1967) (Section 269 could not be used to deny taxpayer the status of a life insurance company); *Cromwell Corp. v. Comm., supra* (the privilege of filing consolidated

returns was not a "deduction, credit, or other allowance" within the meaning of Section 269); *Nutt v. Comm.*, 39 T.C. 231 (1962), *acq.* 1964-2 C.B. 6 (corporation's existence, which IRS sought to disregard under Section 269, was not a "deduction, credit, or other allowance" within the meaning of that section); *Siegel v. Comm.*, 45 T.C. 566 (1966).

## CONCLUSION

For the foregoing reasons, Principal Life's claim for refund based on the capital loss that resulted from its sale in 2002 of the Class A preferred stock of PIC to Deutsche Bank should be allowed in full.

# TAB 22

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

CAPITAL LOSS ON REDEMPTION OF PREFERRED STOCK INVESTMENT IN PRINCIPAL INVESTORS CORPORATION

2003 - $21,634,009

This claim is filed as a protective claim for refund in the event the Service prevails on its position with respect to the capital loss claimed by Principal Life in 2002 as a result of its sale in that year of the Class A preferred stock of its subsidiary, Principal Investors Corporation, to Deutsch Bank.

**Statement of Facts.**

Many of the facts regarding Principal Investors Corporation ("PIC") are set forth in detail in the revenue agents report dated April 17, 2006 (p. 167), and in the narrative accompanying taxpayer's claim for refund for 2002 on the issue involving Principal Life, Deutsch Bank, and the Class A preferred stock of PIC referred to above. Such narrative, entitled "Capital Loss On Sale Of Principal Investors Class A Preferred Stock," as well as the facts set forth in the revenue agent's report, are incorporated herein by reference.

As noted in the revenue agent's report, the Class A and Class B preferred stock of PIC provided for accrual of quarterly dividends, and upon redemption of such shares such dividends were required to be paid in addition to the redemption price. By September 15, 2003, the accrued but unpaid dividends on both classes of such preferred stock totaled in excess of $5 million, most of which was attributable to accrued dividends on the Class B. On or about that date, through a contribution to the capital of PIC, Principal Financial Services, Inc., Principal Life's parent company, transferred $5 million to PIC to enable it to pay the accrued dividends as it proceeded with its decision to redeem its Class A and Class B preferred stock.

On or shortly after September 15, 2003, PIC redeemed both its Class A and Class B preferred stock for the redemption price of $100 per share plus the accrued dividends. Since the 25,000 shares of PIC's Class A preferred stock were then held by Deutsch Bank, Deutsch Bank was paid $2,875,000.[1] The Class B preferred stock of PIC, consisting of 225,375 shares, was all held by Principal Life, and on or about September 15, 2003, PIC paid to Principal Life the sum of $22,537,500 as the redemption price of $100 per share plus accrued dividends relating to such Class B preferred stock. As noted in the revenue agent's report (p. 172), Principal Life's basis in such Class B preferred stock was $22,537,500.

[1] As required by PIC's Articles of Incorporation, Deutsch Bank also received 25,000 shares of PIC common stock in connection with the redemption of its 25,000 shares of Class A preferred.

**Grounds for Refund Claim.**

The Service's position set forth in the revenue agent's report is that the sale of the PIC Class A preferred by Principal Life to Deutsch Bank in 2002 should be ignored or nullified because either (1) the transaction was in actuality only a loan to Principal Life by Deutsch Bank rather than a purchase of the stock by Deutsch Bank, or (2) PIC as an entity must be ignored as an "acquisition to avoid tax" under Section 269. If the Service prevails in its primary position, then the PIC Class A preferred stock must be considered to have remained owned by Principal Life rather than Deutsch Bank at the time such preferred stock was redeemed by PIC in 2003, and $2,418,827 of the redemption proceeds must be considered to have been constructively received by Principal Life and then paid by it to Deutsch Bank in repayment of the loan.[2]

Inasmuch as Principal Life's basis in the Class A preferred stock of PIC was $64,230,280 (as per the revenue agent's report, p. 172), Principal Life is therefore entitled to a 2003 capital loss attributable to the redemption of such stock in the amount of $61,811,454.

---

[2] Of the actual redemption proceeds paid to Deutsch Bank in the amount of $2,875,000, the excess over the $2,500,000 redemption price at $100 per share represented the accrued dividends on the Class A preferred stock that were retained by Deutsch Bank.

# TAB 23

PRINCIPAL LIFE INSURANCE COMPANY

CLAIM FOR REFUND

DIVIDEND AND RETURN OF CAPITAL FROM PRINCIPAL INVESTORS CORPORATION PROPERLY CHARACTERIZED AS INTERCOMPANY DIVIDEND AND NOT TAXABLE.

2003 - $1,774,828

**Grounds for Refund Claim.**

The Service's position set forth in the revenue agent's report is that the sale of the PIC Class A preferred by Principal Life to Deutsch Bank in 2002 should be ignored or nullified because either (1) the transaction was in actuality only a loan to Principal Life by Deutsch Bank rather than a purchase of the stock by Deutsch Bank, or (2) PIC as an entity must be ignored as an "acquisition to avoid tax" under Section 269. If the Service prevails in its primary position, then the PIC Class A preferred stock must be considered to have remained owned by Principal Life rather than Deutsch Bank at the time such preferred stock was redeemed by PIC in 2003, and $2,418,827 of the redemption proceeds must be considered to have been constructively received by Principal Life and then paid by it to Deutsch Bank in repayment of the loan.

If the primary argument of this refund claim does not ultimately succeed, such that Principal Life is denied a capital loss on either the sale of preferred stock to Deutsche Bank, or upon the complete redemption of the preferred stock by PIC, then the PIC entity must be considered to be ignored. In such event, the funds provided by PFSI which were used to redeem the preferred and pay the accrued dividend were only intercompany transfers of funds and be treated as either a capital contribution from PFSI or a dividend from a consolidated subsidiary, PIC.

In either event, the 'dividend' that PIC paid to Principal Life should not then be treated as a dividend in excess of basis and not be treated as income or capital gain income to Principal Life. Principal Life is entitled to a refund due to reduced capital gain of $5,070,938.

# TAB 24

PRINCIPAL LIFE INSURANCE COMPANY
TAX YEAR 2003
$247,247

**Penalty Abatement on Previously Taxed Income**

Taxpayer claims a refund based on removal of an accuracy-related penalty. On audit, the examining agent assessed an accuracy penalty on this transaction. For the reasons set forth below, the application of a penalty to this transaction is inappropriate, and the penalty should be abated.

**Facts**

Taxpayer and Charlton (Delaware), Inc. ("Charlton"), an affiliate of Bankers Trust Corporation ("Bankers Trust") and Deutsche Bank AG ("Deutsche Bank"), formed Whistling Pines on September 7, 2001. Taxpayer contributed $370 million in cash in exchange for the Class A Member interest (the "Class A Member") in Whistling Pines. Charlton contributed 100 percent of the stock of DB Warren Investments Limited ("Warren") and DB Rivington Investments Limited ("Rivington," and together with Warren, the "Cayman Entities"), each of which was a corporation incorporated in the Cayman Islands, in exchange for the Managing Member interest (the "Managing Member") in Whistling Pines. The total value of the stock of the Cayman Entities was $51,373,130.20. Taxpayer's investment in Whistling Pines was one of several investment transactions entered into by Taxpayer in 2001 in the ordinary course of its business.

As set forth in the Whistling Pines Operating Agreement (the "Operating Agreement"), the purpose of Whistling Pines was to acquire, manage, protect, conserve and sell or otherwise dispose of certain assets that Whistling Pines was permitted to hold under the Operating Agreement. Consistent with the provisions of the Operating Agreement, Whistling Pines invested $370 million in the class A common stock of Cedar Investment Co., a Delaware corporation ("Cedar"). Cedar in turn maintained a portfolio of assets that was consistent with certain investment guidelines set forth in its bylaws.

At the time that Charlton contributed the stock of the Cayman Entities to Whistling Pines, each of the Cayman Entities had earnings and profits that consisted in whole or in part of amounts that, for purposes of section 959(a), had previously been included in the gross income of a U.S. shareholder under section 951(a) ("PTI").

The Operating Agreement provided, in relevant part, that the profits of Whistling Pines would be allocated 99% to the Class A Member and 1% to the Managing Member until the Class A Member had received its priority return. Under the Operating Agreement, the Class A Member's priority return was equal to an amount that resulted in an after-tax yield on Class A Member's investment of 3.701 percent.

Whistling Pines received a distribution of $13,921,928 of PTI from the Cayman Entities during 2002. As such, Taxpayer reported the PTI on its tax return as previously taxed income.

**Law**

**A. Negligence or disregard of the rules or regulations**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Under section 6662(b)(1), if any portion of an underpayment is attributable to negligence or disregard of rules and regulations, the 20 percent penalty will be applied. Section 6662(c) defines negligence as any failure to make a reasonable attempt to comply with the provisions of the Title 26. Disregard includes careless, reckless, or intentional disregard. Pursuant to Treasury Regulation section 1.6662-(d), the penalty for negligence or disregard of the rules or regulations applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried, which portion is attributable to negligence or disregard of the rules or regulations in the year in which the carryback or carryover of the loss, deduction, or credit arises ("the loss or credit year").

The penalty for disregarding rules or regulations does not apply if the requirements to Treasury Regulation sections 1.6662-3(c)(1) and 1.6662-3(c)(2) are met.[1] Additionally, the penalty does not apply if the "reasonable cause and a good faith exception" as defined in section 1.6664-4. If the position is contrary to a revenue ruling or notice issued by the Internal Revenue Service, the penalty is not imposed if there is a realistic possibility of being sustained on its merits.

*1. Negligence*

Negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a return. Negligence also includes any failure by the taxpayer to keep adequate books and records to substantiate items. Negligence is strongly indicated where the taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion which would seem to a reasonable and prudent person "too good to be true" under the circumstances.[2]

*2. Disregard*

Disregard of the rules and regulations includes any careless, reckless or intentional disregard of the rules or regulations. Rules and regulations include the provisions of the Internal Revenue Code, temporary or final regulations, and revenue rulings and notices issued by the Internal Revenue Service. A disregard of the rules and regulations is

---

[1] Note that if negligence is asserted, a reasonable basis and disclosure do not preclude the imposition of the penalty.
[2] Treas. Reg. section 1.6662-(b)(1)(ii).

"careless" if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.[3]

A disregard is "reckless" if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances that demonstrate a substantial deviation form the standard of conduct that a reasonable person would observe. A disregard is intentional if the taxpayer knows of the rule or regulation that is disregarded. A taxpayer who takes a position contrary to a revenue ruling or notice has not disregarded the ruling or notice is the contrary position has a realistic probability of being sustained on its merits.[4]

**Analysis**

*1. Negligence*

In applying the accuracy penalty, the Service implied that the Taxpayer had been negligent because Taxpayer "should have known" that the deal was "too good to be true." Case law interpreting negligence concentrates, among other things, on whether the party in question the party sought legal and whether the taxpayer and/or the taxpayer's advisors had any experience in making similar investments. *Charfoos v. Commissioner of Internal Revenue*, T.C. Memo 1991-292; *Reali v. Commissioner*, T.C. Memo 1984-427; *Kozlowskiv. Commissioner*, T.C. Memo 1993-430.

In entering this transaction, the Taxpayer carefully and thoroughly considered all legal, economic, business and tax factors involved in this investment. The Taxpayer assembled a team of employees with considerable experience in investment transactions to review the business, legal and tax risks of the proposed transaction before engaging in it. The team provided its analysis to Taxpayer's Investment Committee before engaging in the transaction and the transaction was approved by the Investment Committee. Because the Taxpayer concluded the law was quite clear, it did not request a formal tax opinion from outside counsel.

The Service cites *Nicole Rose Corp v. Commissioner*, 320 F.3d 282 (2d Cir 2003) for the proposition that sophisticated taxpayers cannot rely on experts to avoid the imposition of an accuracy related penalty. However, in that case, the court held that there was no business purpose or economic substance to the transaction.

In contrast, the Taxpayer's business purpose was to routinely make investments to support its insurance business. The investment also had economic substance because each party bore the risks and benefits of the transaction that could result in a meaningful change in Taxpayer's economic position.

---

[3] Treas. Reg. section 1.6662-(b)(2).
[4] Treas. Reg. section 1.6662-4(b)(2).
[6] T.C. Memo 2004-179.

*a. Maintenance of records*

Additionally, the Taxpayer has maintained adequate books and records to substantiate items. In *Westby v. Commissioner*,[6] the Service asserted negligence penalties for failure to keep adequate records despite requesting and receiving records on several different occasions. The Service argued the records were inadequate because the taxpayer did not maintain formal books of account such as a general ledger or a cash receipts and disbursements journal. The court found that the taxpayer had maintained voluminous records, as demonstrated at trial.

Here, the Taxpayer maintains an extensive accounting system, including a general ledger. Maintaining these books is another indicia that the Taxpayer has not acted negligently.

*2. Reasonable basis defense*

In accordance with Treasury Regulation section 1.6662-3(b), a return position that has a reasonable basis is not attributable to negligence. This standard is a relatively high standard. It is significantly higher than not frivolous or not patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[7] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[8] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[9] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[10]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, congressional intent, and guidance issued by the Service. The Taxpayer also relied upon an experienced team of employees. As a result of this thorough internal analysis, Taxpayer concluded that the law was quite clear. As stated in the regulations, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied. Here, the standard is met because the return position was based on a reasoned analysis of the law, which indicated that the return position was correct.

*3. Disclosure defense to disregard of the rules or regulations*

---

[7] Treas. Reg. section 1.6662-4(b)(3).
[8] Treas. Reg. section 1.6662-4(d)(3)(iii).
[9] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[10] Treas. Reg. section 1.6662-4(d)(3)(ii).

Treasury Regulation section 1.6662-3(c)(1) provides that the penalty for negligence or disregard of the rules cannot be imposed on an understatement that is attributable to a position contrary to a rule or regulation if the position is disclosed in accordance with the regulations. The penalty for disregarding rules and regulations is not imposed on any portion of an underpayment that is attributable to a position contrary to a rule or regulation if the position is adequately disclosed pursuant to the requirements of Treasury Regulation section 1.6662-3(c)(2). Disclosure is adequate under section 1.6662-3(c)(2) if a properly completed Form 8275 is filed.[11]

Taxpayer concluded that the law was clear and did not file Form 8275. On its 2000 and 2001 returns, the Taxpayer prominently stated that it had received "Previously Taxed Income." This statement was a separate line item on Line 7 of Schedule M-1.[12] Upon audit of these returns, the Taxpayer cooperated with the Service and provided all of the relevant documents in their possession, other than documents protected from disclosure by the attorney-client privilege or attorney work-product doctrine. Because the Taxpayer did not attempt to bury the adjustment and because the Taxpayer complied with the Service's document request supporting this adjustment, it is unfair to assert a penalty merely because the Taxpayer did not attach a particular form to its return.

*4. Reasonable cause and good faith defense*

Section 6664(c)(1) provides that no penalty may be imposed upon a showing that there was reasonable cause and taxpayer acted in good faith. "Reasonable cause and good faith" is determined on a case-by-case basis, taking into account all the pertinent facts and circumstances. Generally, the most important factor is the taxpayer's effort to assess the proper tax liability.

A taxpayer's reliance on an opinion may indicate reasonable reliance in good faith. In determining whether a taxpayer has relied in good faith on advice, all the facts and circumstances must be taken into account. Reliance may not be in good faith if the taxpayer knew or should have known that the advisor lacked knowledge of relevant aspects of tax law. Factors used to determine if the taxpayer acted in good faith include the following:

1. The advice must be based on all pertinent facts and circumstances, including the purpose of the transaction or structure of the transaction.

2. The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on the representations, statements, findings or agreements of the taxpayer or any other person.[13]

---

[11] A taxpayer cannot rely on the annual revenue procedure for purposes of negligence portion of the negligence or disregard of the rules or regulations penalty.
[12] In 1999, this item was reported in another line item noted as Income from JVs.
[13] Treas. Reg. section 1.6664-2(c).

In this case, the Taxpayer relied on its team of experienced employees who reviewed the Code, regulations, case law, and Internal Revenue Service guidance. The internal review was not based upon unreasonable factual or legal assumptions or on unreasonable representations, statements, findings, or agreements of the taxpayer and any other person. Because the Taxpayer thought the law regarding the transaction was quite clear, it did not seek a formal, written opinion. On its face, the regulation does not require a written opinion. After a careful and thorough analysis of all the business and tax factors, Taxpayer concluded that the transaction met not only its investment strategy but complied with the law. Accordingly, the Taxpayer had reasonable cause to and acted in good faith in entering the transaction.

*5. Tax shelter items*

Pursuant to Treasury Regulation section 1.6662-4(g)(2)(iv), a corporate taxpayer determines whether the reasonable cause and good faith exception to the substantial understatement penalty applies in accordance with Treasury Regulation section 1.6664-4(e). The determination is based on all pertinent facts and circumstances. A corporation's legal justification may be taken into account in establishing that a corporation acted with reasonable cause and in good faith if certain minimum requirements are met. A failure to satisfy the minimum requirements precludes a finding of reasonable cause and good faith.

The minimum requirements are that there must be substantial authority for the tax treatment of the item and the corporation must have reasonably believed at the time the return was filed that the tax treatment was more likely than not the proper treatment. A corporation is considered to have reasonably believed the tax treatment was more likely than not the proper treatment if:

1. the corporation analyzes the pertinent facts and authorities and reasonably concludes in good faith that there is a greater than 50% likelihood that the treatment will be upheld if challenged, or

2. the corporation reasonably relies in good faith on the opinion of a professional tax advisor if the opinion is based on the advisor's analysis of the pertinent facts and authorities and unambiguously states that the tax advisor concludes that there is a greater than 50% chance the item will be upheld if challenged.[14]

Here, assuming arguendo that the transaction was a tax shelter, it was concluded that there is a greater than 50 percent the taxpayer will prevail. While it is true that the Taxpayer did not seek a written opinion, the regulation does not require a written opinion. To the contrary, the regulation provides that a corporation acts in good faith if the corporation relies on an advisor's opinion as long as the opinion is based on the pertinent facts and authorities and the advisor concludes that there is more than a 50 percent chance the position will be upheld. Here, Taxpayer's experienced team of

[14] Treas. Reg. section 1.6664-4(e)(2).

employees considered all of the factors carefully and as a result of this internal analysis concluded that there was a more than 50% chance of the position being upheld.

Nor can it be contended, either for purposes of the negligence penalty under section 6662(c) or the substantial understatement penalty under section 6662(d), that a significant purpose of the overall plan or entity was avoidance or evasion of federal income taxes within the meaning of section 6662(d)(2)(C)(ii) or Treasury Regulation section 1.6662-4(g)(2). Taxpayer's core business is to invest the funds it receives from customers in order to provide sufficient returns to cover the liabilities (promises) created by the products it sells. It is subject to regulatory action (e.g., penalties) if its investment policies and procedures do not provide for adequate returns. Consistent with this core aspect of its business operations, Taxpayer entered into this transaction to earn an enhanced yield that compared favorably with other short-term risk-adjusted investments. The enhanced yield was commensurate with the greater risks arising from the more complex, illiquid partnership structure. Taxpayer viewed its investment as being similar to an investment in an asset-backed security, which allows investors to maintain spreads while improving the credit quality of their investment. Likewise, the pool of taxable and tax-exempt assets held by the entity permitted Taxpayer to earn a yield comparable to BBB corporate securities while the structure raised the credit quality of the investment to the AA level. Taxpayer's purpose, therefore, was to realize the economic objective of earning an overall BBB yield over the two-year term of the partnership investment but with a higher overall credit quality estimated at AA-. The significance of the tax-exempt characteristic of the previously taxed income, therefore, was not that it avoided federal income tax, but that it increased the Taxpayer's yield on the investment. Moreover, availing oneself of the tax benefits provided by the Internal Revenue Code, such as the previously taxed income benefit provided by section 959, in a manner consistent with the statute and Congressional purpose does not constitute a tax avoidance purpose.[15]

*6. Realistic possibility of being sustained on its merits defense*

Pursuant to Treasury Regulation 1.6694-(2)(b), a position is considered to have a realistic possibility of being sustained on the merits if a reasonable and well-informed analysis by a person knowledgeable in tax law would lead such a person to conclude that the position has approximately a one in three, or greater, chance of being sustained on its merits. The standards used to make this determination are the standards used to determine whether substantial authority exists for purposes of the substantial underpayment penalty.[16]

The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[17] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of

[15] Treas. Reg. §1.6662-4(g)(2)(ii).
[16] Treas. Reg. section 1.6694-2(b)(1), (2).
[17] Treas. Reg. section 1.6662-4(d)(3)(iii).

appeal.[18] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[19]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the realistic possibility standard is generally satisfied. Although there may be different interpretations of guidance, a well-reasoned construction of the applicable provisions also establishes a realistic possibility standard for the position taken.

Here, the Taxpayer and the Service disagree on the treatment of the investment transaction, but that disagreement does not automatically nullify the efforts the Taxpayer undertook to analyze the transaction. Nor does it render the analysis unreasonable. Because the Taxpayer has met the requirements for having a reasonable basis for its position, has shown reasonable cause and that it acted in good faith, and has substantial authority for its position, the Taxpayer has shown it has a realistic possibility of being sustained on the merits.

**Law**

**B. Substantial understatement penalty**

Section 6662(a) imposes a tax equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(2) provides a substantial understatement of income tax results in the 20 percent penalty. A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Section 6662(d)(2)(B) allows a reduction of the amount understated for items (i) for which there is or was substantial authority for such treatment or (ii) that are adequately disclosed and for which a reasonable basis for the tax treatment exists. This reduction is not allowed, however, to any item of a corporation that is attributable to a tax shelter. A tax shelter is defined as a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement if a significant purpose is the avoidance or evasion of Federal income tax.[20]

The penalty for a substantial understatement applies to any portion of an underpayment for a year to which a loss, deduction, or credit is carried that is attributable to a "tainted item" for the year in which the carryback of the loss, deduction, or credit arises. The determination of whether an understatement is substantial for a carryback year is made with respect to the return of the carryback year. Tainted items are those for which there is neither substantial authority nor adequate disclosure with respect to the loss or credit year.[21] In the case of a tax shelter item, a tainted item is any item for which there is not

---

[18] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[19] Treas. Reg. section 1.6662-4(d)(3)(ii).
[20] IRC section 6662(2)(C).
[21] Treas. Reg. section 1.6662-4(c).

both substantial authority and a reasonable belief that the tax treatment is more likely than not the proper treatment.[22]

**Analysis**

*1. Substantial authority defense*

The "substantial authority" standard is an objective standard. This standard is less stringent than "more likely than not" (i.e., greater than 50 percent chance of succeeding in litigation) but stricter than the "reasonable basis" standard.[23] To determine whether substantial authority exists, the authorities must be examined. The weight of the authorities supporting the treatment must be substantial in relation to the authorities supporting a contrary position. Substantial authority is measured at the time the return is filed or on the last day of the taxable year to which the return relates.[24]

Among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance constitute substantial authority.[25] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[26] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[27]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. Substantial authority for the transaction exists.

*2. Adequate disclosure and reasonable basis defense*

*a. Adequate disclosure*

Pursuant to Treasury Regulation sections 1.6662-4(e) and (f), disclosure is adequate if made on Form 8275 or Form 8275-R or in accordance with an annual revenue procedure. Revenue Procedure 2001-52[28] applies to tax returns filed on the 2001 tax form and addresses M-1 items. Additional disclosure of facts relevant to, or positions taken with respect to M-1 items is unnecessary provided that

1. the amount of the deviation from the financial books and records is not the result of a computation that includes the netting of items, and

---

[22] Treas. Reg. section 1.6662-4(c)(3).
[23] Treas. Reg. section 1.6662-4(d)(2).
[24] Treas. Reg. section 1.6662-4(d)(3)(iv)(C).
[25] Treas. Reg. section 1.6662-4(d)(3)(iii).
[26] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).
[27] Treas. Reg. section 1.6662-4(d)(3)(ii).
[28] Revenue Procedures 99-41, I.R.B. 1999-46 and 2001-11, 2001-1 C.B. 275 apply to tax years 1999 and 2000, respectively.

2. the information provided reasonably may be expected to apprise the Service of the nature of the potential controversy concerning the tax treatment of the item.[29]

Additionally, forms and attachments must be completed in a clear manner and in accordance with their instructions. Amounts entered on forms must be verifiable.

As stated above, the Taxpayer did not file Form 8275 or 8275-R because it did not conclude that the investment transaction was contrary to any rule or regulation. However, the Taxpayer did report a separate M-1 item.[30] The item was reported in tax years 2000 and 2001 as "Previously Taxed Income" on line 7 of Schedule M-1. This adjustment is not the result of netting.

The seminal case establishing the standard to measure whether an item was adequately disclosed is *Schirmer v. Commissioner*.[31] The *Schirmer* case is one of many hobby loss cases. In *Schirmer*, the taxpayer was a mechanical engineer who also owned a farm. The issue before the court was whether the farming activity was entered into for profit. The court held that the farm was a hobby activity. The taxpayer reported the farm's income and expenses on Schedule F and filed Form 4562 for depreciation and amortization deductions.

The court found that the inclusion of the schedules with the return did not constitute adequate disclosure. The information provided "was insufficient to enable respondent to identify the potential controversy involved here, that is whether petitioner engaged in the activity for profit."

None of the cases concluding that the disclosure was adequate directly address an M-1 adjustment. Instead, the cases deal with forms or statements attached to the return.[32]

---

[29] Section 4.01 of (3) Rev. Proc. 2001-52, I.R.B. 2001-46

[30] The Taxpayer reported the M-1 adjustment as a separate line item in years 2000 and 2001. In 1999, the Taxpayer had not received a distribution from the LLC. However, income had been accrued for statutory purposes, and a resulting M-1 adjustment was made. The adjustment was not separately itemized. However because the Taxpayer has substantial authority for its position, the substantial understatement penalty should not apply to tax year 1999.

[31] 89 T.C. 277 (1987).

[32] See *Elliot v. Commissioner*, 73 T.C.M. 3197 (1997) (adequate disclosure where taxpayer attached Form 8275 claiming deduction under section 1244 but abandons that position to deduct the losses as bad debts); *Henry v. Commissioner*, 73 T.C.M. 1769 (1997) (attaching a statement indicating options with a zero basis was adequate to apprise the Service of the issue of proper reporting as long term capital gain); *Dibsy v. Commissioner*, 70 T.C.M. 918 (1995) (reporting business income from a liquor store on Schedule C and a "transaction involving the same liquor store which produced zero capital gain as reported on Schedule D" was adequate to alert the Service to identify the controversy -- whether the taxpayers engaged in a tax free exchange under section 1031); *Mayhew v. Commissioner*, 63 T.C.M. 1984 (1992) (adequate disclosure was found where the taxpayer reported a capital gain resulting from the sale of a partnership interest even though the court held the income to be ordinary); *Rebecca K. Crown Income Charitable Fund v. Commissioner*, 98 T.C. 327 (1992) (filing Forms 5227, 1041-A, and 1041 adequately disclosed that the trust was structured as a charitable lead trust, that an annual annuity of $975,000 was required to be paid, and that the trust claimed charitable deductions in excess of the annual annuity amount, putting the Service

Here, however, the M-1 adjustment was clearly set out as a separate line item, including which company in the affiliated group earned the income. The adjustment was clearly identified as "Previously Taxed Income." This should be considered more than enough to "to identify the potential controversy involved," i.e. whether the income was previously taxed income and therefore excludable from taxable income.

*b. Reasonable basis*

In accordance with Treasury Regulation section 1.6662-4(e)(2), disclosure is only effective in relation to the understatement penalty where there is also a reasonable basis, as defined in Treasury Regulation section 1.6662-3(b)(3). In accordance with Treasury Regulation section 1.6662-3(b)(3), this standard is a relatively low standard. It is significantly higher than frivolous or patently improper. It is not satisfied by a position that is merely arguable or merely a colorable claim. If a return position is based on one or more of the authorities used in determining the existence of substantial authority, the position will generally satisfy the reasonable basis standard.[33] The authorities used in determining substantial authority include, among other items, applicable provisions of the Internal Revenue Code, proposed, temporary or final regulations, court cases, congressional intent, and IRS guidance.[34] Generally speaking, court cases are not taken into account unless the treatment is supported by controlling precedent of a United States Court of Appeals to which the taxpayer has a right of appeal.[35] Substantial authority can also exist for a position that is supported only by a well-reasoned construction of the applicable provision.[36]

In analyzing the investment transaction, the Taxpayer relied on provisions of the Internal Revenue Code, regulations under the Code, court cases, congressional intent, and guidance issued by the Service. As stated in the regulation, if a return position is based one or more allowable authorities, the reasonable basis standard is generally satisfied, and the understatement penalty should not apply. The Taxpayers adequately disclosed the item's tax treatment in the tax returns filed for the years in question, and there was a reasonable basis for the tax treatment of this item by the Taxpayers.

3. *Understatement Insufficient to Warrant Penalty*

As provided in section 6662(d)(1)(B), for there to be a substantial understatement of tax, the amount by which the tax is understated must exceed the lesser of (i) 10% of the tax required to be shown on the return, or (ii) $10,000. After reduction of the understatement

---

on notice that the claimed deductions might exceed the amounts paid to charitable beneficiaries under the terms of the trust agreement for purposes of section 642(c)); *Zermeno v. Commissioner*, 62 T.C.M. 1155 (1991) (statement explaining interest income was not effectively connected income was adequate); *Pinson v. Commissioner*, 59 T.C.M. 554 (1990) (adequate disclosure where statement disclosing underlying facts and other documents outlining their legal position and pursuit of civil recourse was sufficient for a theft loss deduction).

[33] Treas. Reg. section 1.6662-4(b)(3).

[34] Treas. Reg. section 1.6662-4(d)(3)(iii).

[35] Treas. Reg. section 1.6662-4(d)(3)(iv)(B).

[36] Treas. Reg. section 1.6662-4(d)(3)(ii).

for any taxable year by the portion attributable to an item for which there was substantial authority and for any item that was adequately disclosed and for which there was a reasonable basis, the remaining portion of such understatement does not exceed the lesser of 10% of the tax or $10,000. Therefore, such remaining portion is not "substantial" within the meaning of section 6662(d)(1)(B) and imposition of the accuracy-related penalty of section 6662(a) by virtue of section 6661(b)(2) is not justified.

In conclusion, all of the facts and circumstances demonstrate that the Taxpayers have met the requirements for a complete reduction of the amount of any claimed understatement attributable to the investment transaction. For the reasons stated above, no penalty should be assessed against the Taxpayers.